**FILED**

April 4, 2019

Jeanne A. Naughton, Clerk
United States Bankruptcy Court
Newark, NJ
By: /s/ Juan Filgueiras, Courtroom Deputy

| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
| --- | --- |
| In re:<br><br>THE MALL AT THE GALAXY, INC.,<br><br>Debtor. | Case No.:    10-12435 VFP<br><br>Chapter    7 |
| STEVEN P. KARTZMAN, as Chapter 7 Trustee,<br><br>Plaintiff,<br>v.<br>LATOC, INC.,<br><br>Defendant. | Adv. Pro. No.:  12-1769 VFP |

## TRIAL OPINION

### APPEARANCES

MELLINGER, SANDERS & KARTZMAN, LLC
101 Gibraltar Drive, Ste. 2F
Morris Plains, NJ  07950
Joseph R. Zapata, Jr., Esq.
Attorneys for Steven P. Kartzman, Chapter 7 Trustee/Plaintiff

PETER A. OUDA, ESQ.
19 North Bridge Street
Somerville, NJ  08876
Attorney for Defendant, Latoc, Inc.

**VINCENT F. PAPALIA, Bankruptcy Judge**

### I.      INTRODUCTION

This matter is before the Court following a three-day trial on August 2, 2017, August 4, 2017 and again on February 28, 2018, after certain *in limine* motions were made that required briefing by the parties and a delay of the trial.[1]  In this adversary proceeding, the Chapter 7 Trustee (the "Trustee") of the Debtor, The Mall at the Galaxy, Inc. (the "Debtor"), seeks to avoid as constructively fraudulent transfers: (i) a promissory note (the "Note" or "Latoc Note") in the amount of $2 million from the Debtor to defendant Latoc, Inc. ("Latoc") or ("Defendant"); and (ii) payments in the amount of $592,875 by the Debtor to Latoc on account of the Note (the "Prepetition Transfers").

For the reasons set forth below, the Court finds that the Debtor's Prepetition Transfers to the Defendant were constructively fraudulent because the Debtor did not receive reasonably equivalent value for the transfers and the Debtor was insolvent at the time of each of the transfers under at least two of the three recognized tests for insolvency.  Therefore, pursuant to 11 U.S.C. §§ 544, 548 and 550, the avoided Prepetition Transfers may be recovered by the Chapter 7 Trustee for the benefit of the estate.

### II.      JURISDICTIONAL STATEMENT

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court on July 10, 1984 and amended on September 18, 2012.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F) and (O).

---

[1]The Transcripts referenced throughout this Opinion are defined in the following manner:
(Trial Tr. vol. 1, Aug. 2, 2017, Dkt. No. 128.)
(Trial Tr. vol. 2, Aug. 4, 2017, Dkt. No. 129.)
(Trial Tr. vol. 3, Feb. 28, 2018, Dkt. No. 130.)

Venue is proper in this Court under 28 U.S.C. § 1408.  The Court issues the following findings of

fact and conclusions of law pursuant to FED. R. BANKR. P. 7052. To the extent that any of the

findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the

extent that any conclusions of law constitute findings of fact, they are adopted as such.

## III.    STATEMENT OF FACTS

### A. Overview of Debtor's Business

At the time of its bankruptcy filing, the Debtor was owner of approximately 105,000 square

feet of commercial and retail space, 76,321 of which was leasable (the "Property"), contiguous to

three large residential condominium towers (1,075 units) in Guttenberg, New Jersey.  The Debtor

was at the time owned by Martin Sergi (90%) and Dennis Squitieri (10%).[2] From 1986, Sergi was

the President, Treasurer and a board member of the Debtor.[3] In addition to these substantial roles,

Mr. Sergi oversaw much of the Debtor's day-to-day operations and finances.[4]

The Debtor had two alleged subsidiaries, PermaLife Internet, LLC (with a purported 20%

equity interest) ("PermaLife Internet") and Piedmont Rubber Recycling, LLC (with a purported

100% equity interest) ("PRR").[5]  Sergi also owned a substantial interest in a related PermaLife

entity called PermaLife Products, Inc., which was the parent company of seven other related

entities (including PermaLife Internet).[6]

No competent proofs were provided of the Debtor's alleged interest in PermaLife Internet

or PRR, including evidence of ownership, such as shares or membership interests, or the precise

amounts owned, when the interests were acquired and for what consideration.  Thus, in a prior

---

[2] (Jt. Stip. of Undisputed Facts ¶ 2, Dkt. No. 107.)
[3] (Sergi Aff., Ex. D to Ouda's Aff. ¶ 1, Dkt. No. 84-5.)
[4] (Jt. Stip. ¶¶ 2-4, Dkt. No. 107.)
[5] (Jt. Stip. ¶ 3, Dkt. No. 107.)
[6] (Jt. Stip. ¶ 4, Dkt. No. 107; DeGraw Certif., Ex. A. at 5, Dkt. No. 95-4.)

decision on a partial summary judgment motion by the Trustee, the Court determined that Latoc had not provided sufficient evidence to support its ownership claims as to PermaLife Internet or PRR.[7]

In 2008, the Debtor determined to convert its space to 32 separate condominium units and sought to sell them to existing tenants and third parties.[8] After the conversion, the Debtor was able to sell only 19 of the 32 new units, 18 of which went to existing tenants.[9] The gross proceeds from these sales were approximately $6 million between May 2008 and August 2009.[10] The Debtor was not able to sell any of the remaining 13 units before it filed for bankruptcy in January 2010.[11]

### B. The Financial and Other Issues Facing the Debtor, Including GTCA Obligations

In 2008, the Galaxy Towers Condominium Association ("GTCA") was the homeowner's association for the entire complex, both residential and commercial. As the condominium's association, the GTCA imposed common charges on the Debtor of approximately $35,000 a month or $420,000 annually.[12] In 2005, Sergi wrote a letter to the Board of the GTCA, describing in detail the many serious issues that confronted the Debtor and outlining potential resolutions.[13] The letter included financial statements covering the 2003-05 period to support Mr. Sergi's statements about the declining financial and physical condition of the Debtor and its property and how the Debtor's rental income was insufficient to cover expenses.[14]

One critical financial issue the Debtor faced at the time was the loss of its theater, its largest tenant, in 2005.[15] Another was the lack of revenue, capital or other funding necessary to pay for

---

[7] (SJ Hr'g Tr. (Excerpt) 19:3-2:17, Jan. 10, 2017; Order Granting Partial SJ, Dkt. No. 90.)
[8] (Jt. Stip. ¶¶ 16-17, 24, Dkt. No. 107.)
[9] (Jt. Stip. ¶ 24, Dkt. No. 107; Pl.'s Findings ¶ 120, Dkt. No. 138.)
[10] (Jt. Stip. ¶ 25, Dkt. No. 107.)
[11] (Pl.'s Findings ¶ 105, Dkt. No. 138.)
[12] (Pl.'s Findings ¶ 11, 12,,. Dkt. No. 138.)
[13] (P-5; Jt. Stip. ¶¶ 18-20; Trial Tr. vol. 2, 4:1-11.)
[14] (P-5; Jt. Stip. ¶¶ 18-20; Trial Tr. vol. 2, 4:12-9:19.)
[15] (P-5; Jt. Stip. ¶¶ 18-20; Trial Tr. vol. 2, 9:22-10:5.)

badly needed repairs and capital improvements.[16]   Mr. Sergi also accurately forecast that without

additional funding and relief from the GTCA, the Debtor could not continue to survive.

Recognizing these formidable issues, Mr. Sergi suggested that one of the options the Debtor should

consider was to grant a deed-in-lieu of foreclosure to its then-current lender.[17]   Thus, there is no

doubt that in 2005, and likely well before then, Mr. Sergi knew that the Debtor's financial situation

was in a critical state.[18]

As the Debtor faced these challenges, it failed to pay the GTCA for common charges and

was often behind in other obligations. In 2007, the GTCA sued the Debtor for failure to pay the

outstanding dues and obtained a judgment against the Debtor in the amount of $631,089.22.[19]   In

2008, the Debtor entered into a settlement agreement and paid the GTCA $706,599.35,

representing unpaid dues as well as other charges.[20] As part of that settlement agreement, the

GTCA allowed the Debtor to convert its space to 32 condominium units.[21]   Approximately $4.4

million of loan proceeds from Valley National Bank were used to pay the GTCA settlement

amount and an existing first mortgage on the Property of approximately $3.6 million (with related

closing costs). [22]   The balance of the Valley loan proceeds was to finance construction related to

the conversion of the units.[23]

**C.  The Latoc Note**

**1.  The Intertwined Relationships Giving Rise to the Latoc Loan**

A description of the circumstances giving rise to the loan from the Debtor to Latoc (the

---

[16] (Pl.'s Findings ¶¶ 51-52, Dkt. No. 138; P-5.)  Unless otherwise indicated, when this Opinion cites to Plaintiff's Post-Trial Findings of Fact, they have been admitted or not disputed by Latoc.

[17] (*Id.* at ¶ 56.)

[18] (*Id.* at ¶¶ 54-56.)

[19] (Jt. Stip. ¶ 18, Dkt. No. 107.)

[20] (*Id.*)

[21] (*Id.* and ¶ 24.)

[22] (*Id.* at ¶ 23; P-26, Valley Nat'l Bank Loan Closing Statement.)

[23] (*Id.* at ¶ 23; P-26.)

"Latoc Loan") requires a review of the relationships between and among Mr. Sergi, Latoc, the Attars (as defined below) and various "PermaLife" entities.    Mr. Sergi was involved in various business transactions with Dibo Attar ("D. Attar") and Raffaele (Raffi) Attar ("R. Attar") and together (the "Attars"), relating to PermaLife Products, Inc. ("PLPI") and affiliated entities (the "PermaLife Entities").[24] D. Attar and R. Attar are father and son.[25] R. Attar was the President of the Defendant, Latoc, Inc., and the Attars and Mr. Sergi directly or indirectly owned interests in various PermaLife Entities.[26]    The numerous and intertwined interrelationships between and among the Debtor, Latoc, the PermaLife Entities and the Attars are also described in R. Attar's Declaration submitted in the bankruptcy cases of the Debtor and various PermaLife Entities in an effort to explain those relationships, including the Attars' involvement with Better Half Bloodstock, Inc. ("BHB").[27]

In 2007, PLPI needed funding and sought financial help from the Attars, who held direct and indirect equity interests in the various PermaLife Entities.[28]  A loan from BHB to PermaLife was proposed.  However, because of R. Attar's roles as equity holder and director of PermaLife and as a principal of BHB, the proposed lender, PermaLife's board refused to authorize the borrowing from BHB.[29]  To work around this conflict, Mr. Sergi and the Attars turned to the Debtor and Latoc to effectuate the loans to the PermaLife Entities through the Debtor.  Accordingly, Latoc and the Debtor entered into the $2 million Latoc Loan transaction by which the loan proceeds were initially provided to the Debtor, but then were immediately transferred to various PermaLife Entities.[30]  The Court finds that the Latoc Loan was made based upon -- and would not have been

---

[24] (Sergi Aff. ¶¶ 6-10, Dkt. No. 84-5.)
[25] (*Id.* at ¶ 6.)
[26] (*Id.* at ¶¶ 5-10; see also DeGraw Certif. Ex. C, PermaLife Products, Inc. Organizational Chart, Dkt. No. 95-4.)
[27] (R. Attar Decl. ¶¶ 1-8, Dkt. No. 85 in Main Case; see also Sergi Aff. ¶¶ 5-10, Dkt. No. 84-5.)
[28] (Sergi Aff. ¶¶ 11-13, Dkt. No. 84-5.)
[29] (Sergi Aff. ¶¶ 6-13, Dkt. 84-5; R. Attar Decl. ¶¶ 1-3, 5-7, Dkt. No. 85 in Main Case; Jt. Stip. ¶ 6, Dkt. No. 107.)
[30] (Sergi Aff. ¶¶ 12, 13, Dkt. 84-5; Trial Tr. vol. 1, 25:22-26:4.)

made without -- the intertwined business relationships between and among Mr. Sergi, the Attars, the Debtor, Latoc and the PermaLife Entities.  Put simply, the Latoc Loan transaction made no sense from the Debtor's point of view, as it provided no benefit to the Debtor -- even though it was taking on a $2 million obligation.

## 2.  The Terms of the Latoc Note

To evidence the Latoc Loan, on November 15, 2007, a Subordinated Promissory Note in the amount of $2 million (the "Latoc Note" or the "Note") was executed on behalf of the Debtor.[31] The Latoc Note provided that the principal amount was due twelve months after the date of issue with a possible one-year extension.  Interest accrued at a rate of 10% per annum, with additional interest to be paid to Latoc based on 20% of proceeds of sale of any unit sold by the Debtor so long as the Latoc Note was outstanding.[32] Interest was payable monthly, in arrears, on the last day of each month.[33]  Additionally, according to a separate October 27, 2008 Letter Agreement between the Debtor and the Defendant, the Debtor could not, without express written consent of Latoc, further encumber or mortgage the Mall Property and was required to transfer to Latoc the net proceeds from the Debtor's tax refund.[34]

Advances on the Latoc Note began on October 16, 2007 (prior to the Note's execution on November 15) and continued until December of 2008.[35]  However, the bulk of the advances (approximately $1.9 million) were made in the short period from October 2007 to January 2008.[36] As noted previously, all or virtually all the advances were immediately transferred to or for the

---

[31] (Jt. Stip. ¶ 5, Dkt. No. 107.)
[32] (Jt. Stip. ¶ 5, Dkt. No. 107; Trial Tr. vol. 1, 123:7-12; see Latoc Proof of Claim (P-3), which attached a copy of the Latoc Note.)
[33] (P-3, Latoc Proof of Claim.)
[34] (P-30; Trial Tr. vol. 1, 144:17-145:11.)
[35] (P-3, Latoc Proof of Claim, Sch. of advances, accruals and payments.)
[36] (*Id.*)

benefit of PermaLife and other related entities.[37]  When taken as a whole, the Debtor transferred

the loan proceeds it received from Latoc (approximately $2 million), as well as additional capital

of its own, to the PermaLife Entities which exceeded the total amount of the Latoc advances.[38]

Although it did not receive the proceeds of the Latoc Note, the Debtor made a total of

$592,875.03 in payments to the Defendant Latoc between February 19, 2008 and September 23,

2009 (previously defined as the "Prepetition Transfers").[39] These sporadic payments often

coincided with the sale of condominium units, and were also made when the Debtor received its

recovery on a real estate tax appeal.[40]  In other words, the Debtor did not receive the benefit of the

Latoc Loan, but paid Latoc back with the Debtor's assets.

Despite the terms of the Latoc Note, no interest payment was made until a partial one on

February 2008, and there were only two months during the entire payment period when regular

interest was fully paid up (in January and February 2009).[41] Additionally, although the Latoc Note

specified that Latoc would receive additional interest in the form of 20% of the proceeds from unit

sales during the life of the Note, no "additional interest" was paid at any time.[42] Nor was the Latoc

Note paid on its due date of one year after issuance or the potentially extended due date a year

later.  In sum, from its inception, the Debtor was unable to pay the Latoc Note as it came due.[43]

Ultimately, Latoc filed a Proof of Claim in the Debtor's case for $1,828,123.67.[44]

---

[37] (Jt. Stip. ¶ 6, Dkt. No. 107.)
[38] (*Id.*)
[39] (P-3, Latoc Proof of Claim.)  No evidence was provided by Latoc that the payments from the Debtor were funded by PermaLife (or anyone else).  To the contrary, the parties stipulated that payments to Latoc from the Debtor coincided generally with sales of units and the Debtor's tax appeal recovery.  (Jt. Stip. ¶ 7, Dkt. No. 107.)
[40] (Trial Tr. vol. 1, 131:14-15; 144:22-25).
[41] (Trial Tr. vol. 1, 126:2-133:2; P-3, Latoc Proof of Claim; DeGraw Certif. Ex. E, Latoc Amortization Sch., Dkt. No. 95-4.)
[42] (Trial Tr. vol. 1, 146:8-12.)
[43] (Jt. Stip. ¶¶ 29, 36, Dkt. No. 107; Trial Tr. vol. 1, 126:2-132:23.)
[44] (P-3, Latoc Proof of Claim.)

### D. **Piedmont Rubber Recycling**

In 2007, the Debtor sought to purchase certain of the assets of Piedmont Rubber Recycling ("PRR").[45] This purchase was to occur in two separate transactions: an acquisition of inventory and an acquisition of equipment.[46] The acquisition of equipment cost about $300,000, half of which ($150,000) was financed through Monarch Capital Finance, which the Debtor guaranteed.[47] The inventory cost about $200,000, half of which (or $100,000) was cash put up by the Debtor.[48] Ultimately, the Debtor did not purchase PRR, despite putting up the $100,000 in cash, and also being obligated on the $150,000 guaranty to Monarch Capital. This obligation went into default almost immediately and was also not repaid.[49]

### E. **Blue Sky International, Inc.**

The Debtor's debt obligations to Blue Sky began with advances in January of 2008, and continued through March of 2008.[50] This was also a period when advances were being made under the Latoc Note.[51]  Like the Latoc Loan, the Blue Sky proceeds were immediately transferred to PLPI and other affiliates.[52]  The Debtor executed several Notes and a guaranty in favor of Blue Sky for a total of approximately $1 million in advances, with each successive borrowing containing more stringent repayment terms.[53] The Blue Sky Notes required repayment of the entire obligation within twelve months, as well as payment of interest on a monthly basis.

---

[45] (Trial Tr. vol. 1, 110:17-23.)
[46] (Trial Tr. vol 1, 112:6-9.)  Here, the Court notes that the acquisition of inventory and equipment is substantively different than the acquisition of the stock of an entity.  This substantive difference could account for Latoc's inability to provide proof of the alleged parent-subsidiary relationship.  Indeed, the Trustee asserted and Latoc admitted that the Debtor did not purchase PRR.  (Pl.'s Findings ¶¶ 16, 20, Dkt. No. 138, as admitted by Latoc, Dkt. No. 140.)
[47]  (Pl.'s Findings ¶¶ 16-19, Dkt. No. 138; Trial Tr. vol. 1, 112:9-16.)
[48]  (Pl.'s Findings ¶ 20, Dkt. No. 138; Trial Tr. vol. 1, 112:9-16.)
[49] (Pl.'s Findings ¶¶ 16-20, Dkt. No. 138; Trial Tr. vol. 1, 112:23-113:1 and 117:4-6; see also Monarch Proof of Claim No. 14-1.)
[50] (Jt. Stip.  ¶ 30, Dkt. No. 107.)
[51] (P-3, Latoc Proof of Claim.)
[52] (Pl.'s Findings ¶¶ 29-30, Dkt. No. 138.)
[53] (*Id*.; Jt. Stip. ¶ 30, Dkt. No. 107.)

The Debtor was never in compliance with the Blue Sky Notes and never made any payments on them.[54] Blue Sky filed a proof of claim in the Debtor's case asserting a liability of $8,798,082.90 based on a September 23, 2009 judgment in that amount that was entered against the Debtor in the District Court for the Eastern District of Pennsylvania.[55] The Trustee later settled this claim with Blue Sky for $1 million.[56] The Court's valuation of the Blue Sky claim for insolvency purposes is discussed later in this Opinion.

### F.  Obligation to JP Morgan Chase

In August 2007, JP Morgan Chase ("Chase") loaned $5 million to PLPI and its subsidiary entities, and in January of 2008, additional guarantees were signed by Sergi, PermaLife Internet and PRR.[57] In the fall of 2008, the PLPI Entities defaulted on this loan, and Chase subsequently filed a complaint seeking to recover under the agreement.[58] After PLPI and certain of its subsidiaries filed petitions for relief under Chapter 11 on September 24, 2009,  the parties to the original obligation, Chase, and the guarantors (including the Debtor) entered into a settlement agreement.[59] Pursuant to that agreement, the Debtor agreed to acquire Chase's claim out of the PLPI bankruptcy for $3,106,750, and Chase would take back a mortgage on the unsold units at the Mall.[60]

This settlement also went into default almost immediately, which was not surprising given the Debtor's financial condition.[61]  Chase filed a proof of claim in the Debtor's case in the amount of $2,229,250 as a result of the defaulted settlement.[62]

---

[54] (*Id*.; Trial Tr. vol. 1, 150:15-18.)
[55] (Trial Tr. vol. 1, 159:23-160:1, Claim No. 9-1.)
[56] (Mot. *In Limine* Hr'g Tr. 9:25-10:4, Sept. 26, 2017, Dkt. No. 120.)
[57] (Jt. Stip. ¶ 10, Dkt. No. 107; Trial Tr. vol. 1, 174:23-24.)
[58] (Jt. Stip. ¶¶ 10, 11, Dkt. No. 107.)
[59] (Jt. Stip. ¶ 13, Dkt. No. 107.)
[60] (Jt. Stip. ¶ 13, Dkt. No. 107; Trial Tr. vol. 1, 179:8-17.)
[61] (Trial Tr. vol. 1, 179:12-17.)
[62] (Jt. Stip. ¶ 15, Dkt. No. 107; Claim No. 11-1.)

### G. **The Determination to Sell the Mall Property and the Izenberg Appraisal**

Up to 2007, the Debtor's sole source of income was rent and additional payments received from tenants.[63]  Since the rent payments were not sufficient to meet the operating and capital needs of the Debtor, Mr. Sergi determined that the Debtor needed to sell the Property, preferably as individual condominium units.[64]  To assist in his efforts to obtain take out and construction financing, Mr. Sergi obtained an appraisal from Izenberg Appraisal Associates ("Izenberg") that valued the Property at $11.7 million as of September 5, 2007.[65]  It is undisputed that this value is based upon a fully completed and constructed property.[66] This appraisal was utilized to obtain the financing from Valley in 2008.

After issuing his Report and shortly before trial, Trustee's expert and accountant, Kenneth J. DeGraw, CPA, sought to make various adjustments to the valuation of the Property and to his insolvency analysis.  That effort was the subject of an *in limine* motion which is discussed below. Also shortly before trial, Latoc (in its trial brief) sought to introduce certain "good faith" defenses to the Trustee's claims under the Bankruptcy Code and New Jersey law.  Because of the seriousness and relative complexity of these issues, the Court adjourned the trial so that these issues could be briefed and argued by the parties as *in limine* motions.  These motions and the Court's resolution of them are discussed in the Procedural History section of this Opinion.

### H. **The Relevant Period: Quarter Ended December 31, 2007 to Quarter Ended September 30, 2009**

The Relevant Period for the insolvency analysis in this case is the quarter ended December 31, 2007 to the quarter ended September 30, 2009.  This is the period when advances were made

---

[63] (Pl.'s Findings ¶¶ 115, 120, Dkt. No. 138.)
[64] (Jt. Stip. ¶¶ 34-35, Dkt. No. 107.)
[65] (Trial Tr. vol. 2, 54:12-17.)  Per Mr. DeGraw's report, at 18, the Izenberg Appraisal was dated October 25, 2007, with a valuation date of September 5, 2007.
[66] (Trial Tr. vol. 2, 53:13-55:20.)

by Latoc to the Debtor under the Latoc Note and payments were made by the Debtor to Latoc, i.e.,

the "Prepetition Transfers." These quarterly periods are analyzed below.[67]

### 1. **Quarter Ended December 31, 2007**

In this quarter, the Debtor incurred the $2 million obligation to Latoc, began transferring

substantially all the Latoc Loan proceeds to PermaLife and related entities, and had already

defaulted on the terms of the Latoc Note. At the same time, the Debtor's obligation to the GTCA

was still not resolved, and the Debtor's balance sheet reflects that its bank account was

overdrawn.[68] In addition to not paying these obligations, the Debtor had a negative cash flow of

approximately $28,000 and was overdrawn on its bank accounts.[69] As a result, during this period

the Debtor was unable to pay its debts as they came due, or address routine operating items.[70]

Similarly, the Debtor had no funding available for needed repairs and capital improvements.[71]

### 2. **Quarter Ended March 31, 2008**

In the quarter ended March 2008, approximately $1.1 million was derived from the Blue

Sky financing and draws from the Latoc Note, with virtually all of these funds again being

immediately transferred to PermaLife.[72] At this time, the Debtor was still not paying the required

dues or common charges to the GTCA (over $700,000 due as of March 31, 2008) and did not have

---

[67] On a prior partial summary judgment motion by the Trustee, the Court determined that the Debtor was insolvent for the period from March 2009 to September 30, 2009. Thus, the analysis of that latter period is not necessary, but will be briefly addressed by the Court for the sake of completeness. (SJ Order, entered May 22, 2017, Dkt. No. 101.)

[68] (Jt. Stip. ¶ 36, Dkt. No. 107; see also Trial Tr. vol. 2, 72:2-5.)

[69] (Pl.'s Findings ¶¶ 124, 125, Dkt. No. 138; P-11, Quarterly Cash Flow Analyses.) Latoc denied (but really objected to) these proposed findings by the Trustee on the grounds of relevance but offered no contrary evidence. The Court overrules the objections as these facts are directly relevant to the issue of insolvency. The Court therefore adopts these findings.

[70] Pl.'s Findings ¶¶ 124, 125, Dkt. No. 138). As previously noted, Latoc also stipulated that, for example, the revenues and related cash flow activities were insufficient to support the facility. (Jt. Stip. ¶ 32, Dkt. No. 107.) Thus, this "denial" on relevancy grounds is misplaced, unsupported by any evidence and contradicted by Latoc's own stipulations and admissions. See also Pl.'s Findings ¶ 106, which was admitted by Latoc. ("The Mall was unable to pay its debts as they came due and lacked adequate capital during the relevant time period").

[71] (Jt. Stip. ¶ 32, Dkt. No 107.)

[72] (Trial Tr. vol. 2, 73:1-74:17.)

the ability to make payments on the Blue Sky obligation.[73]  It also remained in default on the Latoc

Note.  Thus, the Debtor's inability to pay its debts as they came due -- make necessary repairs and

improvements -- continued.

### 3.  Quarter Ended June 30, 2008

In the hope of resolving its financial issues, the Debtor chose to monetize its sole asset and

converted its space into condominiums for sale. To facilitate this conversion, the Debtor obtained

a loan from Valley National Bank in the amount of $7.5 million, which closed on May 2, 2008.[74]

With this financing, the Debtor first paid off the existing mortgage with Astoria Federal

(approximately $3.6 million), resolved the arrearage with the GTCA ($787,000) and paid other

expenses.[75]  However, the Debtor did not have sufficient funds to close the financing, and needed

to borrow $100,000 from its principals to do so.[76] The remaining $3.1 million available under the

Valley Loan was to be drawn down as construction financing for the conversion.[77]  There were

significant restrictions on the Debtor's use of the remaining $3.1 million.  Those funds could be

used only for construction and not for other purposes, such as operating expenses.[78]

In sum, by the quarter ended in June 2008, the Debtor had already received a substantial

portion of the Valley National Bank Loan proceeds, contract deposits for the purchase of certain

condominium units, and paid off the GTCA as well as transferred money to the PermaLife

Entities.[79] Despite a net cash position of $22,000, the Debtor still did not have enough funding or

capital to meet the obligations that it already incurred, including the interest owed to Blue Sky and

---

[73] (Trial Tr. vol. 2, 74:21-75:22.)
[74] (P-26.)
[75] (Jt. Stip. ¶¶ 18, 23, Dkt. No. 107.)
[76] (*Id.* at ¶ 23.)
[77] (*Id.;* P-26.)
[78] (Pl.'s Findings ¶¶ 39-40, Dkt. No. 138; P-26).
[79] (Trial Tr. vol. 2, 75:23-78:16.)

Latoc,[80] or even the closing costs on the Valley Loan.

### 4. **Quarter Ended September 30, 2008**

In the quarter ended September 2008, the Debtor had negative cash flow of approximately $24,000, resulting in a cash deficiency of $1,400, despite receiving $1.2 million from sales of units.[81]    At this time, the Debtor was continuing to convert from a rental operation to selling condominium units, thereby continuing to reduce its income stream.    Additionally, it still had no capital or other funding available other than the restricted use of the Valley Loan proceeds.[82]    The Latoc Note and Blue Sky obligation remained in default.    Thus, the Debtor's inability to pay its debts as they came due continued.

### 5. **Quarter Ended December 31, 2008**

During this quarter, while the Debtor was continuing to sell units, it had negative cash flow of $18,216, resulting in a cash deficiency of $19,638 at the end of the quarter (from negative cash of $1,422 at the start of the quarter).    The Latoc Note and Blue Sky obligation also remained in default at this time.[83]    As before, the sale of units also resulted in the corresponding loss of rental revenue, thereby continuing and ultimately worsening the Debtor's cash flow issues and leaving the Debtor without the ability to pay its ongoing obligations.

### 6. **Quarter Ended March 31, 2009**

During this quarter, even though the Debtor continued to generate some revenue from the sale of units and rentals, the rentals (and therefore cash flow) were further decreasing due to the sales and loss of tenants.    A default was officially declared on the Blue Sky obligation in March,

---

[80] (Trial Tr. vol. 2, 78:17-23 and 79:4-22; Pl.'s Findings ¶ 128, Dkt. No. 138.)  Again, these proposed findings were denied by Latoc on grounds of relevance, but it offered no contrary evidence.  Thus, these facts are also found by the Court.
[81] (Trial Tr. vol. 2, 81:19-22; Pl.'s Findings ¶¶ 128-29, Dkt. No. 138.)
[82] (Trial Tr. vol. 2, 82:6-85:24; Pl.'s Findings ¶ 128, Dkt. No. 138.)
[83] (Pl.'s Findings ¶ 130, Dkt. No. 138; P-11, Quarterly Cash Flow Analyses.)

and the Monarch Note was also in default.  Additionally, the Debtor continued to make transfers
to certain PermaLife Entities (even though several of PermaLife affiliated entities had filed for
bankruptcy protection in this time period) and substantial payments were made on account of the
Latoc Note from the Debtor's assets, including a successful tax appeal, without any repayments
from the PermaLife Entities.[84]   The Debtor's cash flow for this period was slightly positive
($21,522), but it was left with cash on hand of only $1,884[85] and the Latoc Loan remained (along
with the Blue Sky obligation).

### 7.  <u>Quarters Ended June 30 and September 30, 2009</u>

As noted above (in footnote 67), the Court previously determined that the Debtor was
insolvent for the period from March 2009 through September 30, 2009, so there is no need to
analyze these periods.  However, as was shown by the Trustee, and as was largely admitted or
stipulated to by Latoc, the Debtor was generally unable to pay its debts as they came due and had
unreasonably small capital and assets to sustain its operations during the entire Relevant Period.

\*   \*   \*

In summary, by the end of the Relevant Period on September 30, 2009, the Debtor owed
Valley National Bank $3,389,000, Latoc $1,752,000, Blue Sky $8,798,000, Chase $2,229,250
(which the Court is considering only for the end of the third quarter of 2009 for purposes of its
insolvency analysis since this liability did not arise until September 2009) and remained obligated
on the guaranty to Monarch Capital for approximately $140,000, and on a note payable to Mr.
Sergi for $479,578.[86] The Debtor's cash flow during the entire Relevant Period indicates that it
was unable to meet its obligations as they became due.[87]

---

[84] (Jt. Stip. ¶¶ 6-8, Dkt. No. 107.)
[85] (P-11, Quarterly Cash Flow Analyses.)
[86] (Trial Tr. vol. 2, 97:20-98:25; Jt. Stip. ¶ 15, Dkt. No. 107; Pl.'s Findings ¶ 113, Dkt. No. 138.)
[87] (Trial Tr. vol. 2, 99:1-7.)

By the end of the Relevant Period, the Debtor's cash position had not improved, and it was left with new obligations it had no ability to repay, notwithstanding the sale of nineteen units.[88] Ultimately, the Debtor was not able to sell the remaining thirteen units.  They remained unsold at the time of the Debtor's bankruptcy filing in January 2010 and when its case was converted from Chapter 11 to 7 in June of 2011.  The remaining units were ultimately sold by the Trustee for only $2.5 million.  As a result, Valley's loan was never fully repaid.[89]  Finally, as was stipulated by the parties, by the end of the Relevant Period, the Debtor had new (and old) obligations that it had no chance of repaying, which led to its bankruptcy in January 2010, only a few months after the end of the Relevant Period on September 30, 2009.[90]

## I.  The Stipulated, Admitted and/or Undisputed Facts

Critically, and by way of summary, the following facts that evidence the Debtor's insolvency were either stipulated to by the parties, and/or admitted or not disputed by Latoc. Further, most -- if not all -- of the Trustee's Proposed Findings of Fact were independently and properly supported by direct citations to the record.  In contrast, to the extent Latoc did not admit (or purported to dispute) any facts, they were generally not supported by citations to the record, but rather went to the relevance or weight to be afforded a proposed fact.  Thus, unless otherwise expressly noted, the stipulated, admitted and/or undisputed facts asserted by the Trustee are adopted by this Court.  These critical facts include the following:

### 1.  As to the Ownership and Management of the Debtor and Affiliated Entities

- The Debtor was owned by Martin Sergi (90%) ("Sergi") and Dennis Squitieri (10%) ("Squitieri").[91]

---

[88] (*Id.*; Jt. Stip. ¶ 31, Dkt. No. 107.)
[89] (Pl.'s Findings ¶ 105, Dkt. No. 138.)
[90] (Jt. Stip. ¶ 31, Dkt. No. 107.)
[91] (Jt. Stip. ¶ 2, Dkt. No. 107.)

- Sergi was responsible for the day-to-day operations of the Debtor.[92]

- The Debtor had two alleged subsidiaries, PermaLife Internet, LLC (20%) ("PermaLife") and Piedmont Rubber Recycling, LLC (100%) ("PRR").[93]  As set forth in this Court's Opinion read into the record on January 10, 2017: (i) neither the Debtor nor Latoc ever proved the amount or nature of the Debtor's interest in these entities or that they were actually subsidiaries; and (ii) these entities had little or no value to the Debtor.[94]   Both Sergi and the principals of Latoc had substantial interests and involvement in various PermaLife Entities.

- Sergi owned a substantial interest in PermaLife Products, Inc. ("PLPI").  PLPI was the parent company of: (i) Arizona Rubber Recycling, LLC (100%); (ii) Bristow Rubber Recycling, LLC (100%); (iii) New York Rubber Recycling (100%); (iv) PermaLife Internet LLC (60%); (v) PermaLife Mulch, LLC (100%); (vi) PermaLife Products Canada, Inc., which was 100% owned by PermaLife Mulch, LLC; and (vii) a joint venture with CH Rubber Recycling (50%).[95]

- Sergi also served as PermaLife's CEO, a board member and director.[96]

- Dibo and Raffi Attar both had interests in PermaLife, directly and through other entities.[97]

- The Attars also held interests and officer positions in Latoc and had authority to invest and administer the assets of Latoc.[98]

## 2.  As to the Debtor's Solvency Generally

- The Debtor was unable to pay its debts as they came due and lacked adequate capital throughout the relevant time period, i.e., October 1, 2007 to September 30, 2009 (the "Relevant Period").[99]

- The Debtor's rental operations alone were insufficient to provide the capital necessary to provide for ongoing expenses, capital improvements and to meet contingencies, such as the loss of a tenant or economic downturn.[100]

- The Debtor had no source of revenue other than the rents in 2007 (or prior years).[101]

---

[92] (*Id.* at ¶ 4.)
[93] (*Id.* at ¶ 3.)
[94] (*Id.* at ¶ 3; see also SJ Hr'g Tr. (Excerpt) 19:7-18, 20:13-21:6, Jan. 10, 2017, Dkt. 104.)
[95] (Jt. Stip. ¶ 4, Dkt. 107.)
[96] (Sergi Aff. ¶ 5, Dkt. No. 84-5.)
[97] (*Id.* at ¶ 6.)
[98] (*Id.* at ¶¶ 6-11.)
[99] (Pl.'s Findings ¶ 106 (admitted by Latoc), Dkt. No. 138.)
[100] (*Id.* at ¶ 135.)
[101] (*Id.* at ¶ 115.)

- The Debtor chose to monetize (i.e., sell) its sole asset. However, in doing so, the rental base would be eroded as most of the sales would be to existing tenants (or other parties) who would no longer pay rent to the Debtor.[102]

- According to the Debtor's principal, the Debtor's Property "wasn't a cash flow property and that's, frankly, why I went forward with the subdivision, because it was clear to me there was more value to the owner-operators than it was as a rental property."[103]

- The revenues and related cash flow from rental activities were insufficient to support the expenses of the facility.[104]

- The Debtor had no credit lines available.[105]

- There were no funds provided by ownership or management to financially support the Debtor's operations.[106]

- The Debtor's cash flow during the entire Relevant Period reflects that the Debtor was unable to meet its obligations.[107]

- If the Debtor had retained the proceeds of its tax refund [in early 2009] it still could not have sustained its operations.[108]

### 3.  As to the GTCA Obligations

- GTCA obtained a judgment against the Debtor on November 16, 2017 in the amount of $622,864.72 for failure to pay outstanding dues and other obligations.[109]

- The Debtor made only partial payments of the GTCA dues and obligations in the first quarter of 2007, but made no payments to the GTCA in the second, third and fourth quarters of 2007, and could not have paid them if it wanted to.[110]

- The Debtor was also behind on its GTCA obligation in the first quarter of 2008, bringing its total obligation to over $706,000.[111]

---

[102] (*Id.* at ¶ 116.)
[103] (*Id.* at ¶ 117.)
[104] (*Id.* at ¶ 120.)
[105] (*Id.* at ¶ 136.)
[106] (*Id.* at ¶ 137.)
[107] (*Id.* at ¶ 131.)
[108] (Def.'s Proposed Findings of Fact ¶ 34, Dkt. No. 141.)
[109] (Pl.'s Findings ¶ 107, Dkt. No. 138.)
[110] (*Id.*)
[111] (Jt. Stip. ¶ 18, Dkt. No. 107; Pl.'s Findings ¶ 15, Dkt. No. 138.)

- The Debtor had no reserves for the payment of dues and other obligations to the GTCA.[112]

- Even if the Debtor did not borrow from Latoc, it could not pay back the GTCA.[113]

### 4. As to the Latoc Obligations

- From its inception, the Debtor was unable to make payments on the Latoc Note as they became due.[114]

- The Latoc Note called for interest to be monthly, in arrears, on the last day of each month. The advances under the Latoc Note began in October 2007 and continued through December 2008. The Latoc Note was immediately in default as no interest payments (and then only partial payments) were made until February 2008. Additional interest equal to 20% of the proceeds of any unit closing was not paid.[115]

- The Debtor was in default and not current on its obligations under the Latoc Note from the date the first payment was due, November 30, 2007, until the payment to Latoc of $298,361 on January 7, 2009 from the real estate tax appeal refund.[116]

- The proceeds of the Latoc Note were, in most cases, immediately transferred from the Debtor's accounts to the various PermaLife Entities.[117] In addition, some of the proceeds were also disbursed to Sergi as repayment of his personal advances to the Debtor.[118]

- When taken as a whole, the Debtor disbursed the monies it received from Latoc as well as additional capital of its own to the PermaLife Entities, which exceeded the total amount of the Latoc advances [of approximately $2 million].[119]

- The payments made to Latoc by the Debtor generally coincided with the sale of condominium units by the Debtor and the recovery on its tax appeal.[120]

### 5. As to the Blue Sky Obligations

- Blue Sky made a series of advances totaling $1 million to the Debtor and/or its affiliates in early 2008 as follows (the "Blue Sky Obligations"):

---

[112] (Pl.'s Findings ¶ 107, Dkt. No. 138.)
[113] (Def.'s Findings ¶ 44, Dkt. No. 141.)
[114] (Pl.'s Findings ¶ 108, Dkt. No. 138.)
[115] (*Id.* at ¶¶ 108, 111.)
[116] (*Id.* at ¶ 27.)
[117] (*Id.* at ¶ 22; see also Sergi Aff. ¶¶ 12, 14, Dkt. No. 84-5.)
[118] (Pl.'s Findings ¶ 22, Dkt. No. 138.)
[119] (*Id.* at ¶ 22.)
[120] (*Id.* at ¶¶ 23-24.)

- $150,000 on January 25, 2008 that was deposited with the Debtor and transferred to PermaLife Products and Arizona Rubber Recycling.

- $350,000 on February 4, 2008 that was deposited with the Debtor and transferred to PermaLife Products.

- $250,000 on February 13, 2008 that was delivered directly to Bristow Rubber Recycling (an affiliate of PLPI).

- $250,000 on March 18, 2008 of which $200,000 was deposited with the Debtor and transferred to PermaLife Products.[121]

- The Debtor executed an unconditional Guaranty of the Blue Sky Obligations on June 26, 2008, even though it was already directly obligated on some of them.[122]

- At the time of the execution of the Guaranty, the Blue Sky Obligations were in default as to the payment of consulting fees (of $3,000 per week) since April 2008.[123]

- The remaining Blue Sky Obligations were in default as of the payment due October 2008, when an interest payment of $7,500 was due on Notes 1-3 and an interest payment of $1,200 on Note 4 was not made. No amounts were paid by any obligors on the Blue Sky Notes thereafter.[124]

- The Debtor never made any payments under the Blue Sky Notes or its Guaranty.[125]

- The Debtor did not have the benefit of any Blue Sky advances.[126]

- The Debtor would not have been able to pay back the Blue Sky loan with or without the money paid back on the Latoc Loan.[127]

6. **The Valley National Bank Loan**

- To facilitate the conversion to condominiums, the Debtor received a loan commitment, dated August 6, 2007, from Valley National Bank for financing in the amount of $7.5 million.[128]

---

[121] (*Id.* at ¶ 29.)
[122] (*Id.* at ¶¶ 30-31.)
[123] (*Id.* at ¶ 33.)
[124] (*Id.* at ¶ 34.)
[125] (*Id.* at ¶ 35.)
[126] (Def.'s Findings ¶ 36, Dkt. No. 141.)
[127] (*Id.* at ¶ 37.)
[128] (Pl.'s Findings ¶ 36, Dkt. No. 138; P-26.)

- The Valley National Bank loan was based on an $11.7 million valuation of the Property by Izenberg Appraisal Associates. This appraisal was based on an as-completed, fully constructed, built-out valuation.[129]

- The closing on the Valley National Bank loan occurred on May 2, 2008.[130]

- The initial draw down from the Valley National Bank loan of $4.4 million paid off the existing mortgage facility with Astoria Federal ($3.6 million) and resolved the arrearage with the GTCA. The Debtor did not have sufficient cash flow to close, and as a result, needed to borrow from its owners $100,000 ($65,000 from Sergi and $35,000 from Nick Menonna). The remaining unfunded financing ($3.1 million) was structured as construction financing for the renovations necessary for the condominium conversion.[131]

- As is typical in construction financing, there were significant restrictions in the Valley National Bank loan agreement requiring that draws on the $3.1 million in construction financing be dedicated for construction only and were not to be available for any other purpose.[132]

- The Valley National Bank loan did not provide any type of line of credit to satisfy or partially satisfy any ongoing operations of the Mall.[133]

- Despite the restrictions, the Debtor used certain of the drawdowns from the construction loan to pay Latoc.[134]

7. **The Purpose and Structure of the Latoc Loan**

- PLPI was seeking financing to expand its operations. Due to conflicting interests on the part of the Attars, PLPI's board would not authorize financing from an Attar affiliated entity.[135]

- To facilitate the loan to PermaLife and manage the conflict that precluded a direct loan to PLPI from an Attar affiliated entity, Latoc made the loan to the Debtor which then transferred the proceeds to PLPI and PRR.[136]

---

[129] (*Id.* at ¶¶ 142, 148.)
[130] (*Id.* at ¶ 37; P-26.)
[131] (*Id.* at ¶ 38.)
[132] (*Id.* at ¶ 39; P-26.)
[133] (*Id.* at ¶ 40; P-26.)
[134] (Trial Tr. vol. 1, 138:15-139:11.) This fact is denied by Latoc, but its denial is not supported by any evidence or citation to the record. Instead, it is an objection to relevance, which is overruled. In contrast, the Trustee supports this fact with a direct and correct citation to the record. Thus, the Court finds this fact as well.
[135] (Sergi Aff. ¶ 11, Dkt. No. 84-5.)
[136] (*Id.* at ¶ 12.)

- The Latoc Loan proceeds were deposited into the Debtor's accounts and Sergi then caused the loan proceeds to be immediately transferred to PLPI and PRR's accounts.[137]

- At his deposition, Sergi testified that he would not have made these statements regarding the purpose and structure of the loan if he knew they would be used against Latoc and the Attars.[138]

As to this final fact, and the prior statements to which it refers, and as was noted by the Court in granting the Trustee partial summary judgment on the issue of reasonably equivalent value, Mr. Sergi did not indicate that the statements were untrue. Instead, he stated only that he would not have made them if he knew they would be used against Latoc. Thus, these facts are not disputed by Latoc's (and Sergi's) own admission. They simply would have preferred that they had not been made. They were made, however, and were not disputed by any competent evidence. Accordingly, they are found by this Court.

## IV.   **PROCEDURAL HISTORY**

### A.   **The Bankruptcy Case and This Adversary Proceeding**

On January 28, 2010 -- just four months after the end of the Relevant Period -- the Debtor filed a voluntary petition for relief under Chapter 11.[139] On June 1, 2011, the Chapter 11 case was converted to a Chapter 7 bankruptcy case, and Steven P. Kartzman was appointed to serve as the Chapter 7 Trustee (the "Trustee").[140]

After the appointment of the Trustee, he and accountant Kenneth DeGraw took possession of the computers, the Debtor's records, including, the QuickBooks™ accounting file, banking, tax and other financial and nonfinancial records.[141] DeGraw and his firm were involved in providing

---

[137] (*Id.* at ¶¶ 12, 14.)
[138] (See Latoc's Statement of Material Facts Not in Dispute ¶¶ 10-11, Dkt. No. 84, and related portions of Sergi Dep. Tr. 13:1-9; 14:22-16:23, June 3, 2014, Dkt. No. 84-4.)
[139] (Main Case Dkt. No. 1).
[140] (Order Converting Case to Ch. 7, Main Case Dkt. No. 166.)
[141] (Jt. Stip. ¶ 1, Dkt. No. 107.)

monthly operating reports, evaluating condominium charges imposed by the GTCA, analyzing potential avoidance actions, reviewing banking records, the Debtor's financial records and tax returns, and preparing tax returns.[142] DeGraw found Debtor's financial records to be reliable and in generally good order.[143]

On May 12, 2016, the Trustee filed a second amended complaint for avoidance of the Prepetition Transfers to Latoc.[144] This complaint alleged eleven separate counts against Latoc as follows:

| | |
|---|---|
| First Count: | Under 11 U.S.C. § 547, the Prepetition Transfers are avoidable as preferences. |
| Second Count: | Under 11 U.S.C. § 548(a)(1), the Prepetition Transfers were constructively and actually fraudulent and avoidable. |
| Third Count: | Under 11 U.S.C. § 544(b), the Note Obligations were fraudulent pursuant to N.J.S.A. § 25:2-25(a) and/or (b) and avoidable. |
| Fourth Count: | Under 11 U.S.C. § 544(b), the Prepetition Transfers were fraudulent pursuant to N.J.S.A. § 25:2-25(a) and/or (b) and avoidable. |
| Fifth Count: | Under 11 U.S.C. § 544(b), the Latoc Note was fraudulent pursuant to N.J.S.A. § 25:2-27(a) and avoidable. |
| Sixth Count: | Under 11 U.S.C. § 544(b), the Prepetition Transfers were fraudulent pursuant to N.J.S.A. § 25:2-27(a) and avoidable. |
| Seventh Count: | Pursuant to 11 U.S.C. § 550, to the extent that a transfer is avoided under 11 U.S.C. §§ 544, 547, 548 or 549, the Trustee may recover the transferred property. |
| Eighth Count: | Pursuant to N.J.S.A. § 14A:3-3, the Latoc Note and Prepetition Transfers are avoidable as *ultra vires.* |
| Ninth Count: | Pursuant to 11 U.S.C. § 502(d), for disallowance of Latoc's proof of claim as it is an entity from which property is avoidable and recoverable under relevant sections of the Bankruptcy Code. |

---

[142] (Trial Tr. vol. 1, 96:7-20.)
[143] (Pl.'s Findings ¶¶ 5-6, Dkt. No. 138.)
[144] (Am. Compl., Dkt. No. 54.)

Tenth Count:    Pursuant to FED. R. BANKR. P. 7008(b), the Trustee is entitled to reasonable attorney's fees.

Eleventh Count: Under 11 U.S.C. § 544(b), the Prepetition Transfers were fraudulent pursuant to N.J.S.A. § 25:2-27(b) and avoidable.[145]

## B.  **The Partial Summary Judgment Motions**

On December 16, 2016, the Trustee filed a motion for partial summary judgment determining that the Debtor received less than reasonably equivalent value for the $2 million Latoc Note. The Court agreed with the Trustee's argument that the Debtor did not receive an actual benefit or value from the Latoc Note or its proceeds because they were almost immediately and completely distributed to various PermaLife-related entities.[146] The Court accordingly granted partial summary judgment in favor of the Trustee that the Debtor had not received reasonably equivalent value for the Prepetition Transfers.[147]

The Trustee subsequently filed a motion seeking a separate partial summary judgment that the Debtor was insolvent at the time of the Prepetition Transfers, including the $2 million Latoc Note.[148] To support his insolvency argument, the Trustee relied principally on the April 14, 2016 "Solvency Report" prepared by Mr. DeGraw (the "Report") and the documents on which that Report is based.[149] In contrast, Latoc voluntarily chose not to comply with the Court-ordered deadline for filing a rebuttal report, which had been extended several times.[150]  As a result, Latoc was barred from providing a rebuttal report or expert testimony at trial regarding solvency.[151]

---

[145] (Am. Compl., Dkt. No. 54.)
[146] (SJ Hr'g Tr. (Excerpt), 11:5-9, Jan. 10, 2017, Dkt. No. 104.)
[147] (SJ Hr'g Tr. (Excerpt), 14:19-21, Jan. 10, 2017, Dkt. No. 104.)
[148] (SJ Hr'g Tr. 2:14-16, May 16, 2017, Dkt. No. 100.)
[149] (SJ Hr'g Tr. 2:20-22, May 16, 2017, Dkt. No. 100.)
[150] (SJ Hr'g Tr. 11:18-23, May 16, 2017, Dkt No. 100.)
[151] (Order (I) Barring the Defendant from Testifying at Trial for Failure to Obey a Discovery Order on Conditions Pursuant to Fed. R. Bankr. P. 7037(b)(2); (II) Barring the Defendant from Submitting an Expert Report; (III) Barring the Defendant from Providing Expert Testimony at Trial to Rebut the Expert Reports Submitted by the Plaintiff; and (IV) Reducing the Amount of the Defendant's Proof of Claim, entered Oct. 24, 2016, Dkt. No. 73; SJ Hr'g Tr. 13:16-18, May 16, 2017, Dkt. No. 100.)

The Court granted the Trustee's partial summary judgment motion as to insolvency in part and denied it in part, ruling that the Trustee had proven the Debtor's insolvency for the period March 2009 to September 2009.[152]   By that time period, the Debtor was hopelessly in default on the Latoc and Blue Sky Obligations and was otherwise generally unable to pay its debts as they became due.   The Court denied summary judgment, without prejudice, for the period of October 2007 to February 2009 based principally on Mr. DeGraw's opinion that for the quarters ending September 30, 2007 to December 31, 2008, the "fair value of the assets of the Mall exceeded their liabilities by a significant margin."[153]   However, DeGraw also noted that the equity was "entirely tied up in the value of the real estate [and] was generally not available to creditors other than the Mall's secured creditor."[154]   Accordingly, DeGraw opined that while the Mall was technically solvent during this period in terms of assets exceeding liabilities, it was "illiquid."[155]   Thus, the Court ruled that, giving all inferences in favor of Latoc, there was a triable issue as to whether the Debtor was insolvent during the period from October 2007, when the first advance was made under the Latoc Note to February 2009.[156]

## C.  **The Trial and the *In Limine* Motions**

### 1.  **Trial**

Trial began on August 2, 2017 and continued to August 4, 2017.   Both Matthew Krauser and Kenneth DeGraw gave expert testimony.[157] Based on his extensive involvement in reviewing

---

[152] (SJ Order, entered May 22, 2017, Dkt. No. 101.)

[153] (DeGraw Rpt. at 27, Ex. A to DeGraw Certif., and Ex. M thereto, Dkt. No. 95-5.)

[154] (*Id.*)

[155] (*Id.*)

[156] (SJ Order, entered May 22, 2017, Dkt. No. 101.)

[157] As was noted previously, Latoc was barred from providing an expert report or expert testimony due to its repeated failure to comply with discovery deadlines and orders.  In fact, Latoc offered no witnesses of its own as to factual or expert issues.  One of Latoc's principals, Dibo Attar, was barred from testifying at trial due to his failure to comply with discovery deadlines and orders (Order Barring Dibo Attar from Testifying at Trial on Behalf of Defendant Latoc, Inc. for Failure to Obey a Discovery Order, entered Dec. 27, 2016, Dkt. No. 82.)

the Debtor's financial information and his service as the Trustee's accountant in the main bankruptcy case, Mr. DeGraw also had personal knowledge of the information contained in those books and records.

Mr. Krauser is a real estate appraiser in New Jersey, New York, and Pennsylvania and is the senior managing director of Integra Realty Resources Northern New Jersey.[158] The majority of Krauser's testimony was about the macro and micro economic conditions which affected the sales and leasing activity of the Debtor's Property during the time period of October 2007 to September 2009.[159] He explained how the location, size and configuration of the Debtor's property and the downturn in the economy generally led to the substantial decline in the viability of the Debtor's Shopping Mall business.[160] In addition to the negative aspects about the Property, Krauser explained how the Great Recession between December 2007 and June 2009 caused deterioration of the economic markets, further straining the Debtor's financial situation.[161]

The Court finds Mr. Krauser's testimony to have been credible and well supported. The Court also notes that Latoc objected to the relevance of the entirety of Mr. Krauser's testimony as to the insolvency issue. In this regard, the Court finds that most of his testimony had only a general relevance as to background and general economic conditions in the United States and locally. The determination of solvency or insolvency is, however, based on the specific financial condition of the Debtor entity. Thus, the Court is relying on Mr. Krauser's testimony only to the limited extent that he analyzed the conditions at the Debtor's Property specifically.[162] Otherwise, Latoc's relevance objection is sustained as to Mr. Krauser's testimony.

---

[158] (Trial Tr. vol. 1, 41:21-24.)
[159] (Trial Tr. vol. 1, 43:17-20.)
[160] (Trial Tr. vol. 1, 50:22-51:18.)
[161] (Trial Tr. vol. 1, 55:13-16.)
[162] (See Pl.'s Findings ¶¶ 93-99, Dkt. No. 138.)

Mr. DeGraw's testimony began on the first day of trial and extended to a second day on August 4, 2017. Mr. DeGraw and his firm were retained in 2011 to act as accountants for the present bankruptcy matter.[163] The majority of Mr. McGraw's testimony was specifically targeted towards the three recognized insolvency tests and making a determination of whether and when the Debtor became insolvent under each test. Mr. DeGraw's testimony and report addressed each of the three tests on a quarter-by-quarter basis due to the magnitude and the number of transactions that were occurring throughout the relevant time period.[164]  In this regard, the Court notes that Mr. DeGraw initially concluded that the Debtor was insolvent or in financial distress during the entire Relevant Period under two of the three tests; i.e., inability to pay its debts as they came due and inadequacy of capital and assets.  As noted above, he also opined that, although the Debtor's assets exceeded its liabilities by a significant margin during the period from the quarter ended September 30, 2007 to the quarter ended December 31, 2008, it was "illiquid" and essentially unable to utilize those assets to fund its operations or capital needs.

The Court finds Mr. DeGraw's testimony to be generally credible, well supported and directly relevant to the insolvency issue.  The Court takes issue with Mr. DeGraw's testimony to the extent he sought to amend or change his opinions just before trial, as is noted in the following section which discusses the *in limine* motions filed after the second day of trial.

### 2.  The *In Limine* Motions

After Mr. DeGraw issued his Report and shortly before trial began, he determined that the income analysis in the Izenberg Appraisal included rent in the amount of $390,000 from a tenant that did not exist at the Mall.[165]  Thus, at trial, the Trustee, through Mr. DeGraw, sought to adjust

---

[163] (Trial Tr. vol. 1, 95:18-20.)
[164] (Trial Tr. vol. 3, 38:21-24.)
[165] (Pl.'s Mot. *In Limine*, at 3, Dkt. No. 110-1; Trial Tr. vol. 2, 44:4-7.)

the value of the Property downward by $2.4 million based on this factor (the "Fictitious Rent Argument").[166] Also after issuing his Report and just before trial, Mr. DeGraw recognized that the Izenberg Appraisal did not reflect $3.1 million in construction financing needed for the build out (the "Increased Construction Loan Argument").[167]  As a result, Mr. DeGraw sought to further reduce the valuation of the Property on this basis.  At the same time, Mr. DeGraw also sought to provide additional support for the substantially increased amount of the Blue Sky Obligation (from about $1 million in early 2008 to $8.8 million in March 2009) by providing additional information as to how this number was calculated (the "Blue Sky Argument").[168]

Latoc objected to these "adjustments" or corrections as untimely and prejudicial.  Latoc argued that they constituted substantive amendments to the Report and should be precluded under the Court's final pretrial order and the applicable Federal Rules of Civil Procedure.

Also just before and during the trial, Latoc sought to assert so-called good faith defenses under 11 U.S.C. § 548(c) and N.J.S.A. § 25:2-30(a), arguing for the first time in its trial brief (filed one week before trial) that Latoc provided the financing to the Debtor in good faith and for value.[169] The Trustee objected to the assertion of these defenses (the "Good Faith Defenses") on substantive and procedural grounds, particularly as being too late and prejudicial.

Given the significance of these issues, the Court adjourned the trial so that they could be fully briefed and argued by the parties.  The Court's final determinations with respect to each of these issues are described below in inverse order.

### (a) <u>The Good Faith Defenses</u>

The Court ruled that Latoc was barred from asserting any defenses under 11 U.S.C.

---

[166] (*Id*.; Trial Tr. vol. 2, 52:12.)
[167] (*Id*.; Trial Tr. vol. 2, 56:19-60:23.)
[168] (*Id*.; Trial Tr. vol. 2, 93:19-98:6, 156:24-159:15.)
[169] (Latoc Trial Br., at 9, Dkt. No. 108.)

§ 548(c), N.J.S.A. § 25:2-30(a) or other similar good faith defenses generally because these defenses had not been asserted during the extensive pretrial proceedings and were therefore waived.[170]    The Court found that the late introduction of these defenses would prejudice the Trustee, who did not seek any additional discovery on these issues.    In so ruling, the Court also noted the multifaceted relationship among Mr. Sergi, the Attars and their related entities, and the undisputed sworn pretrial testimony of Mr. Sergi that:  (i) the Debtor sought the loan from Latoc only after the proposed loan from an Attar affiliate was disapproved by the PermaLife board; and (ii) Mr. Sergi would never have given the testimony about the PermaLife board disapproval if he knew it would be used against Latoc and the Attars, without ever disavowing the truthfulness of that underlying testimony.[171]    Thus, the good faith defenses belatedly asserted by Latoc were waived, would be prejudicial and were without substantive merit in any event.

### (b) <u>The Blue Sky Argument</u>

Preliminarily, the Court notes that, by its October 23, 2017 Order, it denied the Trustee's motion to allow Mr. DeGraw to amend or supplement his opinion or Report on the bases of the Blue Sky, the Increased Construction Loan or the Fictitious Rent Arguments.[172]    However, the Court ruled that Mr. DeGraw's testimony as to these three issues could be considered by the Court in evaluating Mr. DeGraw's testimony and conclusions.[173] The results of the Court's consideration of that testimony follows.

---

[170] (Order (I) Finding Defendant Waived Its Right to Assert Affirmative Defenses Under Either 11 U.S.C. § 548(c) and/or N.J.S.A. § 25:2-30(a); (II) Barring the Defendant from Presenting a Defense Under Either 11 U.S.C. § 548(c) or N.J.S.A. § 25:2-30(a); and (III) Barring Any Defense of Good Faith at Trial, entered on Oct. 20, 2017, Dkt. No. 122.)

[171] (Sergi Dep. Tr. 22:20-25:12, June 3, 2014, Dkt. No. 77-8; Sergi Aff. ¶¶ 6-14, Dkt. No. 84-5; Sergi Dep. Tr. 14:22-15:13, June 3, 2014, Dkt. No. 77-8.)

[172] (Order Denying the Plaintiff's Motion *in Limine* for Entry of an Order Finding the Trustee's Expert's Testimony to Be Within the Scope of His Report and/or Authorizing the Trustee's Expert to Supplement and/or Correct Omissions in His Report, to the Extent Same Is Necessary, and Granting Alternative Relief to both Parties, entered on Oct. 23, 2017, Dkt. No. 123.)

[173] (*Id.*)

The Blue Sky Obligation first appears on the Debtor's balance sheet as prepared by Mr. DeGraw with respect to the quarter ended March 31, 2008 in the amount of $700,000, based on advances through that date. This number remained the same for the quarters ended June 30, 2008, September 30, 2008 and December 31, 2008.[174]

Then, for the quarter ended March 31, 2009, the Blue Sky Obligation jumped to $8,798,083 (the full Judgment amount) and remained at that level through the end of the Relevant Period on September 30, 2009, which is approximately the same time that Blue Sky obtained its Judgment. That Judgment was obtained by default, after a proof hearing in which Blue Sky's witness testified as to how the total number was calculated. Of course, since the Debtor had defaulted and failed to appear, there was no cross-examination or other adversarial testing of the calculations, except for a few questions by the District Judge.[175]

Subsequently, as was pointed out by Latoc, the Trustee was able to compromise the Blue Sky claim for the sum of $1 million in June of 2012.[176] Latoc also objected to DeGraw's valuation of the Blue Sky claim on this separate, substantial basis. By the Blue Sky Argument, the Trustee (through Mr. DeGraw) sought to provide additional support for his use of the full Blue Sky Judgment amount as of March 31, 2009. Thus, the Court is here faced with the unusual situation in which the valuation of a claim that had been reduced to Judgment during the time period that Mr. DeGraw performed his insolvency analysis for the Trustee is contested by the defendant Latoc on the basis of a subsequent substantial reduction of that Judgment amount by the very same Trustee.

Since the Blue Sky claim went into default in or before March 2009 and was reduced to

---

[174] (*Id.*)
[175] (See Blue Sky Proof Hr'g Tr., P-27).
[176] (Not. of Settlement of Controversy, Main Case Dkt. No. 275.)

Judgment in September 2009, all during the Relevant Period, it is difficult to say that Mr. DeGraw was somehow incorrect in using this number or that it was unfounded. On the other hand, the Trustee himself was able to reduce this claim to $1 million during the course of the Debtor's bankruptcy case. That reduction was based on a settlement approved in June of 2012, which was almost three years after the end of the Relevant Period. In deciding this issue without ultimately reaching a precise number, the Court determines that the proper valuation of the Blue Sky Obligation for insolvency purposes is less than the $8.8 million judgment amount, but more than the $1 million settlement amount. That settlement number may have been arrived at for a number of reasons, including the fact that the Debtor was in bankruptcy, the uncertainty and risks of litigation and the cost of litigating a claim as to which there may be little or no recovery.

But whether the Blue Sky Obligation is valued at $8.8 million, $1 million or somewhere in between (as the Court believes is more appropriate), the following material underlying facts remain the same:

- The Blue Sky Obligation was in default since its inception.

- The Debtor did not receive the benefit of the Blue Sky advances.

- The Debtor was generally not paying this and its other debts as they came due.

Thus, without determining the precise valuation of the Blue Sky claim during the Relevant Period for purposes of insolvency analysis, the Debtor's dire financial condition remained the same. It was unable to pay its debts as they came due and had insufficient assets and capital to sustain its operations whether the Blue Sky Obligation was $1 million or $8.8 million. Said another way, even if the Blue Sky Obligation is reduced to $1 million, as argued by Latoc, the Debtor was still unable to pay its debts as they came due and still had insufficient capital to sustain its operations.

In sum, the Court finds that the amount of the Blue Sky Obligation should be reduced for purposes of the Court's insolvency analysis, with or without consideration of the additional support offered by the Trustee.  Thus, to the extent that Latoc argued that the $8.8 million valuation of this claim for insolvency purposes was too high based on the Trustee's settlement, the Court agrees and finds that the Blue Sky claim should have been valued at approximately $2 million for insolvency purposes (to include a portion of the accruing and unpaid interest and other charges).  However, whether the Blue Sky number is reduced to one in the $2 million range (as the Court believes is more appropriate) or $1 million (as argued by Latoc), that reduction does not affect the Court's insolvency analysis under the paying debts as they came due and unreasonably small capital tests, and only has a minimal impact on the Court's balance sheet analysis, as described below.

### (c) The Increased Construction Loan Argument

The Trustee also argued that DeGraw should be able to supplement or, more accurately, amend his Report and opinions to include an additional $3.1 million in construction financing he neglected to include when preparing the balance sheets for the Debtor beginning with the quarter ended September 30, 2007, even though the balance sheet valuation of the Property ($11.7 million) for that period reflected the renovations as fully completed.[177]   The Court notes that there is no dispute that the total amount of the Valley Loan was $7.5 million.  However, the Valley Loan was listed as approximately $4.3 million in the balance sheets as prepared by DeGraw commencing as of June 30, 2008.  The issue is whether the Report should be corrected to reflect that additional asserted liability of $3.1 million for the prior two quarters and thereby reduce the value of the Property.

---

[177] (Pl.'s Mot. *In Limine* ¶ 2, Dkt. No. 110-3.)

The Trustee (through Mr. DeGraw) argues that this additional liability of $3.1 million should have been included in every quarter during the Relevant Period through June 30, 2008 (the quarter in which the Valley Loan closing took place). However, based on the Court's review of the balance sheets prepared by Mr. DeGraw,[178] even if that $3.1 million "adjustment" or deduction is made, the Debtor's "Total Equity" was in excess of that $3.1 million amount through December 31, 2008. Thus, whether the $3.1 million is included or not, the Debtor still had equity in the Property, although it arguably would have been reduced.[179] That claim is only arguable, however, because there is simply no way for this Court to determine whether this type of calculation did (or did not) enter into Mr. Izenberg's analysis in determining the Property's value, as he did not testify at trial.

The Court further notes that the Izenberg $11.7 million appraisal was dated October 25, 2007, with a valuation date as of September 5, 2007,[180] while the Valley Loan was not funded until May of 2008. Thus, it is at least speculative to deduct the $3.1 million (or any other amount) from Izenberg's valuation based on this "correction." The Court does not know how or even whether the amount of secured debt factored into Izenberg's analysis, because Izenberg did not testify, and no competent evidence was presented in that regard. Accordingly, the Court will not give any credit or consideration to Mr. DeGraw's testimony regarding the Increased Construction Loan Argument, except to acknowledge that the total amount of the Valley Loan was $7.5 million and that the Izenberg Appraisal reflected a fully constructed or built-out Property.[181]

---

[178] (P-9.)

[179] For the quarters ended June 30, September 30, and December 31, 2008, the $3.1 million increase in the Debtor's liabilities would still leave the Debtor with at least some (but decreasing) equity in those quarters; i.e., $1.2 million, $1.0 million and $300,000, respectively, for those quarters.

[180] (DeGraw Rpt. at 18, Ex. A to DeGraw Certif., Dkt. No. 95-5.)

[181] The exclusion of this adjustment does not in any way affect the Report's (or this Court's) conclusions as to the Debtor's inability to pay its debts as they became due or the insufficiency of its capital or assets.

However, like the Blue Sky Argument, this argument relates only to the balance sheet insolvency analysis. It does not affect Mr. DeGraw's opinions or the Court's separate analysis and conclusions as to the Debtor's insolvency under the paying debts as they come due and insufficiency of capital or assets tests. As is described in more detail below, the Court finds that the Debtor was insolvent and had insufficient capital under each of those two tests for the entire Relevant Period.

### (d) The Fictitious Rent Argument

The Trustee also sought to amend or "correct" DeGraw's report to reduce the value of the Property by $2.4 million based on fictitious annual rent of $390,000 that was apparently included in the Izenberg Appraisal. Here, once again, it is difficult, if not impossible, for the Court to determine what Mr. Izenberg did or did not do in reaching his valuation number. In this Court's view, it is simply unfair and inappropriate for this Court to reduce that valuation by about 20% in the absence of testimony from Mr. Izenberg and/or competing appraisal reports from the Trustee, especially after Mr. DeGraw had already submitted his final Report. Thus, the Court will not consider Mr. DeGraw's testimony in support of the Fictitious Rent Argument.

As with the Blue Sky and Increased Construction Loan Arguments, the Court's determination not to consider Mr. DeGraw's testimony regarding the Fictitious Rent Argument has no impact on his or the Court's paying debts as they come due and unreasonably small assets or capital analysis. Additionally, because the Court is not considering Mr. DeGraw's testimony as to these three arguments, the Court will analyze the Debtor's insolvency under the balance sheet test based on his original conclusions and his related opinion testimony at trial. Thus, as previously held, Mr. DeGraw is not permitted to change his original opinion that fair value of the Debtor's assets exceeded its liabilities by a significant margin through the quarter ended December 31,

2008.  However, this similarly does not change his opinion that because the value of the Debtor's assets was tied up in the Property, the Debtor was "illiquid" during the period through December 31, 2008, though it may have been technically solvent under this test.

*   *   *

In sum, for the reasons set forth above, the Court is not considering or giving weight to Mr. DeGraw's trial testimony regarding the Blue Sky, Increased Construction Loan or Fictitious Rent Arguments.  Allowing any evidence of these substantial "corrections" after a final Report was issued would not be fair or appropriate and would be prejudicial to Latoc in this Court's view. However, that determination has no impact on Mr. DeGraw's original conclusions, his related expert testimony at trial and this Court's rulings that: (i) the Debtor was unable to pay its debts as they became due during the Relevant Period; and (ii) the Debtor had insufficient assets or capital to sustain its operations during the Relevant Period.  Similarly, these determinations do not affect Mr. DeGraw's conclusions and this Court's rulings as to whether the Debtor was illiquid during the Relevant Period.

## V.        STATEMENT OF LAW AND ANALYSIS

As was previously noted, by the time of trial, the Court had already determined on prior partial summary judgment and *in limine* motions that: (i) the Debtor did not receive reasonably equivalent value for the Latoc Note and the $592,875 in Prepetition Transfers to Latoc; (ii) the Debtor was insolvent from March 1, 2009 to September 30, 2009; and (iii) that Latoc may not assert affirmative defenses under 11 U.S.C. § 548(c), N.J.S.A. § 25:2-30 or other similar good faith defenses as having been waived and not proven.  As a result, the principal remaining issue for this Court to decide is whether the Debtor was insolvent during the period from October 2007,

35

when the advances under the Latoc Note began, to February 2009.[182]

For the reasons that follow, the Court finds that the Debtor was insolvent and in financial distress during the entire Relevant Period because it was unable to pay its debts as they became due (and knew or should have known that fact) and similarly had unreasonably small capital and assets to sustain its operations during that Period. The Court finds further that, although the Debtor may have technically been solvent under the balance sheet test through December 31, 2008, it was, in fact, hopelessly illiquid during that period and the entire Relevant Period. Thus, to the extent the fair value of the Debtor's assets exceeded its liabilities at any time during the Relevant Period, those excess assets were illiquid and insufficient to ameliorate or remedy the Debtor's insolvency. The Court will therefore enter Judgment in favor of the Trustee and against Latoc avoiding the Latoc Note and the Prepetition Transfers in the amount of $592,875 and preserving those claims for the benefit of the Debtor's estate.

## VI.    STATEMENT OF LAW AND ANALYSIS

### A. Fraudulent Transfers under N.J.S.A. §§ 25:2-25(b), 25:2-27(a), and 11 U.S.C. § 548(a)(1)(B)

#### 1. N.J.S.A. §§ 25:2-25(b) and 25:2-27(a)

Under N.J.S.A. § 25:2-25(b):

[A] transfer made or an obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation:
. . .
(b) Without receiving reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(1) Was engaged *or* was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation

---

[182] The Trustee did not further prosecute his claims that a portion of the Prepetition Transfers constituted a preference under 11 U.S.C. § 547 (First Count) or that the Prepetition Transfers were made with actual intent to hinder, delay or defraud creditors under 11 U.S.C. § 548(a)(1)(A) (portion of Second Count) or N.J.S.A. § 25:2-25(a) (portion of Third Count) or that the Latoc Note transaction was *ultra vires* (Eighth Count). Thus, those claims are deemed abandoned and dismissed. *In re Rivas*, 558 B.R. 690, 701 (Bankr. D.N.J. 2016); *In re Johnson*, 242 B.R. 283, 288-89 (Bankr. E.D. Pa. 1999) (a claim asserted in a complaint but not pressed at trial or raised in a post-trial submission is deemed abandoned).

to the business or transaction; *or*

(2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due. N.J.S.A. § 25:2-25(b) (emphases supplied).

Additionally, under N.J.S.A. § 25:2-27(a):

[A] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time *or* the debtor became insolvent as a result of the transfer or obligation (emphasis supplied).

Under the "strong arm" power granted by 11 U.S.C. § 544(b), the Trustee stands in the shoes of a creditor and may seek to avoid transfers under state law, such as N.J.S.A. §§ 25:2-25 and 25:2-27. *In re PWS Holding Corp.*, 303 F.3d 308, 314 (3d Cir. 2002), *cert. den*., 538 U.S. 924 (2003).

### 2.  **11 U.S.C.  § 548(a)(1)**

The Bankruptcy Code's standards for avoidance of fraudulent transfers are similar to those under New Jersey state law.  A transfer of property is deemed constructively fraudulent under § 548(a)(1)(B) if, within two years of the filing of the Petition, the transferor received less than a reasonably equivalent value in exchange for such transfer or obligation; and (1) the transferor was insolvent at the time of the transfer or became insolvent as a result of such transfer, or (2) the transferor had unreasonably small capital at the time of the transfer *or* became undercapitalized as a result of the transfer, or (3) the transferor intended to incur, or believed that it would incur debts that were beyond its ability to pay as such debts matured. 11 U.S.C. § 548(a)(1)(B). To prevail under this section, the Trustee must demonstrate that: (1) debtor had an interest in property; (2) the interest was transferred within two years of the petition date; (3) debtor was insolvent when the transfer occurred *or* was made insolvent as a result of the transfer; and (4) debtor received less

than a reasonably equivalent value in exchange for such transfer. *Mellon Bank v. Official Committee of Unsecured Creditors of RML, Inc. (In re RML, Inc.),* 92 F.3d 139, 144 (3d Cir. 1996).

The Court has already determined that the Debtor did not receive reasonably equivalent value for the $2 million Latoc Note, and that the payments made by the Debtor in connection with the Note -- the Prepetition Transfers -- were not for reasonably equivalent value.[183] Additionally, it is not contested that the Debtor had an interest in the property that is the subject of this action, i.e., the Latoc Note and the Prepetition Transfers and that those transfers were made within two years of the Debtor's Petition Date of January 28, 2010.[184] Thus, as noted, the principal remaining contested issues in this case are whether or not the Debtor was insolvent, lacked adequate capital, and/or was unable to pay debts as they matured at the time of the Latoc Note and the Prepetition Transfers, and what the Debtor knew or reasonably should have known about its solvency and general financial condition at those times.

### 3. **Insolvency**

A debtor is deemed insolvent if the sum of the debtor's debt is greater than the sum of all the debtor's assets at a fair valuation. 11 U.S.C. § 101(32)(A); N.J.S.A § 25:2-23(a). Additionally, a debtor is insolvent if it is unable to satisfy its obligations as they become due *or* the debtor's remaining assets are unreasonably small in relation to the transaction. N.J.S.A § 25:2-23(b); 11 U.S.C. § 548(a)(1)(B)(ii)(II) and (III); *see also* 11 U.S.C. § 303(h) (regarding involuntary petitions). Both New Jersey and federal law also recognize a distressed financial situation that is short of actual insolvency, i.e., where the debtor has unreasonably small assets or capital to conduct

---

[183] (SJ Hr'g Tr. (Excerpt), 21:11-19, Jan. 10, 2017, Dkt. No. 104.)

[184] The Court notes that the Latoc Note was actually dated November 15, 2007, which is more than two years prior to the Petition Date. Thus, the Latoc Note itself is avoided under N.J.S.A. §§ 25:2-25(b) and 25:2-27(a), but not 11 U.S.C. § 548(a)(1). All the Prepetition Transfers occurred within two years of the Petition Date (see Latoc Proof of Claim, P-3), so they are avoided under 11 U.S.C. § 548(a)(1) as well as N.J.S.A. §§ 25:2-25(b) and 25:2-27(a).

its business.  11 U.S.C. § 548(a)(1)(B)(ii)(II); N.J.S.A. § 25:2-25(b)(1).  These tests are similar under New Jersey state and federal bankruptcy law.

In summary, under federal and state fraudulent transfer law, there are three widely recognized tests of financial distress or insolvency: (1) the adjusted balance sheet test; (2) the insufficient capital or assets test; and (3) the inability to pay debts as they become due test. *Samson v. Western Capital Partners LLC (In re Blixseth)*, 514 B.R. 871, 877 (D. Mont. 2014) *rev'd on other grounds*, 679 Fed. App'x 611 (9th Cir.), *cert. den.*, 1385 S. Ct. 322 (2017); *see generally* COLLIER ON BANKRUPTCY, ¶ 548.05[3] (Richard Levin & Henry J. Sommer eds., 16th ed.).  A debtor need not fail all three tests to show insolvency.  The failure of only one test establishes insolvency, as the statutes are written in the disjunctive. *Id.; Peltz v. Hatten*, 279 B.R. 710, 742 (D. Del. 2002), *aff'd*, 60 Fed. App'x 401 (3d Cir. 2003) ("[t]o succeed on its fraudulent transfer claim, the plaintiff must prove that the debtor was insolvent or rendered insolvent under one or more of the three insolvency tests set forth in 11 U.S.C. § 548(a)(1)(B)(ii) the balance sheet test, the unreasonably small capital test or the ability to pay debts as they come due test").

In short, a debtor's ability to pass one test does not necessarily mean the debtor is solvent, as Latoc seems to argue.  Failure to satisfy any one of the tests can be enough.  Here, the Debtor plainly fails two of these tests (the inability to pay debts as they come due and unreasonably small assets or capital tests) and effectively fails the third of these tests (the balance sheet test).  Each of these tests as applied to the facts of this case is described below.

**(a) <u>Inability to Pay Debts as They Become Due</u>**

The determination as to whether an entity is generally paying its debts as the come due is predominantly a factual one, with the federal test including an element of subjectivity as to whether the debtor believed it was incurring debts beyond its ability to pay.  *See* 11 U.S.C.

§ 548(a)(1)(B)(ii)(I) and (III) (debtor intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured).[185]  Somewhat similarly, but adding a reasonableness standard, N.J.S.A. § 25:2-25(b)(2) provides that debtor "intended to incur, or reasonably should have believed that the debtor would incur," debts beyond its ability to pay as they became due. Thus, the New Jersey fraudulent transfer statute expressly includes a reasonableness (or objective) standard.  In slight distinction, 11 U.S.C. § 548 has been construed as containing both subjective and objective elements.[186]  This Court finds that under any applicable standard, the Debtor was unable to pay its debts as they came due during the entire Relevant Period, and that Mr. Sergi, as an accountant fully familiar with all the Debtor's financial and operational issues, had to have known -- or at the very least should have known -- that was the case.

As was previously noted, the stipulated, admitted and/or undisputed facts include the following acknowledged elements of insolvency:

- The Debtor was unable to pay its debts as they came due and lacked adequate capital throughout the Relevant Period.

- The revenues and related cash flow from rental activities were insufficient to support the expenses of the facility.

- Additionally, the Debtor's rental operations were insufficient to provide for ongoing expenses, capital improvements and meet contingencies, such as the loss of a tenant or an economic downturn.

- The Debtor had no credit lines available.

- There were no funds provided by ownership or management to financially support the Debtor's operations.

- The Debtor's cash flow during the entire Relevant Period reflects that the Debtor was unable to meet its obligations.

---

[185] *See generally, In re Blixseth,* 514 B.R. at 884.
[186] *Blixseth*, 514 B.R. at 884.

There is also a long list of significant specific obligations the Debtor was unable to pay during the Relevant Period:

- GTCA obtained a judgment against Debtor on November 16, 2007 in the amount of $622,864.72 for failure to pay dues and other obligations.

- The Debtor made partial payments for GTCA dues and other obligations in the first quarter of 2007 but made no payments to GTCA in the second, third and fourth quarters of 2007, and could not have paid them if it wanted to.

- The Debtor had no reserves for payment of dues or other obligations.

- From the inception of the Latoc Note (in the fourth quarter of 2007), the Debtor was unable to make payments on that obligation as they became due.

- The proceeds of the Latoc Note were immediately transferred to various PermaLife Entities with a relatively small portion paid to Sergi on account of amounts due to him personally.

- Even if the Debtor did not borrow from Latoc, it could not repay the GTCA.

- The Blue Sky Obligations (which were incurred in the first quarter of 2008) were immediately in default, and the Debtor never made any payments on account of those obligations.

- The Debtor similarly did not have the benefit of any Blue Sky advances.

- The Debtor would not have been able to pay back the Blue Sky Obligations with or without the money paid back on the Latoc Loan.

- Even if the Debtor retained its tax refund [in 2009 rather than paying Latoc], it still could not have sustained its operations.

Thus, the undisputed evidence is overwhelming that the Debtor was unable to pay its debts as they came due during the entire Relevant Period (ending September 30, 2009). Significantly, the Debtor took on the Latoc obligation in the fourth quarter of 2007, when it was already in default of the GTCA obligations, with the vast majority of the advances occurring in that same quarter ($1,575,000) and the first quarter of 2008 (an additional $334,000), for a total of approximately

$1.9 million during that short period.[187]  The Blue Sky advances of $1 million occurred entirely in the first quarter of 2008, and the proceeds of both those loans were immediately transferred or directly paid to PermaLife and affiliated entities.

Thus, at substantially the same time the Debtor was in default under its GTCA obligation and had a judgment of over $700,000 entered against it, the Debtor was simultaneously borrowing $3 million, but received none of the benefit of those proceeds.  Instead, the Debtor transferred them to other entities that never repaid the Debtor.  Also, the Latoc and Blue Sky Obligations remained in default during the entire Relevant Period.  During that same period, the Debtor had no line of credit, and no unencumbered assets or access to capital that would have provided at least some funding for its ongoing obligations.  Thus, the Debtor was plainly unable to pay its debts as they became due, as was acknowledged by Latoc.

This Court also determines that someone with the extensive financial and accounting background of Mr. Sergi and his intimate involvement in and management of the Debtor's operations and financial affairs knew or should have known that the Debtor had no ability to pay its existing obligations as they became due.  As was also acknowledged by Latoc, the Debtor's inability to pay its debts as they became due would have been true even without taking on the additional and substantial burdens of the Latoc Note ($2 million) and Blue Sky Obligations (about $1 million) at around the same time.  This Court finds that those substantial burdens were made even worse by the undisputed fact that the Debtor did not receive the benefit of either of those transactions.

While this mountain of evidence is more than sufficient for this Court to determine that Sergi knew or should have known that the Debtor could not reasonably expect to be in a position

---

[187] (See Latoc Proof of Claim, Accrual Sch., P-3.)

42

to repay its normal operating expenses, as well as its extraordinary obligations to Latoc and Blue Sky, Sergi made his subjective personal knowledge of the Debtor's dire financial condition well known in his September 20, 2005 letter to GTCA's board.[188]  In that letter, Sergi accurately painted a picture of severe financial distress for the Debtor.  The many difficult -- and ultimately insurmountable -- issues facing the Debtor included the following:

- Many years of neglect by prior management caused "severe distress" to the Debtor.

- Capital improvements needed to be made, but had to be funded from an outside source because the Property's cash flow could not fund those expenses.  No such outside funding source was available at the time, nor did one materialize thereafter.

- The Debtor's major tenant -- the theater -- failed and left its space vacant.  That space was never re-rented by the Debtor.

- Extensive common charges and taxes that resulted in charges of $22.40 per square foot. Few tenants paid anything in excess of that amount with the average rental below this level.  This does not even take into account payments to vendors, the GTCA and needed capital improvements.

- The Debtor's rental base was eroding while costs were increasing.

- Sergi indicated that one of the options the Debtor should consider is a deed-in-lieu of foreclosure.

There was no evidence adduced at trial that any of these issues were addressed in whole or in part at any time after this 2005 letter.  To the contrary, Mr. DeGraw's opinion and the substantial evidence on which it was based demonstrated that the Debtor's financial problems continued unabated and even became worse, with only a temporary and partial reprieve when the Debtor decided to start selling units after the condominium conversion and the Valley financing closed. But, as noted by Mr. DeGraw, these sales resulted in further erosion of the rental base, did not provide any significant free cash flow to pay other obligations and therefore did not ameliorate the

---

[188] (P-5.)

Debtor's already insufficient and deteriorating cash flow situation.

Thus, the Court finds that the Debtor (through Mr. Sergi) was painfully and fully aware of its desperate financial condition -- its inability to pay its debts as they came due -- well before and during the entire Relevant Period. *See McNamara v. PFS, a/k/a Premium Financing Specialists*, 334 F.3d 239, 243 (3d Cir. 2003) (intent and conduct of corporate officers may be imputed to corporation); *Official Committee of Unsecured Creditors v. In re R.F. Lafferty & Co., Inc.,* 267 F.3d 340, 359-60 (3d Cir. 2001) (imputation rule applies with particular force where, as here, one or just a few individuals control corporation; in such cases, even individual actions adverse to the corporation may be imputed).  Notwithstanding the Debtor's dire financial condition, it took on an additional $3 million of obligations to Latoc and Blue Sky in a relatively short period of time (mostly in the fourth quarter of 2007 and first quarter of 2008) and promptly used all those monies to fund other entities or, to a much lesser extent, pay back Mr. Sergi. Those obligations plainly and necessarily made a bad financial situation even worse.  It is not surprising to this Court, nor should it have been to anyone -- and especially not Mr. Sergi -- that the Debtor ended up in bankruptcy (and then liquidation) not long after the Relevant Period expired.

For these reasons, Latoc's argument that there was no analysis of Mr. Sergi's subjective intent or belief is rejected on factual and legal grounds.  The numerous admitted or undisputed facts cited above, including (but by no means limited to) Mr. Sergi's extensive financial experience, knowledge of the Debtor and its financial situation, the undertaking of the Latoc and Blue Sky obligations from which the Debtor received no benefit and his letter to the Board were all admitted into evidence and relied upon by this Court in reaching its decision.  Further, as to the mixed question of law and fact as to what Mr. Sergi knew or should have known, the direct and

circumstantial evidence cited above provides ample support for the Court's finding.[189]

In making these determinations, this Court agrees with Latoc and Mr. DeGraw that the Debtor's ultimate decision to convert to condominiums and sell units was understandable in light of the Debtor's dire financial and operational situation, including particularly its demonstrated inability to pay its debts as they became due and lack of capital. But that reasonable decision and the subsequent sales did not transform the Debtor's insolvency to solvency. Instead, the decision to convert and sell its units may have only temporarily delayed, but certainly did not derail, the Debtor's inexorable march into bankruptcy and liquidation. Put simply, the sale of units, the related loss of rental income and unavailability of credit or capital left the Debtor unable to pay its debts as they became due during the entire Relevant Period, even during and after the time the Debtor was able to obtain the Valley National Bank loan. As noted, that financing did nothing to provide the Debtor with the working capital or other unrestricted funding it needed to sustain its ongoing operations and pay its debts as they came due.

In sum, under a reasonableness standard, or a subjective one, this Court finds that the Debtor (through Mr. Sergi) knew or should have known it was incurring debts far beyond its capacity to pay them as they came due during the entire Relevant Period. As a result, the Trustee met his burden of proving insolvency under both N.J.S.A. § 25:2-25(b)(2) and 11 U.S.C. § 548(a)(1)(B)(ii)(I) and (III).

### (b) Unreasonably Small Capital and Assets to Sustain Operations

A transfer may be deemed fraudulent if the debtor's assets (and capital) are unreasonably small to generate sufficient profits to sustain operations.[190] In addressing this standard, New Jersey's Fraudulent Transfer Act, N.J.S.A. § 25:2-25(b)(1) does not require insolvency by name,

---

[189] *See Blixseth*, 514 B.R. at 884.
[190] *MSKP Oak Grove, LLC v. Venuto*, 2016 WL 3566720, at *12 (D.N.J. June 29, 1992).

but rather "a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction."[191]  The Bankruptcy Code utilizes the phrase "unreasonably small capital" in a similar fashion.[192]  As was recognized by the Third Circuit in the *Moody* case in construing the Pennsylvania Fraudulent Conveyance Act, the unreasonably small capital test applies to "financial difficulties short of equitable insolvency."[193] This standard is directed to transfers that leave the debtor technically solvent but doomed to fail and takes into account the debtor's present and prospective debts and whether the remaining assets are sufficient to allow the debtor the liquidity to pay its debts as they become due.[194]

For many of the same reasons this Court found insolvency under the not paying debts as they came due test, the Court reaches the same conclusion as to the inadequacy of capital and assets test.  As noted above, the Debtor's net cash flow was miniscule or negative during the entire Relevant Period.  It was also acknowledged that the Debtor had no lines of credit or other access to working capital from third parties or from ownership or management.  Thus, there were no new or "reasonably anticipated" equity infusions, cash flow from operations or cash from secured or unsecured loans over the Relevant Period that were available to fund operations. The only "funding" that was provided to the Debtor during the Relevant Period was from the Latoc, Blue Sky and Valley National Bank loans.  However, as was noted above, none (or virtually none) of the Latoc Loan proceeds were ever made available for use -- or actually used -- by the Debtor. Instead, those funds were immediately transferred out to PermaLife affiliated entities that did not repay the Debtor.  Worse still, the Latoc Loan transaction was orchestrated by Mr. Sergi and the

---

[191] *See e.g.,* 11 U.S.C. § 548(a)(1)(B)(ii)(II); *In re Fidelity Bond & Mortgage. Co.*, 340 B.R. 266, 294 (Bankr. E.D. Pa. 2006), *aff'd*, 371 B.R. 708 (E.D. Pa. 2007), *citing Moody v. Security Pacific Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992).
[192] *See e.g.,* 11 U.S.C. § 548(a)(1)(B)(ii)(II).
[193] *Moody*, 971 F.2d at 1064, 1070.
[194] *MSKP Oak Grove*, 2016 WL 3566720, at *12-13.

Attars when the PermaLife Entities could not get funding directly from the Attars (through their controlled entity). In short, the Debtor took on a $2 million obligation to Latoc and got literally nothing in return.

Similarly, the Blue Sky Obligations were not used by the Debtor, but instead were also transferred or paid directly to affiliated entities. The Valley National Bank loan also did not provide any free cash or equity to the Debtor. Instead, the Debtor's use of the Valley financing was severely restricted and limited to the refinance of the existing mortgage loan, the payment of the GTCA settlement and construction purposes. Somewhat ironically, the Latoc Loan itself imposed severe restrictions on the Debtor's ability to obtain outside financing by prohibiting any further mortgages.

The Court acknowledges Latoc's argument that access to loans may, in certain circumstances, provide evidence of solvency; however, that was not the case here. The Latoc and Blue Sky loans did not improve the Debtor's cash flow or solvency. Instead, those loans worsened the Debtor's insolvency because those substantial debts (over $3 million) were incurred at a time when the Debtor was unable to pay many of its other ordinary obligations, fund necessary improvements or even pay for the closing costs of the Valley Loan. As was acknowledged by Latoc, even if the Debtor did not borrow from Latoc, it could not repay the GTCA or Blue Sky Obligations. Thus, contrary to Latoc's arguments, there is a direct temporal link between the Latoc and Blue Sky transactions and the Debtor's continuing and worsening insolvency.[195] While those transactions may not have directly caused the Debtor's insolvency (because it was already insolvent as found by this Court), they were made at a time when the Debtor was already insolvent and worsened that situation.

---

[195] *Moody,* 971 F.2d at 1071.

Similarly, the Valley Loan did not ameliorate -- or much less cure -- the Debtor's insolvency or its unreasonably small capital and assets to sustain operations because those loan proceeds were simply not available to fund ordinary operations.  Thus, in this case, the Debtor's ability to obtain "loans" during the Relevant Period either worsened its insolvency, as was the case with the Latoc and Blue Sky Obligations, or simply did not affect its inability to generate sufficient cash flow to sustain its operations and pay its ordinary obligations as they became due.

Here, the Court acknowledges and rejects Latoc's argument that there must be a direct *causal* link between the challenged transaction and the Debtor's insolvency, *citing Moody,* 971 F.2d at 1070-71.  The *Moody* case and the express language of the federal and state fraudulent transfer statutes do not go so far.  While the *Moody* court did state that the Pennsylvania Fraudulent Conveyance statute and the District Court looked for a link, the *Moody* case involved a challenge to a leveraged buyout transaction ("LBO") and a company that had a long history of profits prior to the LBO.  Of course, that is a very different situation than that involved in this case.    Thus, *Moody* involved not only a different state statute but substantially different facts.

Further, and dispositively, neither the federal nor New Jersey fraudulent transfer statutes require that the challenged transaction cause the insolvency or result in unreasonably small assets. The transaction also may be avoided if the Debtor was already insolvent and/or had unreasonably small capital at the time the challenged transaction(s) occurred.  And because they are written in the disjunctive neither do they exclude the possibility that the challenged transaction caused the insolvency.  Either situation is sufficient.  Relying on the plain language of the applicable statutes, this Court finds that the insolvency (or unreasonably small capital) may be found under the applicable provision of Title 11 (11 U.S.C. § 548) and New Jersey law (N.J.S.A. §§ 25:2-25 and 25:2-27) either at the time the challenged transfers are made or as a situation that occurs as the

48

result of the challenged transaction itself.  For example, 11 U.S.C.§ 548(a)(1)(B)(ii)(I) avoids a transaction for less than reasonably equivalent value if the debtor was insolvent at the time of the transfer *or* became insolvent as a result of the transfer.  Similarly, § 548(a)(1)(B)(ii)(III) avoids a transaction where the Debtor was engaged *or* was about to engage in a transaction for which the debtor was left with unreasonably small capital.  Likewise, N.J.S.A. §§ 25:2-25(b) and 25:2-27(a) refer to transactions made at a time when the Debtor was insolvent *or* had unreasonably small capital *or* became insolvent or was left with unreasonably small capital as the result of the transaction. *Moody* does not hold otherwise or require a different result here.  *See In re Blixseth*, 514 B.R. at 883 (rejecting the argument that there must be a causal link between the challenged transaction and the financial distress).

In sum, the Debtor's limited and often negative cash flow, at a time when it was not paying many of its regular bills, the unavailability of any lines of credit or equity funding and the restrictions on the use of the Valley Loan proceeds, demonstrate that the Debtor had unreasonably small assets and capital to sustain its operations during the entire Relevant Period.  And for the same reasons the Court found that the Debtor knew or should have known it would be unable to pay its debts as they became due, it was reasonably foreseeable that the Debtor's assets would be insufficient to pay its creditors, especially when the Debtor took on the Latoc and Blue Sky Obligations without receiving the proceeds or any benefit from them.

These conclusions are further buttressed by the Debtor's exceedingly low current assets ratio (or liquidity test).  As testified to by Mr. DeGraw, this test seeks to determine what liquid assets an entity has available to meet its current obligations over the coming months.[196]  If the current assets ratio is one or over, the Debtor has sufficient current assets to meet current liabilities.

---

[196] (Pl.'s Findings ¶ 139, Dkt. No. 138.)

If the ratio is less than one, the entity has insufficient current assets to meet its current liabilities.[197]

The Debtor's current ratio was significantly below one in every quarter during the Relevant Period. The Debtor's highest ratio was .49 in the quarter ended September 30, 2007, the quarter before the Relevant Period, and quickly worsened to .14 by December 31, 2007. The lowest point was for the quarter ended September 30, 2009 when the current ratio was .02.[198] At this point, the Debtor was poised to enter into bankruptcy. Thus, DeGraw's current ratio analysis further supports the Court's conclusion as to the Debtor's insolvency under both the ability to pay debts as they come due and unreasonably small assets and capital to sustain operations tests.

This Court accordingly finds that the Debtor was also insolvent at all times during the Relevant Period under the federal and state unreasonably small assets and capital test.[199]

### (c) **The Balance Sheet Test**

A debtor is deemed insolvent under the adjusted balance sheet test if its assets at fair valuation are greater than its debts.[200] As was noted above, this Court denied summary judgment for the portion of the Relevant Period that the Debtor's balance sheets (as prepared by Mr. DrGraw) indicated its assets, at fair valuation, were in excess of its liabilities; i.e., from the quarter ended December 31, 2007 to the quarter ended December 31, 2008. Part of the Court's reasoning for that decision was that in addition to the excess value of its assets over its liabilities was that the Debtor was able to obtain $7.5 million in financing from Valley in May of 2008.[201] However, Mr. DeGraw was careful to point out that while the value of the Debtor's assets may indeed have

---

[197] (*Id.*)

[198] (*Id.* at ¶ 140; P-10.)

[199] 11 U.S.C. § 548(a)(1)(B)(i) and (ii)(I) and (II); and N.J.S.A. § 25:2-25(b)(1) advances; see *MSKP Oak Grove*, 2016 WL 3566720, at *12-13); *Moody,* 971 F.2d 1056, 1070.

[200] *Blixseth*, 514 B.R. at 881 *quoting In re Koubourlis*, 869 F.2d 1319, 1321 (9th Cir. 1989).

[201] Giving all inferences in favor of Latoc, the Court also denied summary judgment as to the first two months of 2009 because the Blue Sky default was not yet declared and there was no indication in the record as to the Debtor's equity position during that short period. However, when the Blue Sky default was declared in March of 2009, there was no question that the Debtor was hopelessly insolvent from that period forward.

exceeded its liabilities during that period, the Debtor was illiquid. In other words, the Debtor had no way to readily access that excess value to fund its insolvent operations.

The only way the Debtor could access that excess value was through a construction loan that severely restricted the ways in which the Debtor could use those funds and provided no relief on a working capital basis. In fact, by selling units, the Debtor traded long-term value for temporary, limited and sporadic infusions of cash when sales occurred, but simultaneously reduced the Debtor's cash flow as the sold units were providing no rental income. Thus, the combination of limited use of proceeds and loss of rental income from the conversion did very little to improve the Debtor's longer term illiquidity and insolvency. The Debtor was briefly able to make some payments and even "catch up" on the interest due on the Latoc Loan for a short period in early 2009, but that did not change the fact that the Debtor remained generally unable to pay its other debts as they became due and had unreasonably small capital and assets during the entire Relevant Period.

The concept of technical solvency while the debtor may be illiquid and therefore practically insolvent was addressed by the *Moody* court in a footnote. There, the Third Circuit stated as follows:

> A debtor may have substantial paper net worth including assets which have a small salable value, but which if held to a subsequent date could have a much higher salable value. Nevertheless, if the *present* salable value of assets are less than the amount required to pay existing debts as they mature the debtor is insolvent.

*Moody*, 971 F.2d at 1066, n.13 (emphasis in original).

In contrast to the *Moody* case, which involved an LBO transaction and a debtor that was generally profitable and solvent for many years prior to the LBO, the Debtor in this case was generally not profitable except for 2008, when there were substantial, but limited and

non-recurring, cash flows from the sale of units and the tax appeal litigation.[202]  Further, and more significantly based upon the facts of this case, while the Debtor's assets may have been worth more than its liabilities during at least a portion of the Relevant Period (as was initially determined by Mr. DeGraw), the *present salable* value of those assets was less than what was necessary to pay its debts as they matured.  As a result, and as both Mr. DeGraw and the Third Circuit in *Moody* opined, even though this Debtor may have been technically solvent for a limited period under the balance sheet test, it was illiquid and practically insolvent in any event.[203]

Further distinguishing *Moody* (which is heavily relied upon by Latoc) was the fact that a $15.5 million line of credit that was available to the debtor in that case to fund current obligations. That line of credit, combined with projections the Court determined were reasonable, showed that it was reasonable to believe that the debtor in *Moody* would be able to pay its debts as they came due.[204]  The *Moody* scenario is in sharp contrast to this case where there was no line of credit (or other working capital financing) available, no prior history of significant profits and cash flow, and there were no projections showing the Debtor could pay its debts as they came due.  Thus, while the availability of credit was properly considered in favor of a finding of solvency in *Moody*,[205] the highly restricted use of the Valley Loan proceeds -- and the Debtor's non-use of the Latoc and Blue Sky proceeds -- did nothing to address the Debtor's inability to pay its regular debts as they came due, especially on a longer term basis. In fact, as this Court has already found, the Latoc and Blue Sky transactions only deepened the Debtor's continuing insolvency, at a time it was already unable to pay its debts as they became due.

In sum, as was concluded by Mr. DeGraw, while the Debtor may have technically been

---

[202] (Jt. Stip. ¶ 21, Dkt. No. 107.)
[203] (DeGraw Rpt. at 27, Ex. A to DeGraw Certif., and Ex. M thereto, Dkt. No. 95-5.)
[204] (*Moody*, 971 F.2d at 1074.)
[205] (*Id.* at 1072-73.)

solvent under the balance sheet test for a portion of the Relevant Period, it was also illiquid during that Period, rendering the Debtor's technical solvency insufficient to overcome its actual insolvency under the unable to pay debts as they come due and insufficiency of capital and assets tests.

*   *   *

For all these reasons, the Court finds that the Debtor was insolvent during the entire Relevant Period based on its inability to pay its debts as they became due, the Debtor's actual or constructive knowledge of its dire financial situation, and the Debtor's lack of sufficient assets or capital to sustain its operations.  And while the value of the Debtor's assets may have exceeded its liabilities during the period from the fourth quarter of 2007 to the fourth quarter of 2008, the Debtor was nonetheless illiquid during the entire Relevant Period and unable to access that value to fund its operations.

## B. Avoidance and Recovery of Fraudulent Prepetition Transfers Pursuant to 11 U.S.C. §§ 544(b)(1), 548(a)(1)(B) and 550

Pursuant to 11 U.S.C. § 550, to the extent that a transfer is avoided under 11 U.S.C. §§ 544, 547, 548, or 549, the Trustee may recover the property transferred or the value of such property. 11 U.S.C. § 550(a). Here, because the Court finds the Prepetition Transfers avoidable as fraudulent under 11 U.S.C. §§ 544 and 548, the Trustee may recover the value of the avoided payments made to Latoc on the Note under section 550(a).

## C. Under 11 U.S.C. § 502(d) Latoc's Proof of Claim is Disallowed Unless and Until Prepetition Transfers are Recovered by the Trustee

The Bankruptcy Code Section 502(d) states that:

> [T]he Court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 552(h), 544, 545, 547, 548, 549 or 724(a) of this title, unless such entity or transferee has paid

53

the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d).

Latoc is the transferee from whom property is recoverable and is the transferee of avoidable transfers under Title 11 of the United States Code. Latoc has not yet turned over this recoverable property/transfers. Consequently, the Court disallows Latoc's Proof of Claim in the Debtor's bankruptcy case unless and until the amount of the judgment for the avoided transfers is paid to the Trustee in full.

## VII.  <u>CONCLUSION</u>

For all the foregoing reasons, judgment is entered in favor of the Trustee and against Latoc avoiding the Latoc Note and the Prepetition Transfers in the amount of $592,875, plus interest at the rate set forth in 28 U.S.C. § 1961.  The Prepetition Transfers may be recovered by the Trustee against Latoc for the benefit of the estate.  Further, Latoc's Proof of Claim against the Debtor's estate is disallowed unless and until Latoc pays the full judgment amount to the Trustee.  A separate Judgment will be entered in accordance with this Opinion.

Dated: April 4, 2019

/s/ Vincent F. Papalia
VINCENT F. PAPALIA
United States Bankruptcy Judge