**FILED**

Jeanne A. Naughton, CLERK

**April 29, 2022**

United States Bankruptcy Court
Newark, NJ

By:    *Juan Filgueiras*

Juan Filgueiras, Court Room Deputy

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: | Case No.:      10-12435 (VFP) |
| THE MALL AT THE GALAXY, INC., | Chapter:      7 |
| Debtor. | Judge:      Vincent F. Papalia |
| STEVEN P. KARTZMAN, as Chapter 7 Trustee, | Adv. Pro. No.   12-1769 (VFP) |
| Plaintiff, v. | |
| LATOC, INC., Defendant. | |

## OPINION AFTER TRIAL ON
## ISSUE OF REASONABLY EQUIVALENT VALUE

<u>**APPEARANCES**</u>

MELLINGER, SANDERS & KARTZMAN, LLC
101 Gibraltar Drive, Ste. 2F
Morris Plains, NJ  07950
Steven P. Kartzman, Esq.
Steven A. Jayson, Esq.
Attorneys for Steven P. Kartzman,
Chapter 7 Trustee/Plaintiff

PETER A. OUDA, ESQ.
19 North Bridge Street
Somerville, NJ  08876
Attorney for Defendant, Latoc, Inc.

## I.    INTRODUCTION

This is the Court's Opinion on remand after trial.  The trial followed the April 9, 2020 Opinion and Order of the United States District Court for the District of New Jersey (the "District Court"), which reversed in part the Bankruptcy Court's April 4, 2019 Opinion issued after a three-day trial (as well as a January 19, 2017 Order for partial summary judgment) in the avoidance action filed by Chapter 7 Trustee Steven P. Kartzman, Esq. (the "Trustee") against defendant Latoc, Inc. ("Latoc" or the "Defendant").  The District Court remanded the adversary proceeding to the Bankruptcy Court for further findings solely on the issue of reasonably equivalent value. The Bankruptcy Court conducted a trial on the remanded issue on August 25 and August 26, 2021 and issues this Opinion in compliance with the District Court's Order.

The Trustee's adversary proceeding seeks:

(i)        to avoid a November 15, 2007 promissory note for $2 million between Latoc as lender and The Mall at Galaxy, Inc. (the "Debtor" or the "Mall") as borrower; and

(ii)       to recover for the estate as constructively fraudulent transfers, under federal and state fraudulent transfer law, payments totaling $592,875.03 that Debtor made to Latoc in partial repayment of the loan.

The Trustee argues that Debtor acted as a mere conduit or pass-through for the loan because the Debtor immediately transferred the $2 million in loan proceeds to certain non-debtor entities (defined below as the PermaLife Entities) in which the principals of the Debtor and Latoc both had interests -- but only after a direct loan from Latoc to the PermaLife Entities had been rejected. As a result, the Trustee asserts that the Debtor did not receive reasonably equivalent value for the $2 million loan from Latoc or the $592,875.03 that the Debtor repaid to Latoc on that loan (the "Pre-Petition Transfers") and that the Pre-Petition Transfers should be avoided as constructively fraudulent transfers under applicable state and bankruptcy law.  *See* 11 U.S.C. § 548(a)(1) and 11 U.S.C. § 544(b)(1), which allows the Trustee to pursue such claims under applicable state law,

here N.J.S.A. §§ 25:2-25a(2) and 25:2-27a.   Latoc disputes the Trustee's claim that the Debtor

acted as a mere conduit or pass-through for the loan, arguing that it placed no restrictions on the

Debtor's use of the loan proceeds and that the Debtor reasonably and legitimately used those

proceeds to invest in its alleged subsidiaries.

After trial, the Trustee and Latoc each submitted: (i) Proposed Findings of Fact and

Conclusions of Law; and (ii) responses thereto.[1] Other proceedings germane to this remand

occurred in Bankruptcy Court between the District Court's issuing its April 9, 2020 Opinion and

the Bankruptcy Court's trial of August 25-26, 2021.  These proceedings are described below.

## II.    JURISDICTIONAL STATEMENT

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the Standing

Orders of Reference entered by the United States District Court on July 10, 1984 and amended on

September 18, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) [claims

allowance], (H) [recovery of fraudulent transfer] and (O).  Venue is proper in this Court under 28

U.S.C. § 1408. The Court issues the following findings of fact and conclusions of law pursuant to

Fed. R. Bankr. P. 7052. To the extent that any of the findings of fact might constitute conclusions

of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute

findings of fact, they are adopted as such.

## III.    STIPULATED FACTS AND PROCEDURAL HISTORY

The Trustee's initial post-trial submission, *Post-trial Proposed Findings of Fact as to Issue*

*on Remand* ("Trustee Proposed Findings"), relies in significant part on a Joint Stipulation of

Undisputed Facts (the "Stipulated Facts") agreed to by the parties.  The Stipulated Facts were filed

---

[1] Oct. 15, 2021 Trustee Proposed Findings, Dkt. No. 190; Oct. 15, 2021 Trustee Conclusions of Law, Dkt. No. 191;
Oct. 19, 2021 Latoc Proposed Findings and Conclusions, Dkt. No. 193; Oct. 25, 2021 Trustee Resp., Dkt. No. 195;
Oct. 29, 2021 Latoc Resp., Dkt. No. 196.  Docket references are to the Adversary Proceeding unless otherwise stated.

at Docket No. 180. Many of those Stipulated Facts are relied upon by the Court in issuing this decision. Where non-Stipulated Facts are found or referred to, other appropriate citations will be made.

## A. <u>Background to the Debtor and the November 15, 2007 Loan for $2 Million</u>

Since 1986, Debtor's line of business was leasing commercial units at real property it owned in Guttenberg, New Jersey.[2] Martin Sergi ("Mr. Sergi") was president, treasurer and board member of Debtor since 1986 and 90% equity owner of Debtor since 1997.[3] Mr. Sergi also held equity interests in and served as an officer, director and/or board member of numerous other entities, including (i) PermaLife Products, LLC ("PermaLife"); (ii) Bristow Rubber Recycling ("Bristow"); (iii) New York Rubber Recycling ("NYR"); (iv) Arizona Rubber Recycling LLC ("Arizona"); (v) Piedmont Rubber Recycling, LLC ("Piedmont"); and (vi) PermaLife Internet, LLC ("PLI") (collectively, the "PermaLife Entities").[4] None of the PermaLife Entities engaged in the same line of business as the Debtor.[5]

Mr. Sergi had repeated business dealings with Dibo Attar ("D. Attar") and his son, Raffaele Attar ("R. Attar") (collectively, the "Attars"), and with entities in which the Attars held interests and/or controlled.[6] The Attars directly or indirectly also held equity interests in PermaLife (including through Better Half Bloodstock, Inc., an entity in which the Attars owned interests).[7] R. Attar served as a director of PermaLife until shortly before it filed for bankruptcy protection

---

[2] Stipulated Facts ¶¶ 2-3, Dkt. No. 180.
[3] Stipulated Facts ¶ 4, Dkt. No. 180.
[4] Stipulated Facts ¶ 7, Dkt. No. 180.
[5] Stipulated Facts ¶ 8, Dkt. No. 180. The first four of these named entities filed for Chapter 11 protection in 2009. *In re PermaLife Products, LLC*, Case No. 09-11482 (MS); *In re Bristow Rubber Recycling, LLC*, Case No. 09-11496 (MS); *In re New York Rubber Recycling, LLC*, Case No. 09-11489 (MS); *In re Arizona Rubber Recycling, LLC*, Case No. 09-11500 (MS). PermaLife and NYR were converted to cases under Chapter 7 by Orders entered on August 25, 2010 (Dkt. Nos. 339, 46); and Bristow and Arizona were dismissed by Orders entered on August 24, 2010 and on August 25, 2010, respectively (Dkt. Nos. 40).
[6] Stipulated Facts ¶ 10, Dkt. No. 180.
[7] Stipulated Facts ¶ 12, Dkt. No. 180.

with various other PermaLife Entities in 2009.[8]  R. Attar also served as president of Latoc and of Better Half Bloodstock during the relevant period.[9]

In 2007, PermaLife needed funding and sought financing from the Attars.[10] PermaLife's need for financing stemmed in substantial part from a fire that occurred in September 2007 at its Arizona facility, causing significant damage.[11]  Because of R. Attar's conflicting roles with the prospective borrower (PermaLife) and lender (Latoc), the PermaLife Board would not approve borrowing from an Attar-affiliated entity such as Latoc.[12]  Additionally, Gemini Investors IV, L.P. ("Gemini"), an existing, secured creditor of PermaLife, had imposed restrictions in its loan terms (the "Gemini Loan") that prevented PermaLife from further borrowing from third parties.[13]  These restrictions also prevented a direct loan to PermaLife by Latoc.

The parties dispute (at the fringes) how Latoc's $2 million loan to the Debtor came about. Based on D. Attar's deposition testimony, as confirmed by R. Attar and Mr. Sergi, the parties agree that the Latoc Loan was discussed while Mr. Sergi and D. Attar were on vacation in Italy later that same month (September 2007).[14]  At that time, when the parties also discussed the fire at the Arizona PermaLife facility, Mr. Sergi approached D. Attar for a loan.[15]  When asked at deposition if that was for a loan to PermaLife, D. Attar said:  "no for a loan," and he ultimately testified that the request was for a loan to the Debtor.[16]

Shortly thereafter, Mr. Sergi and D. Attar caused the Debtor and Latoc to enter into a $2 million loan agreement (the "Loan" or the "Latoc Loan") that was evidenced by a November 15,

---

[8] Stipulated Facts ¶¶ 9, 14, Dkt. No. 180.
[9] Stipulated Facts ¶¶ 12, 15, Dkt. No. 180.
[10] Stipulated Facts ¶ 11, Dkt. No. 180.
[11] Stipulated Facts ¶¶ 20-21, Dkt. No. 180.
[12] Stipulated Facts ¶ 13, 17, Dkt. No. 180.
[13] Stipulated Facts ¶ 13, 18, Dkt. No. 180; June 3, 2014 Sergi Dep. 23:11-19, P-26 ("Latoc couldn't loan direct").
[14] Aug. 26, 2021 Trial Tr. 41:7-21, Dkt. No. 183.
[15] Stipulated Facts ¶ 19, Dkt. No. 180; May 4, 2014 D. Attar Dep. 58:1-59:19; 60:9-20; 61:11-16, P-27.
[16] Stipulated Facts ¶ 20; May 4, 2014 D. Attar Dep. 59:1-3, P-27.

2007 promissory note (the "Latoc Note").[17]  The Latoc Note required the Debtor to repay the loan with interest and as it sold condominium units, among other terms.[18]  It is undisputed and indeed stipulated that the $2 million in loan proceeds (the "Loan Proceeds") were deposited into Debtor's account at JP Morgan Chase Bank, N.A. through advances made from October 2007 (before the Latoc Note was signed in November) through May 2008.[19]  It is similarly stipulated that, after being deposited in those accounts, all or virtually all the Loan Proceeds were immediately transferred to various PermaLife Entities, which were "all entities that [Mr.] Sergi and the Attars controlled and/or in which he [Sergi] and the Attars held an ownership interest."[20]  The Debtor and the PermaLife Entities did not enter into any written agreement regarding the transfer of the Latoc Loan proceeds or how they would be repaid to the Debtor.[21]  During the period from February 2008 to September 2009, the Debtor made the Pre-Petition Transfers in the amount of $592,875.03 to Latoc in repayment of that Loan.[22]

As part of its defense, Latoc asserts that it was not aware of the purpose of the Latoc Loan and that it did not restrict or limit how its proceeds would be used.[23]  The Court finds this contention to be not credible for several reasons.  First, the timing of the Loan, which was made shortly after the fire at the PermaLife facility in Arizona and after a direct loan from the Attars or their entities had been rejected by the PermaLife Board, strongly indicates that both the Debtor and Latoc knew what the purpose of the Loan was.  Second, the acknowledged discussions

---

[17] Stipulated Facts ¶ 22, Dkt. No. 180; R. Attar became involved after the terms of the Loan were agreed upon by Mr. Sergi and D. Attar.  *Id*. at ¶ 21.  Latoc Proof of Claim No. 1-1 and P-5.
[18] Stipulated Facts ¶¶ 22-23, Dkt. No. 180.
[19] Stipulated Facts ¶ 28, Dkt. No. 180; see also Nov. 23, 2020 Certification of Kenneth J. DeGraw ¶ 3; and Ex. A, Dkt. No. 156-2 ("DeGraw Certif. I").
[20] Stipulated Facts ¶ 29, Dkt. No. 180 (further stipulating that "virtually all" the loan proceeds were "contemporaneously" transferred to the PermaLife Entities); July 12, 2011 Sergi Aff. ¶ 12, P-25 ("I immediately transferred the [Loan] proceeds to PermaLife's and Piedmont's accounts").
[21] Stipulated Facts ¶ 24, Dkt. No. 180.
[22] Stipulated Facts ¶¶ 25-26, Dkt. No. 180 (reciting approximate amount of $600,000).
[23] Latoc Proposed Findings, ¶¶ 33, 40-44, Dkt. No. 193; see also Stipulated Facts at ¶¶ 20-21, Dkt. No. 180; May 14, 2014 D. Attar Dep. 58:1-60:20, P-27.

between Mr. Sergi and the Attars as to PermaLife's need for funding after the fire further confirm

this knowledge.  Third, the immediate and full disbursement of the Loan Proceeds by the Debtor

to PermaLife and its affiliates as advances were made by Latoc is completely consistent with that

intended purpose.  Fourth, the close business and personal relationships between Mr. Sergi and the

Attars, including particularly their common interests in the PermaLife Entities, all evidence to the

Court that both the Debtor and Latoc knew precisely what the intended purpose of the Latoc Loan

was and how those proceeds would be used -- to provide the immediately needed financing to the

PermaLife Entities -- and the Court so finds.  To find that Latoc did not know what the purpose of

the Loan was would require this Court to ignore these cumulative (and often stipulated)

surrounding facts and circumstances, all of which point to a knowingly and intentionally structured

transaction that allowed Latoc to do indirectly what it could not do directly -- make a loan to the

PermaLife Entities, who were the intended and actual beneficiaries of that Loan.

This finding is further supported and indeed confirmed by a July 12, 2011 Affidavit

submitted by Mr. Sergi in the PermaLife bankruptcy proceedings.  There, Mr. Sergi explained

under oath and in a consistent manner the circumstances that surrounded the Latoc Loan, including

the PermaLife Board's refusal to allow a direct loan from Attar-affiliated entities to PermaLife

because of conflict of interest and how the Latoc Loan was designed to "manage the conflict"

created by a direct loan from any Attar entities to PermaLife:

> 11.  . . .The circumstances leading to Latoc's claim began in 2007, <u>when PermaLife
> was seeking financing</u>.  At this time, Raffi Attar was a director of PermaLife and
> the president of Latoc.  PermaLife was seeking financing so it could expand
> operations.  <u>Due to conflicting interests, the PermaLife board would not authorize
> borrowing from an Attar affiliated entity</u>.
>
> 12**.**  <u>In order to facilitate the loan and manage the conflict that precluded a direct
> loan to PermaLife</u>, Latoc made the Loan to the Mall, which then transferred the
> proceeds to PermaLife and Piedmont, one of the Mall's subsidiaries . . . <u>The Loan</u>

<u>proceeds were deposited into the Mall's accounts, and then I immediately
transferred the proceeds to PermaLife's and Piedmont's accounts.</u>[24]

Thus, it was PermaLife (not the Debtor) that was seeking the financing when the Attars
were approached.  That is because it was PermaLife (and not the Debtor) that needed the financing.
The immediate transfer of the Latoc Loan Proceeds by the Debtor to the PermaLife Entities was
completely consistent with the true and intended purpose of the Latoc Loan, i.e., to provide the
desperately and immediately needed funding to the PermaLife Entities.  In fact, the parties
stipulated that, with each disbursement from Latoc to the Debtor, Mr. Sergi "caused the Debtor to
contemporaneously reconvey all or virtually all of the loan proceeds to accounts owned by
PermaLife, NYR, Bristow, Arizona, PLI and to or for the benefit of Piedmont."[25]   All of these
beneficiaries were "entities that [Mr.] Sergi and the Attars controlled and/or in which he and the
Attars held an ownership interest."[26]  The Court finds that the substantial and continuing business
and personal relationships between Mr. Sergi and the Attars, particularly as related to PermaLife,
also belie any notion that Latoc did not know what the purpose of the $2 million Loan to the Debtor
was.

Along similar lines, Latoc also argued that the Latoc Loan terms did not require the Loan
Proceeds to be used for any particular purpose.  For many of the same reasons that the Court found
that both Latoc and the Debtor knew what the purpose of the Latoc Loan was, this Court also finds
that the lack of any specific terms regarding the use of proceeds in the three-page Latoc Note --
the only document executed in connection with the $2 million Latoc Loan -- is more indicative of

---

[24] July 12, 2011 Sergi Aff. ¶¶ 11-12, Ex. P-25 (emphases supplied).
[25] Stipulated Facts ¶ 29, Dkt. No. 180; see also DeGraw Certif. I, Analysis of Use of Latoc Proceeds, Ex. A, Dkt. No. 156-2; Jan. 18, 2021 Certification of Kenneth J. DeGraw; Supplemental Analysis, Ex. A, Dkt. No. 160-4 ("DeGraw Certif. II").
[26] Stipulated Facts ¶ 29, Dkt. No. 180.

the close business and personal relationships between Mr. Sergi and D. Attar, rather than any lack of knowledge by Latoc as to how the Loan Proceeds would be used.

For these reasons, and others that will be described below, the Court rejects Latoc's argument that there was no evidence that Latoc was aware of the purpose and intended use of the Latoc Loan and its Proceeds.[27]   In reality, there was ample evidence that Latoc was aware of PermaLife's immediate need for funding, the PermaLife Board's refusal to allow that funding from the Attars and the restructuring of that transaction to allow the Loan to be made through the Debtor indirectly rather than PermaLife directly.   Accordingly, the Court finds that both the Debtor and Latoc knew very well that the purpose of the Latoc Loan was to "manage the conflict" of the Attars "that precluded a direct loan" to PermaLife by having the Loan made indirectly through the Debtor so that the Debtor could immediately provide the Latoc Loan proceeds to the PermaLife Entities. And that is exactly what happened, as those parties intended and Mr. Sergi admitted in his Affidavit.

### B.  The Bankruptcy Petition and Trustee's Adversary Proceeding

The Debtor filed its voluntary Chapter 11 petition on January 28, 2010, and the case converted to one under Chapter 7 on June 1, 2011.  Latoc filed Proof of Claim No. 1-1 on February 23, 2010 for $1,828,123.67, the balance that it calculated as due on the Latoc Note (the "Latoc Proof of Claim").  The Chapter 7 Trustee filed the instant Adversary Complaint on July 30, 2012, followed by Amended Complaints on October 24, 2014 and on May 12, 2016, to recover as a fraudulent or preferential transfer the $592,875.03 that Debtor made in Loan repayments to Latoc (the "Pre-Petition Transfers").  The Trustee retained Withum Smith and Brown, P.C. ("Withum")

---

[27] See, e.g., Latoc Resp. at 11, Dkt. No. 196.

as his accountant by Order entered on July 1, 2011 and ultimately engaged Kenneth J. DeGraw, CPA, CFP, CFE ("DeGraw"), a principal at Withum, as his expert witness.[28]

The parties engaged in significant discovery and discovery motion practice and entered a total of nine Joint Scheduling Orders.   DeGraw, who analyzed the Debtor's solvency by quarter-years, produced in a timely manner an April 14, 2016 Report titled "Solvency of the Debtor Entity" in his cover letter to the Trustee (the "Report").[29]   That Report opined, among other things, that the Debtor was insolvent during the entire Relevant Period defined as the Quarter ended December 31, 2007 to the Quarter ended September 30, 2009.[30]   The September 4, 2016 Fifth Amended JSO granted Latoc until August 31, 2016 to respond to the Trustee's June 20, 2016 discovery demands and until September 12, 2016 to serve its rebuttal expert report and to produce a representative for deposition under the Trustee's June 20, 2016 Notice in Lieu of Subpoena.[31]

Latoc did not provide a rebuttal expert report or otherwise comply with the September 4, 2016 Fifth Amended JSO.  As a result, the Trustee moved on October 3, 2016 for various discovery sanctions,[32] a motion which Latoc did not oppose.  The Court entered an October 24, 2016 Order that barred Latoc from producing an expert report, expert testimony or rebuttal expert testimony at trial:

> 4. As Defendant has advised the Court that it will not be serving any rebuttal expert reports, pursuant to the Fifth Amended Joint Order Scheduling Pretrial Proceedings and Trial, the time period for Defendant to submit rebuttal expert reports and thereafter to take expert depositions expired on September 12, 2016. Defendant shall not be allowed to provide a rebuttal expert report hereafter, nor provide expert testimony at trial to rebut the expert reports submitted by the Plaintiff. [33]

---

[28] July 1, 2011 Retention Order, Main Dkt. No. 187.
[29] Trustee Certif., Apr. 14, 2016 Report, Ex. A, Dkt. No. 168-1 and P-30.
[30] *Id*. at 16.
[31] Sept. 4, 2016 Fifth Amended JSO, Dkt. No. 66.
[32] Oct. 3, 2016 Trustee Mot., Dkt. No. 68.
[33] Order (I) Barring the Defendant from Testifying at Trial for Failure to Obey a Discovery Order on Conditions Pursuant to Fed. R. Bankr. P. 7037(b)(2); (II) Barring the Defendant from Submitting an Expert Report; (III) Barring the Defendant from Providing Expert Testimony at Trial to Rebut the Expert Reports Submitted by the Plaintiff; and (IV) Reducing the Amount of the Defendant's Proof of Claim, entered Oct. 24, 2016, Dkt. No. 73.

The October 24, 2016 Order conditionally barred R. Attar and D. Attar from testifying at trial if they failed to appear for deposition on or before November 25, 2016.[34]  A December 27, 2016 Order finally barred D. Attar from testifying at trial but did not prevent Trustee from subpoenaing him as a witness.[35]

On December 6, 2016, the Trustee moved for partial summary judgment on the issue of reasonably equivalent value, which Latoc opposed.[36]  By Order entered on January 19, 2017, the Bankruptcy Court granted the Trustee's motion for partial summary judgment, finding that the Debtor received less than reasonably equivalent value for the Latoc Loan and its Pre-Petition Transfers to Latoc.[37]

On March 24, 2017, the Trustee moved for partial summary judgment on the issue of insolvency.[38]  Latoc filed an objection, and the Trustee, a reply.  By Order entered on May 22, 2017, the Court found that the Debtor was insolvent during the period from March 2009 through September 30, 2009, but denied without prejudice Trustee's request for a finding that Debtor was insolvent during the period from October 2007 through February 2009, during which certain of the challenged transfers were made.[39]

The Bankruptcy Court initially tried the adversary proceeding for three days, on August 2, 2017, August 4, 2017 and February 27, 2018.[40]  The Court found that the Debtor was insolvent during the entire "Relevant Period" (which was defined as the Quarter ended December 31, 2007 through the Quarter ended September 30, 2009); avoided the Latoc Note and the $592,875.03

---

[34] Oct. 24, 2016 Order ¶ 3, Dkt. No. 73.
[35] Dec. 27, 2016 Order, Dkt. No. 82.
[36] Dec. 6, 2016 Mot. for Summary Judgment, Dkt. No. 77.
[37] Jan. 19, 2017 Order, Dkt. No. 90.
[38] Mar. 24, 2017 Mot. for Summary Judgment, Dkt. No. 95.
[39] May 22, 2017 Order, Dkt. No. 101.
[40] Apr. 4, 2019 Op., at 2, Dkt. No. 142.

repayment as constructively fraudulent transfers under 11 U.S.C. § 544(b) and N.J.S.A.

§§ 25:2-25a(2) and 25:2-27a and preserved the avoided transfer for the benefit of the Debtor's

estate under 11 U.S.C. § 550 (the Judgment also disallowed Latoc's Proof of Claim until Latoc

paid the judgment due the Trustee).[41]

C. **The Appeal by Latoc and the District Court's April 9, 2020 Opinion**

Latoc filed a timely Notice of Appeal on April 17, 2019, appealing not only the Judgment

after trial entered on April 4, 2019 but also the January 19, 2017 Order for partial summary

judgment, which found that the Debtor did not receive reasonably equivalent value for the $2

million Loan or for the $592,875.03 in repayments.[42] Here, it is important to note that Latoc did

not appeal this Court's May 22, 2017 Order that granted partial summary judgment in favor of the

Trustee on the issue of insolvency during a portion of the Relevant Period or that aspect of this

Court's April 4, 2019 Opinion and Order that found that the Debtor was insolvent during the entire

Relevant Period.[43]

By Order and Opinion issued on April 9, 2020, the District Court reversed only that aspect

of the January 19, 2017 Order granting the Trustee partial summary judgment on the issue of

reasonably equivalent value, but otherwise affirmed in all other respects the Court's April 4, 2019

Opinion and Order.[44] In addressing reasonably equivalent value, the District Court held:

> Reasonably equivalent value is not defined in the bankruptcy code. *In re R.M.L.*,
> 92 F. 3d 139, 148 (3d Cir. 1996). In the Third Circuit, courts apply a two-step test

---

[41] Apr. 4, 2019 Op., at 12-15, Dkt. No. 142; Apr. 4, 2019 Judgment, Dkt. No. 143.

[42] Latoc also appealed two other Orders not described in the text above. Apr. 17, 2019 Notice of Appeal, Dkt. No.
146. The first was this Court's Oct. 20, 2017 Order (i) Finding Defendant Waived Its Right to Assert Affirmative
Defenses Under Either 11 U.S.C. § 548(c) and/or N.J.S.A. § 25:2-30(a); (ii) Barring the Defendant from Presenting a
Defense Under Either 11 U.S.C. § 548(c) or N.J.S.A. § 25:2-30(a); and (iii) Barring Any Defense of Good Faith at
Trial, Dkt. No. 122. The second was the Oct. 23, 2017 Order Denying the Plaintiff's Motion in Limine for Entry of
an Order Finding the Trustee's Expert's Testimony to be Within the Scope of His Report and/or Authorizing the
Trustee's Expert to Supplement and/or Correct Omissions in His Report, to the Extent Same is Necessary, and
Granting Alternative Relief to Both Parties, Dkt. No. 123.

[43] See Apr. 17, 2019 Notice of Appeal, Dkt. No. 146 and Latoc's Statement of Issues on Appeal, Dkt. No. 150-1.

[44] Apr. 9, 2020 D. Ct. Order and Op., Dkt. No. 153.

to determine whether a transferor received reasonably equivalent value. The first step is to determine whether the transferor received any value at all. *Id.* at 150. This value need not be direct, tangible, or even easily quantifiable. *See id.* at 149. For example, even "the ability to obtain substantial credit" and "synergy expected to result" from a leveraged buyout qualify as value. *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F. 2d 635, 647 (3d Cir. 1991). Once it has been established that some value has been conferred, the court applies a totality of the circumstances test to determine whether this value was reasonably equivalent to the amount transferred. *In re R.M.L.*, 92 F. 3d at 153. This evaluation can consider, among other factors, the fair market value of what the debtor receives and the arm's-length nature of the transaction. *See id.*[45]

The District Court determined that the Bankruptcy Court should not have found in the January 19, 2017 Order on summary judgment that the Debtor did not receive reasonably equivalent value in the transaction because this Court's focus on whether the Debtor received reasonably equivalent value when it transferred the Latoc Loan Proceeds to the PermaLife Entities was not relevant to the issue of whether the Debtor received reasonably equivalent value from the $2 million Loan made by the Debtor to Latoc.[46]  Instead, the Court's focus should have been on whether the Debtor received any value or reasonably equivalent value from Latoc or whether the Debtor acted as a "[mere] conduit, or pass-through, to get the $2 million to the PermaLife Entities."[47]  The District Court applied the law and made its analysis as follows (quoted in full except that footnote 8 is quoted and discussed separately below):

> The question then, on summary judgment, was whether there was a genuine dispute as to a material fact that could lead the factfinder to conclude the Debtor did receive reasonably equivalent value in exchange for the Pre-Petition Transfers. Latoc argues that there was indeed such a genuine dispute. The Debtor indisputably received $2 million from Latoc, then transferred the Loan proceeds to the PermaLife Entities, and later transferred approximately $600,000 to Latoc in repayment prior to the filing of the petition. Thus, the critical question is whether the Pre-Petition Transfers (*i.e.*, the approximately $600,000) were constructively fraudulent because the Debtor never received reasonably equivalent value from the Loan (*i.e.*, the $2 million). If the Debtor did not receive reasonably equivalent value from the Loan, then the same conclusion is warranted as to the Pre-Petition

---

[45] Apr. 9, 2020 D. Ct. Op., at 9, Dkt. No. 153.
[46] Apr. 9, 2020 D. Ct. Op., at 9-11, Dkt. No. 153.
[47] Apr. 4, 2019 Op., at 11, Dkt. No. 142.

Transfers. In other words, the Pre-Petition Transfers of about $600,000 are inextricably tied to the question of whether the Debtor received reasonably equivalent value in the original loan for $2 million.

As will be discussed, the bankruptcy court focused on whether the Debtor received reasonably equivalent value when it transferred the $2 million to the PermaLife Entities. But these transfers were irrelevant to the question of whether the Debtor received reasonably equivalent value from the $2 million loan.[7] At first blush, the answer as to whether there was value (and, if so, how much value) is straightforward — $2 million, the amount of the loan. As it was a cash loan, there is no need to determine the "reasonably equivalent" value; the parties knew the precise value, that is, $2 million. The critical question becomes whether the $2 million was actually a loan to the Debtor or whether the Debtor was merely a conduit, or pass-through, to get the $2 million to the PermaLife Entities. If the Debtor was a mere conduit, then it did not receive *any* value, and the Pre-Petition Transfers would also not reflect reasonably equivalent value. The Court remands this matter to the bankruptcy court to make this determination in the first instance.[8]

> In ruling on summary judgment, the bankruptcy judge said the following:
>
> [T]he trustee has submitted ample proofs that are unrefuted that neither Piedmont nor PLI had any value at the time of the Loan and that these entities were assets, were either fully encumbered and/or negligible and that they were operating at losses so the Court finds that there was no value.
>
> But even if I were to say there was some value and even if the interests were acquired, even if that could be considered some value, the Court finds that it was not reasonably equivalent to the, in any respect, to the $2 million loan[.]

A227-28. The foregoing analysis by the bankruptcy court would be relevant if the issue were whether the Debtor received reasonably equivalent value when it provided $2 million to the PermaLife Entities. But that was not the issue. Instead, the critical inquiry was whether the Debtor received reasonably equivalent value when it received the $2 million loan. The answer is evident — it did, in the amount of $2 million. However, and as noted above, if the Debtor was not the actual beneficiary of the loan, that is, if the Debtor were merely acting as a conduit or pass-through so that Latoc could get the money to the PermaLife Entities, then the Debtor received no value. In such a case, the Pre-Petition Transfers [would] not be of reasonably equivalent value.

For the foregoing reasons, the bankruptcy court's grant of summary judgment in favor of the Trustee is reversed.[48]

---

[48] Apr. 9, 2020 D. Ct. Op., at 9-11, Dkt. No. 153 (emphasis supplied; bracket added).

At footnote 8, the District Court acknowledged the evidence provided by each party on this point.[49] In doing so, the District Court expressed no opinion about whether the Bankruptcy Court, on remand, could decide the issue of reasonably equivalent value on summary judgment or required a trial:

> The Court is not deciding whether the issue is ripe for adjudication at the summary judgment stage or must be tried. The Trustee puts forth significant evidence that the alleged "loan" to the Debtor was a sham in that the Debtor was merely a conduit to get the money to the PermaLife Entities. Yet, Sergi testified at his deposition that the Debtor did receive value when it provided the $2 million to PermaLife Entities. A067. Sergi claimed that the Debtor received a 20% interest in PLI and became an owner of Piedmont. *Id.* However, there were *no* documents evidencing the payments and ownership to support this assertion. In addition, all of PLI's profits in 2008 were paid out to PermaLife Entities, not the Debtor —further evidence that the Debtor did not own PLI. A083. Moreover, in a different bankruptcy proceeding, Sergi stated that the purpose of the Loan was to allow Latoc to make a loan to PermaLife. A153 at ¶¶ 11-12. Thus, while there may be significant evidence that undercuts the Debtor's argument, there may also be sufficient evidence to create a genuine issue of material fact precluding summary judgment. The Court, however, leaves this determination to the bankruptcy judge on remand.[50]

### D.  **The Remand and Trustee's Two Subsequent Motions**

The Bankruptcy Court held a June 25, 2020 scheduling conference to determine how the parties sought to proceed on remand, i.e., go directly to trial or proceed with another summary judgment motion.  The Trustee advised the Court and Latoc by July 6, 2020 letter that he would address the issue on remand with a third motion for summary judgment (rather than proceeding directly to trial).[51]

---

[49] Apr. 9, 2020 D. Ct. Op., at 10 n.8, Dkt. No. 153.
[50] Apr. 9, 2020 D. Ct. Op., at 10 n.8, Dkt. No. 153 (emphasis supplied, italics in original).
[51] July 6, 2020 Letter from Trustee, Dkt. No. 154.

1. **The Trustee's November 23, 2020 Motion for Summary Judgment**

On November 23, 2020, the Trustee filed his second motion for summary judgment on the issue of reasonably equivalent value.[52]  In that motion, each party introduced one or more new certifications.  The Trustee submitted:

(i)     a new, November 23, 2020 Certification from DeGraw, covering a spreadsheet that analyzed use of the Latoc Loan Proceeds (by date);[53] and

(ii)    a new, January 18, 2021 Certification from DeGraw, covering a spreadsheet that analyzed use of the Latoc Loan Proceeds (by affiliate).[54]

Latoc submitted a new, January 5, 2021 Certification of Mr. Sergi that provided a long background as to the history of the Debtor and his own experience and which also sought to further explain the statements in his July 12, 2011 Affidavit about the purpose of the Latoc Loan and how the Latoc Loan allegedly benefited the Debtor.[55]

By Order entered on March 25, 2021, the Court denied the Trustee's motion for summary judgment on reasonably equivalent value,  essentially based on its finding that, except for the new certifications, the record before the Court was essentially the same as the one on which this Court decided the prior summary judgment motion on reasonably equivalent value and on which the District Court decided the Appeal, and ordered that the issue would be decided after trial.[56]  The March 25, 2021 Order also scheduled an April 22, 2021 pretrial conference before which the parties were directed to attempt to resolve and to narrow as many issues as they could regarding witnesses, exhibits, and any *in limine* motions.[57]

---

[52] Nov. 23, 2020 Trustee Mot. for Summary Judgment, Dkt. No. 156.
[53] Nov. 23, 2020 DeGraw Certif. I, Analysis of Use of Latoc Proceeds, Ex. A, Dkt. No. 156-2.
[54] Jan. 18, 2021 DeGraw Certif. II., Supplemental Analysis of Use of Latoc Proceeds, Ex. A, Dkt. No. 160-4.
[55] Jan. 11, 2021 Sergi Certif., Dkt. No. 159-1 (date of docketing).
[56] Mar. 25, 2021 Order, Dkt. No. 162; Feb. 9, 2021 Hr'g Tr., Dkt. No. 164.
[57] Mar. 25, 2021 Order, Dkt. No. 162.

On April 21, 2021, before the April 22, 2021 conference, the parties filed a *Joint Stipulation*

*as to Authentication and Admissibility of Exhibits and Qualifications of Experts to Testify* that

provided the following:

(i)      Trustee's expert Kenneth J. DeGraw is qualified to testify as an expert.

(ii)     The full deposition transcripts of Dibo Attar (May 4, 2014) and of Martin Sergi
         (June 3, 2014) "shall be admitted into evidence and may be relied upon by either
         party, for any purpose, without limiting [Trustee's] right" to call either as a witness
         and Defendant's right to call Martin Sergi as a witness.

(iii)    The authentication and admissibility of the following documents:

        1. All documents admitted into evidence on the first trial.

        2. All documents and pleadings on the dockets of The Mall bankruptcy, and the
           Latoc adversary proceeding.

        3. All documents and pleadings on the docket of the PermaLife Products
           bankruptcy case.

        4. Joint Stipulation for trial at Dkt. 107.

        5. GTCA v. Mall complaint filed 3/21/07, and Order Granting Summary Judgment
           against The Mall on November 16, 2007.

        6. Analysis of use of Latoc Proceeds – Exhibit A to DeGraw Certification, Dkt.
           156-3.[58]

        7. Analysis of use of Latoc Proceeds by Recipient – Exhibit A to DeGraw
           Certification, Dkt. 160-5.

        8. 07/12/2011 Affidavit of Martin J. Sergi – Exhibit A to Kartzman Certification,
           Dkt 156-6.

        9. Martin Sergi Deposition Transcript (full) – 06/03/2014.

        10. Dibo Attar Deposition Transcript (full) – 05/04/2014.

        11. PermaLife Products, LLC – Opposition to Committee's Motion for Conversion
            filed 01/13/2010, Dkt. 258. Exhibit E to Kartzman Certification, Dkt. 156-10.

---

[58] Dkt. Nos. 156 and 160 cited above are from Trustee's Nov. 23, 2020 summary judgment motion.

12. Declaration of Raffaele Attar in PermaLife Products, LLC, Dkt. 338.[59]

The parties also submitted a *Summary of Matters Not Agreed Upon for Trial of Issue on Remand*.[60]  They included whether the trial would be live or remote; whether the Defendant should provide the Trustee a list of trial exhibits apart from the documents referenced above; and, in most pertinent part:

> 2.    Whether Plaintiff's expert, Kenneth J. DeGraw, may supplement his April 14, 2016 expert report as to the issue on remand, without adding facts beyond those in the record and in Plaintiff's list of documents for the trial on remand.
>
> a.    Plaintiff asserts it is entitled to have its expert testify as to the issue on remand and therefore it is required to provide a supplementary expert report pursuant to F.R.C.P. 26(e)(2).
>
> b.    Defendant objects to a supplementary expert report.[61]

Although Latoc's counsel agreed in the parties' April 21, 2021 *Joint Stipulation* that DeGraw was qualified to testify at trial, at the April 22, 2021 conference, Latoc's counsel reiterated his objection to the Trustee's request to supplement DeGraw's Report.[62]  The Court asked the parties to brief the issue.

## 2.  **The Trustee's May 19, 2021 Motion to Supplement DeGraw's Report**

In response to the Court's request for briefing of the issues, the Trustee, on May 19, 2021, filed a motion to allow DeGraw to supplement his April 14, 2016 Report and to testify as an expert at trial on the issue on remand.[63]  Latoc filed an objection, and the Trustee, a reply.[64]  After a hearing on June 15, 2021, the Court entered a June 24, 2021 Order that:  (i) denied the Trustee's application to allow DeGraw to supplement his April 14, 2016 Report; but (ii) granted the Trustee's

---

[59] Apr. 21, 2021 Joint Stipulation, Dkt. No. 166 (quoted; footnotes omitted).
[60] Apr. 21, 2021 Summary, Dkt. No. 167.
[61] Apr. 21, 2021 Summary, Dkt. No. 167 (quoted).
[62] Trustee Br., at 2, Dkt. No. 168-7.
[63] May 19, 2021 Mot., Dkt. No. 168.
[64] May 28, 2021 Latoc Obj., Dkt. Nos. 172, 173; Trustee Resp., Dkt. No. 175.

application to allow DeGraw to testify at trial on the issue on remand based on his existing Report.[65]

On April 11, 2021, the parties filed the Stipulated Facts (at Docket No. 180) and pretrial briefs (Docket Nos. 179 and 181). Trial was conducted on August 25, 2021 and August 26, 2021.

## IV.    SUMMARY OF ISSUES DEVELOPED AT TRIAL

The District Court deemed it axiomatic the Debtor at least facially obtained "value" for the loan ($2 million in cash) because those proceeds were undoubtedly transferred to the Debtor by Latoc (at least temporarily) and observed that Debtor's election to use the loan proceeds for other than their stated purpose (or for other than the Debtor's own benefit) may not negate Debtor's receipt of value.[66] The District Court also indicated that the Debtor would **not** have received value or reasonably equivalent value for the $2 million Loan Proceeds if Trustee could show that Debtor was a "mere conduit" or "pass-through" for the Loan Proceeds, so that, as a consequence, the Debtor's partial Loan repayment ($592,875.03) was not supported by Debtor's prior receipt of "reasonably equivalent value."

> If the Debtor was a mere conduit, then it did not receive any value, and the Pre-Petition Transfers would also not reflect reasonably equivalent value.[67]

The Trustee also argues that, under the related (or underlying) legal theory of a "collapsed transaction," the Court may disregard the mediate transferee (the Debtor) in a fraudulent conveyance analysis if the transferor knew that the transferred asset was intended to benefit a third party, citing *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986), *cert.*

---

[65] June 24, 2021 Order, Dkt. No. 176; June 15, 2021 Hr'g Tr., Dkt. No. 178. Latoc's counsel stated on the record at the June 15, 2021 hearing that he already concurred with Trustee that DeGraw may testify as to the material in his April 14, 2016 Report. June 15, 2021 Hr'g Tr. 2:13-3:11, Dkt. No. 178.
[66] Apr. 9, 2020 D. Ct. Op., at 10 n.7, Dkt. No. 153.
[67] Apr. 9, 2020 D. Ct. Op., at 10, Dkt. No. 153.

*denied*, 483 U.S. 1005 (1987).[68]  Accordingly, on remand, the issues before the Bankruptcy Court are:

     (i)     whether the Debtor was a "pass-through" or "mere conduit" for the $2 million loan proceeds; and

     (ii)    whether facts adduced at trial concerning the knowledge and intent of the parties in interest allow the Court to disregard the mediate transfer to the Debtor and to collapse the loan transaction from Latoc to the PermaLife Entities.

Latoc argued that it did not impose any conditions on the Debtor's use of the Latoc Loan Proceeds, that it did not know how they would be utilized by the Debtor and that there was no (or insufficient) evidence that the Debtor acted as a mere conduit for the Latoc Loan.  Latoc further argues (through the Debtor's principal, Mr. Sergi) that the Debtor sought the financing from Latoc to fund its acquisition of and investments in its alleged subsidiaries, Piedmont (100%) and PLI (20%), and provide a continued existence for the Debtor.  Latoc also asserts that the success or failure of those investments is not relevant to the reasonably equivalent value inquiry so long as the alleged investment was "reasonable and legitimate," which Latoc argues was the case.

The Court conducted trial on the issue of reasonably equivalent value on August 25 and 26, 2021.  The Trustee called Mr. DeGraw as a witness on his affirmative case.  Latoc called Mr. Sergi and Mr. R. Attar.  All witnesses were subject to cross-examination.  Following trial, the parties each submitted proposed Findings of Fact and Conclusions of Law as to which each party filed a response.

## V.     THE DEBTOR DID NOT RECEIVE REASONABLY EQUIVALENT VALUE FOR THE LATOC LOAN

### A.  <u>Reasonably Equivalent Value</u>

#### 1.  <u>The District Court's Rulings on Appeal</u>

---

[68] Trustee's Conclusions of Law ¶ 88, Dkt. No. 191.

On appeal, the District Court reversed entry of this Court's ruling on summary judgment

that the Debtor did not receive reasonably equivalent value for the $2 million Loan from Latoc

and remanded that singular issue to this Court.[69]   The other rulings of this Court that were the

subject of Latoc's appeal, i.e., an October 20, 2017 Order barring amendment of Latoc's answer

to include certain affirmative defenses and an October 23, 2017 Order permitting certain expert

testimony, were affirmed by the District Court.[70]

Here, it is important to note what the District Court did not rule.  The District Court did not

make any determination as to whether the Debtor received value, or reasonably equivalent value

for the Latoc Loan, as Latoc argues.  Instead, the Court remanded for a determination as to whether:

> the $2 million was actually a loan to the Debtor or whether the Debtor was
> merely a conduit, or pass-through, to get the $2 million to the PermaLife
> Entities. If the Debtor was a mere conduit, then it did not receive any value,
> and the Pre-Petition Transfers would also not reflect reasonably equivalent
> value. The Court remands this matter to the bankruptcy court to make this
> determination in the first instance.[71]

Thus, the questions as to whether the Debtor received any value at all and whether it received

reasonably equivalent value for the $2 million Latoc Loan and the Pre-Petition Transfers were

expressly left open by the District Court.

In doing so, the District Court also noted that it was "not deciding whether the issue is ripe

for adjudication at the summary judgment stage or must be tried."[72] Contrary to Latoc's repeated

assertions that the District Court determined that any evidence related to the value of the PermaLife

---

[69] D. Ct. Op. at 1, Dkt. No. 153.  As a result, this Court's April 4, 2019 Judgment in favor of the Trustee was also revised and remanded.

[70] Id., n.1.  Additionally, as noted above, Latoc did not appeal that portion of this Court's April 4, 2019 Opinion and Judgment that determined that the Debtor was insolvent during the entire Relevant Period (the Quarter ending December 31, 2007 to the Quarter ending September 30, 2009).  See April 4, 2019 Op. at 11, Dkt. No. 142. See Latoc Notice of Appeal, Dkt. No. 146 and Statement of Issues on Appeal, Dkt. No. 150-1.

[71] D. Ct. Op. at 10, Dkt. No. 153 (emphasis supplied).

[72] Id., n.8 (emphasis supplied).

Entities or the Debtor's alleged ownership interest in them is irrelevant or immaterial,[73] the District Court referred to the "significant evidence" put forth by the Trustee "that the alleged 'loan' to the Debtor was a sham in that the Debtor was merely a conduit to get the money to the PermaLife Entities."[74] In this connection, the District Court also noted the Debtor's (and Latoc's) argument that the Debtor received ownership interests in PLI and Piedmont at the time of the Loan, as well as the Trustee's counterarguments in this regard. As to the Trustee, the District Court specifically referred to his arguments that there was no documentary evidence of the Debtor's ownership interest in PLI or Piedmont (other than limited entries on the Debtor's tax return and general ledger); that PLI's profits in 2008 were paid to the PermaLife Entities, not the Debtor; and that in the separate, but related bankruptcy proceedings of certain of the PermaLife Entities, the Debtor's principal, Mr. Sergi, "stated that the purpose of the Latoc Loan was to allow Latoc to make a loan to PermaLife."[75]

The District Court cited to these arguments and evidence as being relevant to this Court's determination as to whether summary judgment on the reasonably equivalent value issue may be appropriate.[76] Thus, rather than rejecting any argument that ownership and value of the PermaLife Entities was relevant to the reasonably equivalent value issue, as is argued by Latoc, the District Court specifically referred to this evidence as potentially relevant to the arguments of both parties as to that issue on summary judgment or, ultimately, at trial. In fact, Latoc itself argues (through Mr. Sergi) that the purpose of the Latoc Loan was "to make investments in PLI and Piedmont" and that such use was "legitimate and reasonable," notwithstanding that those investments may

---

[73] See, e.g., Latoc Proposed Findings (Conclusions), ¶¶ 6, 18-21, Dkt. No. 193; Latoc Resp., at 5, Dkt. No. 196.
[74] D. Ct. Op. at 10, n.8, Dkt. No. 153 (emphasis supplied; quotation marks in original).
[75] D. Ct. Op. at 10, n.8, Dkt. No. 153 (citing Appellate record at A067, A083, A153); July 12, 2011 Sergi Aff. ¶¶ 11-12, Ex. P-25. See also Stipulated Facts at 40, 44, Dkt. No. 180; Aug. 25, 2021 Trial Tr. 42:9-18, Dkt. No. 189.
[76] D. Ct. Op. at 10 n.8, Dkt. No. 153.

have failed.[77]    Certainly, if that alleged "investment" is relevant to Latoc's defenses, it is also relevant to the Trustee's affirmative claims and his responses to those defenses.

In sum, both sides argue (and therefore effectively acknowledge) that the Debtor's alleged interests in Piedmont and PLI are part of the "totality of the circumstances" that must be reviewed and analyzed by this Court in making the reasonably equivalent value determination.  The District Court also cited to this type of evidence as relevant to the determination of reasonably equivalent value on summary judgment or at trial.  Accordingly, the Court will consider evidence of the Debtor's alleged interests and investments in Piedmont and PLI in its "totality of the circumstances" analysis.  That analysis will also include other matters, such as the pre-existing and longstanding business and personal relationships between Mr. Sergi, the principal of the Debtor, and the Attars, principals of Latoc, the immediate transfer of the Latoc Loan Proceeds to the PermaLife Entities that both the Debtor's principal and Latoc principals had interests in, and the sworn statements or testimony of Mr. Sergi and the Attars indicating the Latoc Loan was made to the Debtor only after a direct loan from an Attar entity to PermaLife was refused by the PermaLife Board.

With this background in mind, the Court will set forth the legal standards applicable to the reasonably equivalent value analysis, as to which the parties seem to generally agree, and then apply these standards to the facts of this case.

## 2.   The General Standards for Determining Reasonably Equivalent Value

The Trustee's constructive fraudulent transfer claims are brought under federal bankruptcy and state law, including the utilization of the Trustee's "strong arm" powers under 11 U.S.C. § 544(b)(1).  *See* 11 U.S.C. § 548(a)(1)(B), 11 U.S.C. § 544(b)(1) and N.J.S.A. §§ 25:2-25a(2) and

---

[77] Latoc Proposed Findings (Conclusions) ¶¶ 16-17, Dkt. No. 193.

25:2-27a.[78]  Both require proof that the Debtor received less than "reasonably equivalent value" in

connection with the challenged transaction.  As the language in the federal and state statutes is

nearly identical, the Third Circuit has noted that fraudulent transfer claims under federal and state

bankruptcy laws require almost identical analysis.  *Lowenschuss v. Resorts Int'l Inc. (In re Resorts*

*Int'l Inc.)*, 181 F.3d 505, 514 n.6 (3d Cir.), *cert. denied*, 528 U.S. 1021 (1999); *see also VFB LLC*

*v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (where the Third Circuit indicates its

belief that "the New Jersey Supreme Court would agree with the 'common sense' approach we

have used to determine 'reasonably equivalent value' under the bankruptcy code's similar

fraudulent transfer provision. . .") (quotations as in original); and *Motorworld, Inc. v. Benkendorf*,

228 N.J. 311, 327 (2017) (citing to Third Circuit fraudulent transfer law in avoiding a transfer

made for the benefit of a third party).

The District Court recited the general standards for determining reasonably equivalent

value at page 9 of its Opinion, which will also be set forth here.  Since the Bankruptcy Code does

not define the term, courts in the Third Circuit have developed and applied a two-step test to

determine whether the debtor received reasonably equivalent value for a transfer. The first step is

to determine whether the debtor/transferor received any value at all.[79]  The value transferred may

be direct or indirect and need not be easily quantifiable.[80]  As was also noted by the District Court,

the "ability to obtain substantial credit" and "synergy expected to result" from a leveraged buyout

may constitute value.  *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir.

1991), *cert. denied*, 503 U.S. 937 (1992).  In the case of investments made by a debtor that turn

out to be unsuccessful, the Court must determine whether at the time of the transaction, it was

---

[78] The statutory language of these sections is set forth in the Appendix.
[79] *In re R.M.L., Inc.,* 92 F.3d 139, 148-50 (3d Cir. 1996); D. Ct. Op., at 9, Dkt. No. 153; s*ee also In re ASHINC Corp.,* 629 B.R. 154, 194-95 (Bankr. D. Del. 2021).
[80] D. Ct. Op. at 9, Dkt. No. 153; *In re R.M.L.,* 92 F.3d at 150.

"'legitimate and reasonable' to expect some value [to accrue] to the debtor." *In re Autobacs Strauss Inc*., 473 B.R. 525, 560 (Bankr. D. Del. 2012) (citing cases); *In re Princeton Paper Prods.,* 2015 Bankr. LEXIS 3831, at *21 (Bankr. D.N.J. Nov. 6, 2015) (same).

Once it has been established that some value has been transferred, a "totality of the circumstances" test is applied to determine whether reasonably equivalent value has been transferred. *In re R.M.L.*, 92 F.3d at 153. The question of whether the debtor received reasonably equivalent value must be viewed "from the standpoint of the creditors" based on the circumstances that existed at the time of the transfers. *In re R.M.L.*, 92 F.3d at 150; *In re ASHINC Corp.*, 629 B.R. 154, 194, 199 (Bankr. D. Del. 2021); *Motorworld*, 228 N.J. at 326-27. The Third Circuit has also declared that "reasonably equivalent value is not an esoteric concept: a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'" *In re Fruehauf Trailer Corp.* 444 F. 3d 203, 213 (3d Cir. 2006); *In re R.M.L.*, 92 F.3d at 152. At this point, "the court must engage in a fact-driven comparison between such value and the transfer sought to be avoided to determine 'whether the debtor got roughly the value it gave.'" *In re AmCad Holdings, LLC,* 579 B.R. 33, 41 (Bankr. D. Del. 2017), *citing In re Fruehauf Trailer*, 444 F.3d at 213; *In re Universal Mktg. Inc*., 541 B.R. 259, 296 (Bankr. E.D. Pa. 2015).

In contrast to the relatively limited showing required to determine that at least some "value" was transferred as part of the first step of the analysis, the second step requires a greater showing because a "minimal" value, such as an indirect benefit, may not constitute reasonably equivalent value. *See In re R.M.L.,* 192 F.3d at 148 (where chances of a loan closing were "negligible," court found that substantial fees paid by Debtor to obtain a loan commitment did not constitute reasonably equivalent value and that the challenged transfers could be avoided as constructively fraudulent); *see also Motorworld*, 228 N.J. at 316 (to be reasonably equivalent,

"value" must be received by and for the benefit of the debtor transferor, not for the benefit of a different person or entity citing [N.J.S.A. § 25:2-27a]).

Additionally, as is noted by 5 COLLIER ON BANKRUPTCY ¶ 548.03[6], at 548-57 (Richard Levin & Henry J. Sommers, eds., 16th ed.), our fraudulent transfer laws have "always exalted substance over form." Accordingly, courts will look to the substance of a transaction rather than its form to determine whether a fraudulent transfer has occurred. Finally, the burden of proving reasonably equivalent value, like all other affirmative elements of a fraudulent transfer claim, is on the plaintiff, here the Trustee. *In re Fruehauf Trailer*, 444 F.3d at 211.

### 3. The Totality of the Circumstances in This Case Demonstrates That the Debtor Did Not Receive Reasonably Equivalent Value for the Latoc Loan

Considering the totality of the circumstances in this case, this Court finds that the Trustee has met his burden of proving that the Debtor was a "mere conduit" or "pass-through, to get the $2 million to the PermaLife Entities."[81] The PermaLife Entities were in immediate need of substantial funding due primarily to a fire that severely damaged their Arizona facility.[82] The principals of the Debtor and Latoc had common interests in the PermaLife Entities.[83] PermaLife was incurring substantial losses at the time, as was PLI.[84] When the PermaLife Entities went to the Attars for that financing, they were rebuffed by the PermaLife Board because of the conflict of interest between the Attars and PermaLife, as well as the restrictive provisions of the Gemini Loan. Shortly after that refusal, the PermaLife Entities were able to obtain that financing through

---

[81] D. Ct. Op. at 10, Dkt. No. 153 (citing July 12, 2011 Sergi Aff. ¶¶ 11-12, A153 and P-25).
[82] See Stipulated Facts ¶¶ 11, 20, 21, 48, Dkt. No. 180, stating that: "PermaLife did not have the equity to acquire, build and operate the intended facility" that would replace the capacity lost in the Arizona fire; May 4, 2014 D. Attar Dep. Tr. 58:1-60:20, P-27.
[83] Stipulated Facts ¶ 29, Dkt. No. 180.
[84] Aug. 25, 2021 Trial Tr. 59:15-17, Dkt. No. 189. PermaLife incurred operating losses of $2.1 million in 2006, $2.6 million in 2007 and $5.2 million in 2008. PLI incurred losses of $278,000 in 2007 and $561,000 in 2008. *Id.* at 80:11-13; Stipulated Facts ¶ 45, Dkt. No. 180.

26

the $2 million Loan from Latoc, albeit indirectly through the Debtor. That $2 million was immediately passed through by the Debtor to the PermaLife Entities.

These material facts as found by this Court (and mostly, if not entirely, stipulated by Latoc) were not directly addressed by Latoc at trial or in its post-trial submissions, other than to argue generally that the funds were used to invest in and acquire the Debtor's alleged (but not proven) subsidiaries and provide the Debtor with a continued existence in a completely unrelated business -- rubber recycling. The Court rejects those arguments for lack of proof and failing to adequately explain why the Debtor would "invest" $2 million in the PermaLife Entities (most of which were not even alleged to be Debtor subsidiaries) in an extremely short period of time, without any loan documents, when those entities were experiencing substantial financial issues of their own, and without using any of those Loan Proceeds to fund the Debtor's own financially strapped and insolvent business -- The Mall at Galaxy.

Similarly, Latoc failed to address: (i) the common business interests of the principals of the Debtor and Latoc in the PermaLife Entities and the potential benefit they would both derive from propping up the likewise financially strapped businesses of the PermaLife Entities; (ii) the fact that the discussions relating to a loan from Latoc to the Debtor did not occur until after the direct loan to PermaLife by Latoc was rejected; (iii) the fact that Latoc began advancing substantial sums to the Debtor ($690,000) that were in turn immediately transferred to PermaLife even before the Latoc Note was signed; or (iv) the fact that most of the Latoc Loan Proceeds were provided to PermaLife Entities in which the Debtor did not have even an alleged ownership interest.[85] The failure to address these material facts demonstrates not only the strength of the Trustee's case but also Latoc's inability to explain them in any way other than what they show: that the Debtor was

---

[85] See DeGraw Certif. I, ¶ 27 and Ex. A, Dkt. No. 156-2; DeGraw Certif. II, Ex. A, Dkt. No. 160-4.

a mere conduit for the Latoc Loan and its Proceeds when the direct loan from Latoc to PermaLife failed.

Moreover, in contrast to the direct and immediate benefits the PermaLife Entities received from the full and unrestricted use of the Latoc Loan Proceeds -- which also had the potential to at least indirectly benefit Mr. Sergi and the Attars -- the Debtor obtained only the detriment represented by the $2 million obligation and the amounts it repaid on that obligation, which also adversely affected the Debtor's creditors.  Thus, the Debtor received no value (or benefit) at all -- and much less reasonably equivalent value -- from the $2 million Latoc Loan.  In fact, based on the proofs submitted at trial, the Debtor's dire and, in fact, insolvent financial condition -- and the ability of its creditors to be repaid -- were both materially and adversely impacted by the substantial obligation it undertook through the Latoc Loan and the subsequent repayment of that Loan by the Debtor.

4.  **The Debtor's Principal Stated Under Oath That the Purpose of the Latoc Loan Was to Manage a Conflict That Precluded a Direct Loan by Latoc to PermaLife and Make That Loan Through the Debtor**

As was previously noted, Mr. Sergi submitted an Affidavit in the PermaLife bankruptcy proceedings in which he stated that the circumstances leading to the Latoc Loan began in 2007 when PermaLife (rather than the Debtor) sought financing from the Attars, but was precluded from doing so by the PermaLife Board because of the conflict R. Attar had as a director of PermaLife and President of Latoc.[86]  Mr. Sergi then stated under oath that:

> In order to facilitate the loan and manage the conflict that precluded a direct loan to PermaLife, Latoc made the loan to the Mall, which then transferred the proceeds to PermaLife and to [Piedmont], one of the Mall's subsidiaries . . . The loan proceeds were deposited into the Mall's accounts, and then I immediately transferred the proceeds to PermaLife's and Piedmont's accounts."[87]

---

[86] July 12, 2011 Sergi Aff. ¶ 11, P-25.
[87] *Id*. at ¶ 12.

Mr. Sergi also testified at deposition that D. Attar "wanted to help PermaLife" because of the "terrible fire" at its Arizona facility.[88] Thus, these statements, as well as the Attars' and Mr. Sergi's common interests in the PermaLife Entities (with D. Attar serving as a director of PermaLife), demonstrate that both Mr. Sergi and the Attars were acutely aware that the PermaLife Entities needed the financing immediately and that the Attar conflict and Gemini Loan restrictions precluded a direct loan from Latoc to PermaLife. In fact, as was stated by Mr. Sergi, it was PermaLife that was seeking the financing from the Attars in 2007, not the Debtor. And it was the PermaLife Entities who were the immediate and intended beneficiaries of that financing.

The Court considers these sworn statements to be highly relevant and probative on the issue of reasonably equivalent value, both as to the structure of the transaction and Mr. Sergi's (and the Attars') intent in entering into it. These sworn statements (and others) were heavily relied upon by the Trustee at trial and in support of his initial summary judgment motion on the reasonably equivalent value issue. Recognizing that these statements were damaging, Mr. Sergi subsequently stated (also under oath) that he would not have made these statements if he knew they would be used against Latoc. As this Court previously found in its April 4, 2019 Opinion:

> The Court also noted the multifaceted relationship among Mr. Sergi, the Attars and their related entities, and the undisputed sworn pretrial testimony of Mr. Sergi that: (i) the Debtor sought the loan from Latoc only after the proposed loan from an Attar affiliate was disapproved by the PermaLife board; and (ii) Mr. Sergi would never have given the testimony about the PermaLife board disapproval if he knew it would be used against Latoc and the Attars, without ever disavowing the truthfulness of that underlying testimony.[171]
>
> [171]Sergi Dep. Tr. 22:20-25:12, June 3, 2014, Dkt. No. 77-8; Sergi Aff. ¶¶ 6-14, Dkt. No. 84-5; Sergi Dep. Tr. 14:22-15:13, Dkt. No. 77-8.[89]

---

[88] June 3, 2014 Sergi Dep. Tr. 23:1-24:7; 28:15-16, P-26 (also noting Latoc Loan could not be made "direct" by Latoc to PermaLife).
[89] Apr. 4, 2019 Op., at 29, Dkt. No. 142.

As before, this Court finds it significant and telling that Mr. Sergi did not disavow those sworn statements, nor did he testify that they were untrue. Instead, Mr. Sergi said only that he would not have made them if he knew they would be used against Latoc.[90]    Further, while Mr. Sergi claimed that he gave up his "personal value" in the Debtor by authorizing the Latoc Loan,[91] he was actually giving up the value the Debtor had to its creditors since the Debtor was insolvent and Mr. Sergi had no equity in the Debtor at the time. In making this claim, Mr. Sergi also again confirmed that Latoc made the Loan to the Debtor because "other members [of PermaLife] were not willing to have the loan direct" from Latoc or any Attar-affiliated entity.[92]

The Court finds that Mr. Sergi's statements were true when made and that they succinctly and accurately describe why the Loan was made by Latoc to the Debtor rather than to PermaLife -- to manage the conflict that precluded the direct loan by Latoc to PermaLife by having that loan made indirectly through the Debtor. In furtherance of that intended purpose, the Latoc Loan Proceeds were then immediately transferred by the Debtor to the PermaLife Entities, including Piedmont, all of which were entities in which Mr. Sergi and the Attars controlled and/or held ownership interests.[93]    Despite that immediate transfer of substantial funds at a time when the Debtor was experiencing its own financial difficulties,  "[t]he Debtor did not enter into any written agreement with [the PermaLife Entities] regarding the transfer of the [Latoc Loan Proceeds] from [Latoc], or for the repayment of same to the Debtor."[94]    Additionally, the PermaLife Entities were in a completely different line of business -- rubber recycling -- than the Debtor, which owned and leased commercial condominium units in New Jersey.[95]

---

[90] Apr. 4, 2019 Op., at 22, Dkt. No. 142.
[91] June 3, 2014 Sergi Dep. Tr. 28:12-16, P-26.
[92] June 3, 2014 Sergi Dep. Tr. 28:15-16, P-26.
[93] Stipulated Facts ¶ 29, Dkt. No. 180.
[94] Stipulated Facts ¶ 24, Dkt. No. 180.
[95] Stipulated Facts, ¶¶ 2, 3, 5 and 8, Dkt. No. 180.  The Court recognizes that Mr. Sergi claimed (but did not prove) that the Debtor owned 100% of Piedmont.  However, Latoc stipulated at paragraph 29 of the Stipulated Facts that

In this Court's view, considering all the evidence adduced through multiple summary judgment motions and two trials, the mostly stipulated facts found and discussed above are by themselves sufficient to determine that the Debtor acted as a "mere conduit" or "pass-through" for the Latoc Loan so that Latoc could do indirectly what it was not able to do directly -- make a loan to PermaLife. As noted below, there are, however, additional facts and circumstances that further support this finding.

5. **There was Insufficient Proof of the Debtor's Alleged Investment in Piedmont and PLI**

In determining whether any value was received at all (the first prong of the test):

> a court should *not* consider the "totality of the circumstances" in evaluating the threshold question of whether any value was received at all. Rather, a court must consider whether, "based on the circumstances that existed at the time" of the transfer, it was "legitimate and reasonable" to expect some value accruing to the debtor

*In re Fruehauf Trailer*, 444 F.3d at 212 (internal citations omitted; emphasis in original); *see also In re R.M.L.*, 92 F.3d at 152 (investments that fail can confer value). In *In re R.M.L.*, the court further stated that "so long as there is some chance that contemplated investment will generate positive return at time of disputed transfer, we will find that value has been conferred." *Id.* This initial step in the analysis is fact sensitive and requires the Court to determine whether any value was conferred at all where the alleged benefit was indirect. *Cf. In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1125-27 (5th Cir. 1993) (funds spent in failed attempt to keep commuter airline alive conferred value on the debtor, but debtor did not receive reasonably equivalent value for funds

---

Piedmont was one of the PermaLife Entities, which he and the Attars controlled and/or in which they had ownership interests. Given the close relationships between the various PermaLife Entities and their related lines of business, as well as the common interests of the Attars and Mr. Sergi in those entities, the Court finds Latoc's Stipulation to be more convincing and probative of the nature and structure of the parties' common interests in the PermaLife Entities, including Piedmont, than Mr. Sergi's unsupported claim that the Debtor owned Piedmont exclusively. Further, the disparate businesses of the Debtor and the PermaLife Entities belie any true business connection or purpose among those entities.

spent after airline ceased operations) with *In re ASHINC Corp.*, 629 B.R. at 194, 200, 203 (granting summary judgment based on finding no direct or indirect value was conferred by challenged payments made by debtor for the benefit of third parties).

Latoc argues that the Debtor received value in the form of its investment in Piedmont and PLI, even though the investment may not have been successful.   More specifically, Mr. Sergi's testimony in this regard was that the purpose of the Latoc Loan was to allow the Debtor to acquire a 100% interest in Piedmont and a 20% interest in PLI and that those alleged investments were made to provide the Debtor with a continued existence.[96]  For many of the same reasons -- and others -- that the Court found that the Debtor was a mere conduit or pass through for the loan to PermaLife, the Court also finds that: (a) the alleged "investment" in Piedmont and PLI was not sufficiently proven by Latoc; and (b) even if there was such an investment, it was not reasonable and legitimate to expect a roughly commensurate return based on the circumstances as they existed at the time of the Latoc Loan.

In this regard, Latoc called Mr. Sergi to testify and offered his certifications in support of the claim that the Debtor used the Latoc Loan to "obtain a 100% interest in Piedmont and be given a 20% interest in PLI."[97] In a certification submitted to this Court, Mr. Sergi stated that another purpose was  "to provide additional funding to retrofit specific spaces" of Debtor's property.[98] Latoc characterized Mr. Sergi's testimony in this regard as "unassailable."[99]  Rather than being unassailable, the Court finds this testimony to be either unsupported by the record or at least

---

[96] Aug. 26, 2021 Trial Tr. 18:25-20:6; 25:23-26:3; 26:13-22; 27:15-21; 45:25-46:4; 50:14-51:1, Dkt. No. 183; July 12, 2011 Sergi Aff. ¶ 11, P-25.
[97] Stipulated Facts ¶ 39, Dkt. No. 180.
[98] Jan. 11, 2021 Sergi Certif. ¶¶ 24, 26-27, Dkt. No. 159-1.
[99] See Latoc Proposed Findings (Conclusions) ¶¶ 7, 9, 13, 16, Dkt. No. 193.

inconsistent with Mr. Sergi's other sworn testimony and the circumstances surrounding how, why and when the Latoc Loan was made and how its proceeds were utilized.

As to the claim that the Loan Proceeds were used to "retrofit" the Debtor's property, there was simply no evidence presented at trial (or otherwise) that any of the proceeds were so used by the Debtor.  Instead, as noted above, the proceeds were immediately transferred to the PermaLife Entities.

Next, the claim that the Loan Proceeds were used to acquire interests in Piedmont (100%) and PLI (20%) was not supported by any evidence, even after multiple summary judgment motions and two trials.[100]  Latoc failed to produce any documents or other evidence that indicated when it acquired those alleged interests, how much it paid for them or any of the other details regarding those transactions.[101] No specific agreements, share certificates, membership interests or other evidence was provided by Latoc or Mr. Sergi.   In fact, the only limited evidence of any interest that the Debtor may have had in either entity was "pass-through" allocations reflected in the Debtor's tax return and entries in the Debtor's general ledger.[102]  And even that limited evidence of income/loss was provided by the Trustee.[103]

As a result, the Court simply has no way of knowing -- because of the lack of proof -- whether the Debtor acquired any asserted interest in Piedmont or PLI before, after or when the Latoc Loan was made, what funds (if any) were used to make those acquisitions, how much was paid for them and when, or any of the other terms or details that accompanied those alleged transactions.  If the Debtor had any such interests, they may have been acquired before the Latoc Loan (or after it), in which case the Loan Proceeds would not have been used to acquire those

---

[100] See Stipulated Facts ¶¶ 39-40, Dkt. No. 180.
[101] Stipulated Facts ¶ 40, Dkt. No. 180.
[102] *Id.*
[103] Aug. 25, 2021 Trial Tr. 68:24-69:5; 69:14-71:2, Dkt. No. 189.

alleged interests. Moreover, the alleged interests may have been acquired by someone else or for other unknown consideration that may have had nothing to do with the Latoc Loan or the Debtor. Additionally, the parties stipulated that all of PLI's profits were paid to PermaLife, disregarding the Debtor's alleged ownership.[104]  In contrast, the only evidence offered by the Debtor or Latoc in this regard is Mr. Sergi's statement that the purpose of the Latoc Loan was for the Debtor to acquire interests in PLI and Piedmont, unsupported by any documents of any kind. Thus, on this record, Latoc (and the Debtor) simply failed to prove that any of the Latoc Loan Proceeds were used to fund the Debtor's alleged investment in these two entities.

This argument (made by Latoc primarily through Mr. Sergi) is further undercut by the fact that the Latoc Loan Proceeds were immediately distributed in substantial part to PermaLife Entities in which the Debtor did not have even an alleged ownership interest, with only limited disbursements going to Piedmont and PLI, its alleged subsidiaries.[105]  Those disbursements are entirely consistent with the intended purpose of the Latoc Loan and the use of its proceeds, i.e., to provide the immediately needed financing to the PermaLife Entities when the direct loan from Latoc failed.

In sum, the Court finds Latoc's arguments that the Latoc Loan Proceeds were used to acquire interests in Piedmont and PLI and to retrofit the Debtor's property are unconvincing, as they were unsupported and, in certain instances, contradicted by the record. For many of the same reasons, and as is explained in more detail below, even if the Debtor did hold interests in Piedmont and/or PLI, the Court finds that it was not reasonable and legitimate for the Debtor to expect a

---

[104] Stipulated Facts ¶ 44, Dkt. No. 180.
[105] DeGraw Certif. I, Analysis of Use of Latoc Proceeds, Ex. A, Dkt. No. 156-2; DeGraw Certif. II, Analysis of Use of Latoc Proceeds, Ex. A, Dkt. No. 160-4.

return on its alleged investment on those money-losing entities, many of which were soon headed
into bankruptcy proceedings of their own.

### 6.  The Debtor's Alleged Investment in Piedmont and PLI Was Not Reasonable or Legitimate

As acknowledged by Latoc and the Debtor, the PermaLife Entities were already in a difficult
financial position at the time the Latoc Loan was made to the Debtor in October/November 2007,
particularly due to the fire at PermaLife's Arizona facility that occurred in September 2007.  In fact,
and at around the time the Latoc Loan was nominally made to the Debtor and its proceeds were
immediately transferred by the Debtor to the PermaLife Entities, including Piedmont and PLI:

- a direct loan from an Attar-affiliated entity (Latoc) had been rejected by the PermaLife Board due to the conflict of interest between R. Attar and PermaLife, who was a Director of PermaLife and President of Latoc, as well as the restrictions on such financing under the loan from Gemini to PermaLife.[106]

- PermaLife did not have the funds to acquire, build or operate the intended new facility needed as the result of the fire.[107]

- PermaLife was experiencing multimillion-dollar losses in 2006 ($2.1 million), 2007 ($2.6 million) and 2008 ($5.2 million).[108]

- PLI showed losses of over $278,000 in 2007 and more than $561,000 in 2008.[109]

- any profits that may have been made by PLI were paid to PermaLife rather than the Debtor, disregarding the Debtor's alleged ownership interest.[110]

- In other verified testimony in the PermaLife bankruptcy proceedings, Mr. Sergi stated that the substantial sums advanced by the Debtor to the PermaLife Entities, "without any repayment whatsoever" were evidence of the Debtor's "generosity" towards the PermaLife Entities.[111]

- PermaLife and certain of its other affiliates filed their own bankruptcy petitions in January 2009 (Case No. 09-11482), after PermaLife and its related entities defaulted

---

[106] Stipulated Facts ¶¶ 17-21, Dkt. No. 180.
[107] Stipulated Facts ¶¶ 20-21, Dkt. No. 180.
[108] Aug. 25, 2021 Trial Tr. 59:4-17, Dkt. No. 189.
[109] Stipulated Facts ¶ 45, Dkt. No. 180.
[110] Stipulated Facts ¶ 44, Dkt. No. 180.
[111] Debtor's Verified Obj. to the Committee's Motion for Conversion ¶ 12, Dkt. No. 258, Case No. 09-11482 and P-28.

on their $5 million loan from JP Morgan Chase beginning in the fall of 2008.[112]  That default resulted in the entry of judgments against certain related non-debtor entities in excess of $7 million.[113]

- The Debtor was also in default of its obligation to the Galaxy Towers Condominium Association, which resulted in a $622,864 Judgment being entered against the Debtor on November 16, 2007, one day after the Latoc Note was signed.[114]

- At or around the same time, the Debtor defaulted on its obligations to Blue Sky, which filed a proof of claim against them for more than $8 million based on a judgment in that amount.[115]

- The proofs of claim filed in the PermaLife bankruptcy cases demonstrate that PermaLife itself was also in default of various substantial obligations, including to Latoc, for years.[116]

Thus, at the time the Debtor obtained the Latoc Loan and then immediately transferred the Latoc Loan Proceeds to the PermaLife Entities, those Entities were in dire and deteriorating financial condition, and the Debtor itself was insolvent, as previously found by this Court.[117] Further, as was also noted above (and stipulated by the parties), both Attars and Mr. Sergi had ownership and/or controlling interests in the PermaLife Entities.  Accordingly, it was in their respective mutual interests to provide the funding for those Entities, in none of which the Debtor had even any alleged ownership interest, other than the alleged (but not proven) interests in Piedmont (100%) and PLI (20%).  So, when the "direct" loan from Latoc to the PermaLife Entities

---

[112] Stipulated Facts ¶ 33, Dkt. No. 180.

[113] Id. at ¶ 34.  No judgments were entered against the PermaLife Entities that did file for bankruptcy as the result of the automatic stay.

[114] Apr. 4, 2019 Op., at 18, Dkt. No. 142.

[115] Stipulated Facts ¶ 32, Dkt. No. 180; Blue Sky Int'l, Inc. Notes, Guaranty and Judgment, P-6; Blue Sky Int'l, Inc. Claim No. 9-1 filed May 18, 2010 for $8,798,082.90.   In a prior Opinion relating to the Debtor's solvency (on Trustee's Motion for Summary Judgment, May 16, 2017 Hr'g Tr. 7:19-8:5; 21:10-12, Dkt. No. 100), this Court found that the Blue Sky obligation was artificially inflated by high and rapidly compounding interest.  Nonetheless, no matter the correct amount due, the fact remains that Blue Sky advanced $1 million to the Debtor during a very short time period (January 2008 through March 2008), and the Debtor quickly went into default on that obligation as well.

[116] Aug. 25, 2021 Trial Tr. 87:10-13, Dkt. No. 189; Proofs of Claim, P-40E-P-40J.  Other convoluted and money-losing transactions involving the Debtor and Piedmont are described in the Stipulated Facts ¶¶ 50-56, Dkt. No. 180.

[117] Apr. 4, 2019 Op., at 12-16, 53, Dkt. No. 142.

was turned down, Mr. Sergi and D. Attar found a way to get that funding to PermaLife through the Debtor.

Rather than making a "reasonable and legitimate" investment, the Debtor was used by Mr. Sergi and the Attars as a pass-through vehicle to get the badly and immediately needed funding to the PermaLife Entities -- in which both had interests -- when the PermaLife Entities were not able to obtain that funding on their own.  As a result, Mr. Sergi caused the Debtor to incur the substantial additional indebtedness represented by the Latoc Loan -- which he characterized as "generosity" - - at a time when the Debtor could not afford it  (it was insolvent) and then immediately advanced those proceeds to the PermaLife Entities when they were also losing money and defaulting on various obligations, all to the significant detriment of the Debtor's creditors. The common interests of Mr. Sergi and the Attars in the PermaLife Entities and the rush to get these funds to them also demonstrate that the Latoc Loan transaction was something less than an arm's length one.   Here, the Court also notes that despite not receiving any repayments from the PermaLife Entities on account of the advances made possible by the Latoc Loan, the Debtor did manage to repay Latoc almost $600,000 (i.e., the Pre-Petition Transfers) on account of the Latoc Loan.

As further evidence of the less than arm's length nature of the entire transaction, Latoc advanced $690,000 to the Debtor, which the Debtor then immediately transferred to the PermaLife Entities, even *before* the November 15, 2007 Note was signed.  Also, there were no written agreements between the Debtor and the PermaLife Entities regarding the transfer of the Loan Proceeds to the PermaLife Entities or their repayment by the Debtor.[118]  And of the $2 million in Latoc Loan Proceeds transferred by the Debtor to the PermaLife Entities, the only evidence of funds going in the opposite direction was an $85,000 transfer to the Debtor by PLI that was immediately

---

[118] Stipulated Facts ¶ 24, Dkt. No. 180.

transferred back to PermaLife in its entirety and a $9,000 transfer from PLI to the Debtor, as to which no evidence was provided by the Debtor or Latoc with respect to the reason for or nature of that transfer.[119] Further, all profits made by PLI "were paid over to PermaLife, disregarding the Debtor's alleged ownership."[120]   Thus, Latoc (and the Debtor) also failed to prove that any alleged investment in PLI and Piedmont was reasonable and legitimate at the time those alleged -- but not proven -- investments were made, if they were made at all.   As a result, this Court finds it was neither legitimate nor reasonable for the Debtor to expect a return on its alleged (but not proven) "investment" in the PermaLife Entities in these dire circumstances.

## 7.   The Timing of the Latoc Loan and Advances

The fire at the Piedmont/PermaLife Arizona facility occurred in September 2007 and caused severe damage.[121]   Shortly thereafter, the PermaLife Entities were turned down for a direct loan from an Attar-affiliated entity (which included Latoc).   D. Attar and Mr. Sergi then discussed and put into motion the indirect Loan from Latoc to the Debtor.[122]   In fact, those discussions occurred later that very same month (September 2007) when Mr. Sergi and D. Attar were vacationing in Italy.[123]   Latoc began disbursing on the loan on October 16, 2007, almost exactly a month before the Latoc Loan was documented by the Note dated November 15, 2007.  The advanced funds were then immediately transferred by the Debtor to Piedmont and other PermaLife Entities for their use and benefit.   In fact, $690,000 of those advances (or approximately 35% of the entire $2 million Latoc Loan) were made before the Latoc Note was even signed.   The Debtor did not use those funds for its operations or otherwise; instead, all the proceeds went immediately to the PermaLife Entities.

---

[119] Aug. 25, 2021 Trial Tr. 79:19-24, Dkt. No. 189.
[120] Stipulated Facts ¶ 44, Dkt. No. 180.
[121] Stipulated Facts ¶¶ 11, 20, Dkt. No. 180.
[122] Stipulated Facts ¶¶ 13, 17-21, Dkt. No. 180.
[123] Aug. 26, 2021 Trial Tr. 41:7-21, Dkt. No. 183.

Then, the Debtor used the funds it generated from unit sales and real estate tax refunds to pay its debt to Latoc, rather than its other creditors.[124]

Thus, the timing of the Latoc Loan, which was made shortly after the fire at the Arizona facility and the direct loan from Latoc to PermaLife was rejected; Mr. Sergi and the Attars' common interests in the PermaLife Entities; the immediate use of the proceeds to fund the PermaLife Entities; the substantial advances ($690,000) before the Latoc Note was signed; and the repayment of the Latoc Loan without receiving any proven repayment of any kind from the PermaLife Entities, are all additional facts and circumstances which demonstrate that the Debtor did not receive reasonably equivalent value for the Latoc Loan (and that the alleged investment in Piedmont and PLI was not reasonable and legitimate). Instead, the Debtor acted as a mere conduit or pass-through to get the badly and immediately needed funding to the PermaLife Entities when the direct loan from Latoc to them failed.

## B. <u>Summary of Reasonably Equivalent Value Analyses</u>

As noted, the Attars and Mr. Sergi had repeated business dealings among themselves and their entities. Additionally, there was a personal relationship between Mr. Sergi and at least D. Attar, as they both were vacationing in Italy when the Latoc Loan was discussed. The Attars and Mr. Sergi both had interests in the PermaLife Entities, individually and/or through entities they controlled, with R. Attar serving as a Director of PermaLife when he was also the President of Latoc.[125] As such, they were all well aware of the fire at the Arizona facility, PermaLife's immediate need for funding, and the refusal of PermaLife's Board to authorize a direct loan from Latoc.[126] Shortly after that refusal, the "indirect" loan from Latoc to the Debtor was made. Given

---

[124] Stipulated Facts ¶¶ 29-31, Dkt. No. 180.
[125] Stipulated Facts ¶¶ 10-15, 20-21, Dkt. No. 180.
[126] See Stipulated Facts ¶ 20 (D. Attar testimony) and ¶ 21 (R. Attar testimony), Dkt. No. 180. In fact, Mr. Sergi testified that D. Attar wanted "to help" PermaLife after the fire.

these extensive mutual business and personal relationships, and the other related circumstances described above, this Court determines that it was in the mutual interests of the Attars and Mr. Sergi to find another way to get the badly and immediately needed funding to the PermaLife Entities when the direct loan from Latoc to PermaLife failed. They did so, through the indirect Loan from Latoc to the Debtor, which then immediately transferred the Loan Proceeds to the PermaLife Entities.

Thus, based on this Court's review of the totality of the circumstances surrounding the Latoc Loan, and viewing these transactions from the standpoint of creditors, the Debtor did not get "roughly the value it gave" for that Loan. To the contrary, this Court finds that the Debtor was a mere indirect "pass-through" or "conduit" for the Latoc Loan and its Proceeds, which were immediately advanced by the Debtor to its intended beneficiaries -- the PermaLife Entities -- and that it was those Entities that all that Latoc "gave" through its Loan to the Debtor. As a result, the Debtor did not receive value or reasonably equivalent value for the Latoc Loan. Instead, it received no value for the Latoc Loan, which actually resulted in substantial detriment to the Debtor and its creditors in the form of a $2 million obligation that the Debtor incurred while insolvent and that it was ultimately unable to repay. And even if Latoc had proven (which it did not) at least some value was received by the Debtor from the Latoc Loan in the form of the alleged "investment" in PLI and Piedmont, that alleged value was not reasonably equivalent to the value the Debtor gave up in incurring the $2 million Latoc Loan obligation. The Latoc Loan and the Post-Petition Payments are therefore avoided as constructively fraudulent transfers for less than reasonably equivalent value under both federal bankruptcy and state law.

C.  **The Latoc Loan Transaction May Be Collapsed**

As an additional and alternative argument on the issue of reasonably equivalent value, the

Trustee asserts that the Latoc Loan transaction should be collapsed into a single integrated

transaction and treated as a loan directly from Latoc to PermaLife.  This Court agrees.

When a claim for fraudulent conveyance involves multiple transfers, the Court, in

appropriate circumstances, may collapse the separate transactions, treat the multiple transfers as

an integrated transaction, and "infer facts, intent, and notice gleaned from one part of a transaction

into another." *In re DSI Renal Holdings, LLC*, 617 B.R. 496, 504-05 (Bankr. D. Del. 2020).  This

practice, called the "collapsed transaction doctrine," promotes the fraudulent transfer law policy

of preferring substance over form and allows the Court "to infer facts, intent and notice gleaned

from one part of a transaction into another" and to "'slice through complicated transactions to

compare what value the debtor gave and what value the debtor got.'"  *Id.* at 505 (quoting 5 COLLIER

ON BANKRUPTCY ¶ 548.03[6], at 548-57 (Richard Levin & Henry J. Sommers, eds., 16th ed.).

Within the Third Circuit, *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302,

1303 n.8 (3d Cir. 1986), *cert. denied*, 483 U.S. 1005 (1987) (a non-bankruptcy case) is recognized

as the leading case for the collapsed transaction doctrine.  In *Tabor*, the lender, borrower and

transferee all engaged in negotiating the loan that passed from lender to borrower's escrow account

to the transferee.  The transferee was an entity which borrower had created expressly to use the

loan proceeds to buy out borrower's stockholders, a transaction that the borrower had been unable

to fund directly.  *Tabor*, 803 F.2d at 1292, 1302.  The Third Circuit deemed the transfers an

integrated transaction, of which the lender had actual knowledge and which could be treated as a

collapsed transaction for fraudulent conveyance analysis.  *Id.* at 1302-03.  The Third Circuit

concurred with the District Court that the loan proceeds had "merely passed through the borrower

41

to [the transferee]." *Tabor*, 803 F.2d at 1302. As a consequence, the Third Circuit affirmed that various transfers under a leveraged buyout were either constructively or intentionally fraudulent and subject to avoidance. *Tabor*, 803 F.2d at 1305 n.9.

Similarly, in *Voest-Alpine Trading USA Corp. v Vantage Steele Corp.*, 919 F.2d 206, 211-12 (3d Cir. 1990) (a subsequent non-bankruptcy case), the Third Circuit examined a sequence of contemporaneous transactions through which Oldco and its principals evaded plaintiff-creditor's debt and preserved their equity by incorporating Newco, with the assistance of Oldco's lender. The lender foreclosed on Oldco's collateral and immediately sold it to Newco, after having issued to Newco a line of credit that Newco used in part to purchase Oldco's assets. The Third Circuit found this to be an integrated, collapsed transaction undertaken with the knowledge of all parties to it, including lender. *Id.* at 211-12. Accordingly, the Court found it was appropriate to collapse the transactions, treat them as one and avoid the collapsed transactions as a fraudulent transfer.

Bankruptcy Courts within the Third Circuit recognize the authority of *Tabor* and of *Voest* to apply the collapsed transaction doctrine to avoidance actions in bankruptcy cases. *See*, *e.g. In re Mervyn's Holdings, LLC*, 426 B.R. 488, 493, 497 (Bankr. D. Del. 2010). In *Mervyn's*, where debtor and its parent company were both retail chains, debtor's parent established two debtor-affiliates, controlled by the same investors, ostensibly to purchase the parent's interest in the debtor but effectively to strip debtor's valuable real estate to the detriment of debtor's creditors. In denying the parent's motion to dismiss debtor's adversary complaint against the parties to these transactions, the Bankruptcy Court determined that the debtor had "established a valid claim under *Tabor Realty* and *Hechinger*[127] for collapsing the transactions" at issue and avoiding them as

---

[127] *In re Hechinger Inv. Co.*, 327 B.R. 537, 546-47 (D. Del. 2005), *aff'd*, 278 Fed. App. 125 (May 19, 2008).

42

fraudulent transfers.  *In re Mervyn's Holdings,* 426 B.R. at 498.  Other courts inside and outside

the Third Circuit also recognize that a series of related transactions may be collapsed.  *See, e.g., In

re DSI Renal Holdings* where, in denying a motion to dismiss, the Bankruptcy Court determined

that it could collapse a series of transactions that stripped a debtor of its assets and allowed

defendants to sell their restructured interests for nearly one-half billion dollars.  617 B.R. at 500.

Similarly, in *In re Energy Conversion Devices, Inc.*, 621 B.R. 674, 753-54 (Bankr. E.D. Mich.

2020), the court cited numerous cases for the principle that "an allegedly fraudulent conveyance

must be evaluated in context; where a transfer is only a step in a general plan, the plan must be

viewed as a whole with all its composite implications"  (internal citations omitted).

In this case, based on the factual findings already made above, the Court determines that it

is appropriate to collapse the Latoc Loan transaction into one that was made with the knowledge

and direct involvement of the lender, Latoc, and which was an intermediate step in the plan to fund

the PermaLife Entities indirectly through the Debtor after the direct loan from Latoc to these

Entities was rejected.  As a result, the Loan from Latoc to the Debtor, which was in substance a

loan from Latoc to the PermaLife Entities, will be collapsed into one from Latoc to the PermaLife

Entities and avoided as constructively fraudulent transfer for less than reasonably equivalent value.

Latoc, in its post-trial reply brief, does not squarely address the Trustee's argument that the

Court may collapse the Latoc Loan.  Instead, it recites the District Court's April 9, 2020 findings

at pages 10-11 and disregards Mr. Sergi's inconsistent and/or conflicting testimony and

certifications about his conversations with D. Attar and/or R. Attar and Mr. DeGraw's testimony.

In doing so, Latoc appears to misstate the District Court's ruling as to the potential relevance of

the value and financial condition of the PermaLife Entities and the related circumstances described

above to the reasonably equivalent value analysis. Here, Latoc argues that the Trustee produced no evidence at trial that anyone other than the Debtor was the actual beneficiary of the Latoc Loan:

> There was no evidence offered by the Trustee that the Mall was not the actual beneficiary of the Latoc Loan. The district court rejected any analysis that focused on the value of the PermaLife entities and that is the only analysis that was offered by the Trustee's only witness, Kenneth DeGraw. There was undisputed and unrebutted evidence from Mart[y] Sergi that the Mall was not acting as a conduit for other entities. His testimony is unassailable. Sergi, a seasoned businessman wanted to create life for the Mall beyond the sale of the units. DeGraw, who has no real estate business experience and no rubber recycling business experience, admitted that Sergi was in a better position than himself to make that evaluation.[128]

Contrary to those generalized statements: (i) there was a significant and largely unrebutted quantum of evidence demonstrating that the Debtor was a mere conduit for getting the Latoc Loan Proceeds to PermaLife, as described above; and (ii) the District Court did in fact focus on the inconsistent and/or conflicting testimony and evidence relating to the PermaLife Entities in connection with the issue of reasonably equivalent value as was also noted above.[129]

Additionally, Latoc's argument does not give proper effect to the trial testimony of the three trial witnesses, including Mr. DeGraw, and/or their prior affidavits or depositions, all of which amply demonstrate that the movement of money from Latoc to the Debtor to PermaLife was an integrated transaction as to which each of the parties had knowledge, with the Latoc Loan to the Debtor being discussed and implemented only after the direct loan from Latoc to PermaLife was rejected, as detailed above and summarized below:

- The impetus for the loan in 2007 was Mr. Sergi's search for financing for <u>PermaLife</u> (rather than the Debtor) after the fire at its Arizona facility in September 2007.[130]

- The principal of the Debtor (Mr. Sergi) and Latoc (the Attars) had common interests in the PermaLife Entities.[131]

---

[128] Oct. 29, 2021 Latoc Resp., at 5, Dkt. No. 196.
[129] *See* Section IV *supra*.
[130] July 12, 2011 Sergi Aff. ¶ 11, P-25; Stipulated Facts ¶¶ 20-21, Dkt. No. 180.
[131] Stipulated Facts ¶ 29, Dkt. No. 180.

- At a PermaLife Board meeting (which R. Attar and possibly D. Attar had attended by telephone), the PermaLife Board refused to approve a loan from an Attar-affiliated entity, and Gemini refused to waive a restriction that prevented an insider from making a direct loan to PermaLife.[132]

- After the direct loan was rejected, Mr. Sergi approached D. Attar for a loan when they were vacationing in Italy.[133]

- Debtor, rather than PermaLife, obtained the loan from Latoc to "manage the conflict" that prevented PermaLife from borrowing directly from Latoc.[134]

- The Latoc Loan Proceeds were deposited into Debtor's account and then transferred immediately to the accounts of PermaLife and Piedmont.[135]

- When asked on direct examination what discussions he had with D. Attar about use of the proceeds, Mr. Sergi began to discuss PermaLife and his common interest in those entities with D. Attar:

  > I would say the discussions we had is I was going to do what I thought was right for the Mall and that I wanted it to go into things, including what I believed even -- there were certain restrictions in Permalife where we couldn't put money directly into Permalife. So Marty or Dibo, _we_ would have difficulty putting things into Permalife. Okay.

  > So the discussion I had with Dibo is, you know, _we_ have these things like we can't get to the Southeast, so I need a Southeast location to distribute and color rubber and by putting in this place called Piedmont, which was in North Carolina . . . .[136]

- When asked on cross-examination how he used the Loan Proceeds, Mr. Sergi recited a sequence of uses related to PermaLife and the rubber recycling entities.[137]  He concluded: "[I]f any portion of that loan was going to help PermaLife which just also happened to help the Mall, I would think

---

[132] June 3, 2014 Sergi Dep. Tr. 49:16-51:10, P-26.

[133] May 14, 2014 D. Attar Dep. Tr. 58:1-59:19, P-27.

[134] July 12, 2011 Sergi Aff. ¶ 12, P-25.

[135] July 12, 2011 Sergi Aff. ¶ 12, P-25.

[136] Aug. 26, 2021 Trial Tr. 25:17-26:2, Dkt. No. 183 (brackets and emphasis added).  In his next statements, Mr. Sergi appeared to equate the success of PermaLife with the continued viability of the Mall—even though those entities were in completely different lines of business with separate existences and different but affiliated management:  "I wanted to have [the rubber recycling business] work.  I believed that was a place that the Mall could have another life."  Aug. 26, 2021 Trial Tr. 26:9:15, Dkt. No. 183.  Clearly, the PermaLife Entities, including Piedmont and PLI, could and did have lives of their own without allegedly being owned by the Mall, whose only business up to that point was the leasing of commercial condominium units in New Jersey.  Stipulated Facts ¶¶ 2-3, Dkt. No. 180.

[137] Aug. 26, 2021 Trial Tr. 45:25-46:16, Dkt. No. 183.

Gemini and the whole crew [the PermaLife Board] would be very happy with that."[138]

In sum, as noted previously, this evidence -- including Mr. Sergi's testimony and Affidavit -- amply demonstrated that the Latoc Loan was made to the Debtor so that Latoc could do indirectly what it could not do directly -- make a loan to PermaLife.  Mr. Sergi even referred to himself and D. Attar as the "we" who "would have difficulty putting things into PermaLife."  The Court finds that the after-the-fact attempted explanations and rationalizations as to why the Loan was made by Latoc to the Debtor were just that: attempts to avoid the import and effect of the overwhelming facts and circumstances described above, including Mr. Sergi's sworn statements that demonstrated the true substance and purpose of the Latoc Loan transaction.  That purpose was to "manage the conflict" that prevented a direct loan from Latoc to the PermaLife Entities by using the Debtor as a mere conduit or pass-through to get the Latoc Loan Proceeds to PermaLife.

\* \* \*

For all these reasons, this Court finds and determines that the Trustee has met his burden of proving, by a preponderance of the evidence, that the Debtor did not receive reasonably equivalent value:  (i) for the $2 million Loan, which Debtor obtained for the benefit of the PermaLife Entities with the actual knowledge of Latoc's principals, D. Attar and R. Attar; or for (ii) Debtor's partial repayment of that Loan in the amount of $592,875.03 from the Debtor's own funds.  Accordingly, for these same reasons, and those set forth in this Court's April 4, 2019 Opinion, the Latoc Loan and the Pre-Petition Transfers are avoided as constructively fraudulent transfers under applicable bankruptcy law (11 U.S.C. § 548(a)(1)) and state fraudulent transfer law (N.J.S.A. §§ 25:2-25a(2) and 25:2-27a, as incorporated into 11 U.S.C. § 544(b)(1)).

---

[138] Aug. 26, 2021 Trial Tr. 46:24-47:2, Dkt. No. 183.

## VI.    INTEREST

The Trustee seeks prejudgment interest on the $592,875.03 loan repayment on the grounds that such interest is part of the "value" to be returned to the estate under 11 U.S.C. § 550(a) and related case law.[139]  Latoc objects on the grounds:  (i) that the relevant sections of the Bankruptcy Code do not address prejudgment interest; and (ii) that Latoc was repaid only a portion of the $2 million that it advanced and therefore enjoyed no "gain" from this transaction.[140]

While 28 U.S.C. § 1961(a) mandates the award of post-judgment interest, prejudgment interest may be awarded in an exercise of the Court's discretion.  *In re USN Commc'ns, Inc.*, 280 B.R. 573, 602 (Bankr. D. Del. 2002).  The Bankruptcy Court in *In re USN Commc'ns*, canvassing Circuit Courts, observed:

> most courts find that awarding prejudgment interest in an avoidance action furthers the congressional policies of the Bankruptcy Code by compensating the estate for the time it was without use of the transferred funds.

*In re USN Commc'ns*, 280 B.R. at 602 (awarding prejudgment interest from the filing date of the complaint in a preference action at the post-judgment rate set forth in 28 U.S.C. § 1961(a)).  Courts cite 11 U.S.C. § 550(a), which requires the return to the estate of "the value of such property" transferred and subsequently recovered in the avoidance action, as statutory authority for awarding prejudgment interest. *In re USN Commc'ns*, 280 B.R. at 603; *In re Art Shirt Ltd., Inc.*, 93 B.R. 333, 341 n.9 (E.D. Pa. 1988).

The Seventh Circuit in *In re Milwaukee Cheese Wisc., Inc.*, 112 F.3d 845, 849 (7th Cir. 1997) observed that the court's "[d]iscretion must be exercised according to law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so."  The Court in *In re Milwaukee* explained at length that the award of prejudgment interest in an avoidance action

---

[139] Trustee Conclusions of Law ¶¶ 179-81, Dkt. No. 191.
[140] Latoc Resp., at 12, Dkt. No. 196.

is not "punitive" or a matter of determining "who deserves the money more." *Id.* Instead, the

award is simply a matter of compensating the plaintiff for the lost time-value of money, and the

amount of prejudgment interest is not a defense to allowing it:

> Doubtless judges have discretion to exercise when deciding whether to award
> prejudgment interest—more discretion than they possess when deciding whether to
> avoid a preferential transfer. Discretion is not, however, authorization to decide
> who deserves the money more. <u>Discretion must be exercised according to law,
> which means that prejudgment interest should be awarded unless there is a sound
> reason not to do so.</u> The only reason appellants give why discretion should have
> been exercised in their favor is that the case has lasted a long time, so interest has
> mounted; an award now, they say, would be "punitive." This misunderstands why
> courts award prejudgment interest. Compensation deferred is compensation
> reduced by the time value of money. . . . That is why prejudgment interest is an
> ingredient of full compensation. It is also why an award, no matter how large,
> cannot be called "punitive": <u>defendants can invest the funds while the litigation
> proceeds, then use the interest they receive to satisfy the obligation.</u>
>
> <u>Delay is a reason to award interest, not to avoid interest</u>; the longer the case lasts,
> the more of the stakes the defendant keeps even if it loses (and the less the victorious
> plaintiff receives), unless interest is added.

*In re Milwaukee*, 112 F.3d at 849 (emphases supplied).

In the *Milwaukee* case, the Seventh Circuit upheld the award of prejudgment interest by

the Bankruptcy Court and District Court on a preference action that Chapter 11 Trustee prosecuted

against the employee-depositors in the debtor's irregular thrift-savings plan. *Id*. at 846-47.

Although the Seventh Circuit acknowledged that the appellant employee-defendants were

sympathetic and attributed the ten-year delay in the prosecution of the case in part to

procrastination by the lower courts, those observations did not disturb the Seventh Circuit's

decision to uphold a substantial award of prejudgment interest. *In re Milwaukee*, 112 F.3d at

846-47, 848-49. The Third Circuit in *In re Hechinger Inv. Co. of Del., Inc.*, 489 F.3d 568, 579-80

(3d Cir. 2007) cited the analyses of *In re Milwaukee*, *In re USN Commc'ns* and *In re Art Shirt* with

approval for both the statutory predicate in 11 U.S.C. § 550(a) for the award of prejudgment

interest and finding that "'prejudgment interest should be awarded unless there is a sound reason not to do so.'" *In re Hechinger*, 489 F.3d at 580, quoting *In re Milwaukee*, 112 F.3d at 849.

In line with these cases, the Trustee argues that, in the decade since the Trustee filed his Complaint, "Latoc has enjoyed the benefit of the funds [$592,875.03], and the ability to let the funds earn interest, invest them, and make profits from the funds."[141]  Because Latoc is in the business of lending money, the use of those funds over the extended prejudgment period was of particular benefit to it.  In its response, Latoc acknowledges the cases cited above (except for *In re Hechinger*) but argues that there is "reason" not to grant the Trustee prejudgment interest as Latoc did not receive the full return of its $2 million outlay ("[T]he court should look at how much money Latoc lost.  The repayment of the loan by the Mall in the amount of $600,000. was not a gain for Latoc by any means").[142]  The money that Latoc argues it "lost" on the transaction is not "good reason" to deny the Trustee prejudgment interest under applicable case law.  If it were, there would be few cases in which prejudgment interest would be awarded in avoidance actions.  For example, in most avoidance actions, in addition to being required to return the avoided payments, the defendant is often owed other sums that the debtor did not pay pre-petition.  In fact, there is an implicit acknowledgement of this common situation in 11 U.S.C. § 502(d), which is applicable here, and provides that a claim against the estate is disallowed until the recipient of an avoidable transfer has paid the avoidable amount to the estate.  11 U.S.C. § 502(d). Thus, this Court's contemporaneous decision to avoid the entire $2 million loan as constructively fraudulent (and to expunge Latoc's $1,828,123.67 residual proof of claim for the alleged balance due) further undermines Latoc's argument.

---

[141] Trustee Conclusions of Law ¶ 181, Dkt. No. 191.
[142] Latoc Resp., at 12, Dkt. No. 196.

The Courts in *In re USN Commc'ns*, 280 B.R. at 603, and in *In re Milwaukee*, 112 F.3d at 849, also observed that "gratuitous delay" by the party seeking the recovery may be grounds for limiting an award of interest to that party.  That has not been the case in this adversary proceeding, in which the Trustee has made numerous summary judgment motions, some of which were granted and others that were not, and the proceedings were extended as the result of discovery disputes and delays, some of which resulted in the imposition of discovery sanctions against Latoc.  Moreover, as noted above, Latoc has had the use of the now-avoided Pre-Petition Transfers for approximately ten years (since the filing of this Complaint), during which it was permitted to earn interest and otherwise invest those funds.  Accordingly, the Court will exercise its discretion in favor of awarding pre-judgment interest from July 30, 2012, the date the Trustee filed this Adversary Complaint, and post-judgment interest from and after the entry of the Judgment, with both interest components at the rate set forth in 28 U.S.C. § 1961(a), until the debt is fully paid.

## VII.    CONCLUSION

For all the foregoing reasons, the Court finds that the Debtor did not receive reasonably equivalent value for either:

(i)      the $2 million Loan extended from Latoc to the Debtor under the November 15, 2007 promissory note; or

(ii)     the $592,875.03 that Debtor paid to Latoc in partial repayment of the Loan.

For those same reasons, and those set forth in its April 4, 2019 Opinion, the Court therefore avoids as a constructively fraudulent transfer under both 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. §§ 544(b)(1), applying N.J.S.A. §§ 25:2-25a(2) and 25:2-27a:

(i)      the $2 million Loan from Latoc to the Debtor; and

(ii)     the $592,875.03 that the Debtor repaid to Latoc on account of the Loan.

Judgment will be entered in favor of the Trustee and against Latoc avoiding the Latoc Note and the Pre-Petition Transfers in the amount of $592,875.03, plus pre-judgment and post-judgment interest at the rate set forth in 28 U.S.C. § 1961 from July 30, 2012, the date the Trustee commenced this adversary proceeding.   The Pre-Petition Transfers, plus pre-judgment and post-judgment interest, may be recovered by the Trustee against Latoc for the benefit of the estate. Further, the Latoc Proof of Claim is disallowed unless and until the full judgment amount, including pre-judgment interest and post-judgment interest, is paid to the Trustee.   A separate Judgment will be entered in accordance with this Opinion.

Dated: April 29, 2022.

*Vincent F. Papalia*
VINCENT F. PAPALIA
United States Bankruptcy Judge

**Appendix On Next Page**

## Appendix of Relevant Federal and State Statutes

11 U.S.C. § 502.  Allowance of claims or interests.

(a)  A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

. . .

(d) Notwithstanding subsections (a) and (b) [claims allowance process] of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 544.  Trustee as lien creditor and as successor to certain creditors and purchasers.

(b)(1) Except as provided in paragraph (2) [concerning levying, unsatisfied creditor, not relevant here], the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 548.  Fraudulent transfers and obligations.

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

i

11 U.S.C. § 550.  Liability of transferee of avoided transfer.

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
(2) any immediate or mediate good faith transferee of such transferee.

N.J.S.A. § 25:2-25.  Transfer or obligation voidable as to present or future creditor.

a.  A transfer made or obligation incurred by a debtor is voidable to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(a)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(b)    Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

b.  A creditor making a claim for relief under subsection a. of this section has the burden of proving the elements of the claim for relief by a preponderance of the evidence.

N.J.S.A. § 25:2-27.  Transfer or obligation voidable as to present creditor.

a.  A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

b.  A transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

c.  Subject to subsection b. of R.S. 25:2-23, a creditor making a claim for relief under subsection a. or b. of this section has the burden of proving the elements of the claim for relief by a preponderance of the evidence.